UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARISOL ARROYO-CASTRO<br>Plaintiff,<br><br>vs.<br><br>ANTHONY GASPER, in his individual and official capacity; MARYELLEN MANNING, in her individual and official capacity; DARIO SOTO, in his individual and official capacity; and ANDREW MAZZEI, in his individual and official capacity,<br><br>Defendants. | Civil Action No.  3:25-cv-00153<br><br><br>**MEMORANDUM OF LAW SUPPORTING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................... i

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION................................................................................................... 1

BACKGROUND ..................................................................................................... 2

SUMMARY OF THE ARGUMENT ..................................................................... 12

ARGUMENT......................................................................................................... 14

   I.   Likelihood Of Success On The Merits............................................................ 14

      A.   Defendants Violated Ms. Castro's First Amendment Rights to Religious Free Exercise................................................................................................................ 15

          1.   *Defendants have burdened Ms. Castro's sincere religious exercise* ........................ 15

          2.   *Disciplining Ms. Castro for her religious exercise is neither neutral nor generally applicable*.................................................................................................... 17

          3.   *Justified only by a mistaken view of the Establishment Clause, Defendants' actions do not withstand strict scrutiny* ........................................................................... 18

      B.   Defendants Violated Connecticut's Act Concerning Religious Freedom ................... 21

      C.   Defendants Violated Ms. Castro's First Amendment Rights to Free Speech............... 22

          1.   *Ms. Castro expressed herself in her personal capacity* ............................................ 23

          2.   *Ms. Castro's symbolic expression was on a matter of public concern*.................... 25

          3.   *Ms. Castro's devotional expression may bypass the Pickering-Garcetti requirement that speech relate to a matter of public concern* ........................................... 29

      4.    *Defendants burdened Ms. Castro's speech without valid justification*.....................30

   D.   Defendants' Actions Contradict The First Amendment's History And Tradition........34

  II.   Irreparable Harm ........................................................................................36

  III.   Public Interest ...........................................................................................39

**CONCLUSION** ........................................................................................**40**

**CERTIFICATE OF SERVICE** .................................................................**42**

## **TABLE OF AUTHORITIES**

Page(s)

### **CASES**

*Agudath Israel of America v. Cuomo*, 983 F.3d 620 (2d Cir. 2020)......................14, 18, 37, 39, 40

*American Legion v. American Humanist Association*, 588 U.S. 29 (2019) ................................32

*Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011)...............................................29

*Bronx Household of Faith v. Board of Education of City of New York*,
    331 F.3d 342 (2d Cir. 2003)...............................................................32, 37

*Bronx Household of Faith v. Board of Education of City of New York*,
    650 F.3d 30 (2d Cir. 2011)......................................................................33

*Brown v. Polk County, Iowa*, 61 F.3d 650 (8th Cir. 1995) ........................................30

*Burwell v. Hobby Lobby Stores*, 573 U.S. 682 (2014)................................................16

*Cantwell v. Connecticut*, 310 U.S. 296 (1940) .......................................................15

*Capitol Square Review & Advisory Board v. Pinette*, 515 U.S. 753 (1995) ................................36

*Carson v. Makin*, 596 U.S. 767 (2022)..............................................................32

*Central Rabbinical Congress of U.S. & Canada v. New York City Department of*
    *Health & Mental Hygiene*, 763 F.3d 183 (2d Cir. 2014).............................................15, 18

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993) ........................................15

*City of San Diego v. Roe*, 543 U.S. 77 (2004) ..............................................27

*Connick v. Myers*, 461 U.S. 138 (1983)...........................................................25, 36

*Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*,
    96 F.4th 351 (2d Cir. 2024) ......................................................................12

*Daniels v. City of Arlington*, 246 F.3d 500 (5th Cir. 2001) ........................................26

*Draper v. Logan County Public Library*,
    403 F. Supp. 2d 608 (W.D. Ky. 2005)......................................23, 26, 27, 29, 30

*Elrod v. Burns*, 427 U.S. 347 (1976) ..............................................................2, 37

*Engel v. Vitale*, 370 U.S. 421 (1962) ............................................................36

*Fulton v. City of Philadephia*, 593 U.S. 522 (2021) ...............................................18

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ............................................................22, 24

*Gitlow v. New York*, 268 U.S. 652 (1925) .............................................................22

*Good News Club v. Milford Central School*, 533 U.S. 98 (2001) ...........................32, 33

*Huth v. Haslun*, 598 F.3d 70 (2d Cir. 2010) .........................................................25

*IMS Health Inc. v. Sorrell*, 630 F.3d 263 (2d Cir. 2010)........................................22

*Jackler v. Byrne*, 658 F.3d 225 (2d Cir. 2011) ....................................................24

*Johnson v. Poway Unified School District*, 658 F.3d 954 (9th Cir. 2011) ..............22, 25

*Kane v. De Blasio*, 19 F.4th 152 (2d Cir. 2021) ..................................................38, 39

*Kennedy v. Bremerton School District*,
   597 U.S. 507 (2022)................................1, 15, 16, 18, 19, 20, 22, 23, 27, 29, 30, 31, 32, 40

*Knights of Columbus Council 2616 v. Fairfield*, No. 3:22-cv-1579,
   2024 WL 3900102 (D. Conn. Aug. 22, 2024) .................................................22

*Lane v. Franks*, 573 U.S. 228 (2014)................................................................24, 25

*Moscowitz v. Brown*, 850 F. Supp. 1185 (S.D.N.Y. 1994)........................................27

*National Treasury Employees Union v. United States*,
   990 F.2d 1271 (D.C. Cir. 1993)......................................................................25

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022)........................34, 36

*New Yorkers for Religious Liberty, Inc. v. New York*, 125 F.4th 319 (2d Cir. 2024)...................37

*Nichol v. ARIN Intermediate Unit 28*, 268 F. Supp. 2d 536 (W.D. Pa. 2003)............25, 26, 28, 29

*Paulsen v. County of Nassau*, 925 F.2d 65 (2d Cir. 1991) ........................................2, 37

*Pickering v. Board of Education of Township High School District 205,
   Will County*, 391 U.S. 563 (1968)....................................................................22

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14 (2020)....................................36, 39

*Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819 (1995) .....................32

*Sanguigni v. Pittsburgh Board of Public Education*, 968 F.2d 393 (3d Cir. 1992)......................25

*Shurtleff v. City of Boston*, 596 U.S. 243 (2022) ...............................................32, 33, 34

*Singer v. Ferro*, 711 F.3d 334 (2d Cir. 2013)....................................................25, 27, 28

*Singh v. City of New York*, 524 F.3d 361 (2d Cir. 2008) ................................................25

*Skoros v. City of New York*, 437 F.3d 1 (2d Cir. 2006) ..........................................15, 31

*Snyder v. Phelps*, 562 U.S. 443 (2011) ...........................................................................29

*Sousa v. Roque*, 578 F.3d 164 (2d Cir. 2009) ................................................................25

*Specht v. City of New York*, 15 F.4th 594 (2d Cir. 2021)...............................................29

*Tandon v. Newsom*, 593 U.S. 61 (2021) .........................................................................37

*Texas v. Johnson*, 491 U.S. 397 (1989) ..........................................................................23

*Thomas v. Review Board of Independent Employment Security Division*,
    450 U.S. 707 (1981)....................................................................................................17

*Tinker v. Des Moines Independent Community School District*,
    393 U.S. 503 (1969)....................................................................................................22

*Trinity Christian School v. Commission on Human Rights & Opportunities*,
    189 A.3d 79 (Conn. 2018) ..........................................................................................21

*Tucker v. State of California Department of Education*,
    97 F.3d 1204 (9th Cir. 1996) ................................................................................25, 26

*Van Orden v. Perry*, 545 U.S. 677 (2005) ......................................................................32

*Vidal v. Elster*, 602 U.S. 286 (2024)...............................................................................34

*Weintraub v. Board of Education of City of New York*,
    593 F.3d 196 (2d Cir. 2010)........................................................................................24

*West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943)..............2, 36

*West v. Atkins*, 487 U.S. 42 (1988) ..................................................................................14

*Wisconsin v. Yoder*, 406 U.S. 205 (1972) .......................................................................36

*Wood v. Florida Department of Education*, 729 F. Supp. 3d 1255 (N.D. Fla. 2024)....28

## STATUTES, RULES, AND REGULATIONS

42 U.S.C. § 1983.................................................................................................................14

Conn. Gen. Stat. § 1-210...................................................................................................11

Conn. Gen. Stat. § 10-151c...............................................................................................11

An Act Concerning Religious Freedom, Conn. Gen. Stat. § 52-571b........................10, 12, 21, 22

Conn. Code of 1650 ....................................................................................................................35

Northwest Territory Ordinance, art. 1, 3 (July 13, 1787) ...........................................................35

U.S. Const. amend. I ............................................................................................................15, 22

U.S. Const. amend. XIV .......................................................................................................15, 22

## OTHER AUTHORITIES

11A Charles Allen Wright & Arthur R. Miller, Federal Practice & Procedure
§ 2948.1 (3d ed. 2020) ...........................................................................................................37

Adrienne Fulco, *Under the Radar: Connecticut's First-in-the-Nation State
Religious Freedom Law*, 50 Conn. L. Rev. 927 (2018) ....................................................21

*Board Policy Statement 2120.00—Assignment and Organization of Personnel*,
Cons. Sch. Dist. of New Britain.............................................................................................3

David Komline, *The Common School Awakening* (Oxford U. Press 2020) ..................................35

*District Profile and Performance Report for School Year* 2022-23,
Conn. State Dep't of Educ. (2023)) ...................................................................................3

*Guidance on Constitutionally Protected Prayer and Religious Expression in
Public Elementary and Secondary Schools*, U.S. Dep't of Educ. (2023)........................10

Michael W. McConnell, *Establishment and Disestablishment at the Founding,
Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105 (2003) .................35, 36

Philip Gorski, *American Covenant: A History of Civil Religion from the Puritans
to the Present* (2017)..........................................................................................................28

## **INTRODUCTION**

Marisol Arroyo-Castro is a public school educator with over thirty years of experience. She is also a devout Catholic.  For the past decade, as an expression of her religious faith, Ms. Castro has hung a small crucifix in her personal workspace immediately beside her classroom desk.  Other teachers also display personal items in their workspaces: family and pet photos; inspirational quotes; and even team pennants, action figures, and pop art.  These personal items make teachers' challenging workdays a bit brighter and humanize educators to their students.

But in December 2024, Defendants claimed for the first time that the crucifix's placement violated the Establishment Clause and ordered Ms. Castro to remove it.  When she declined to do so, Defendants punished her.  Defendants suspended Ms. Castro without pay, placed her on administrative leave for several months, and involuntarily reassigned her to a non-classroom position.  This all took place because, Defendants contended, the crucifix's placement made the school appear to endorse religion.

Fewer than three years ago, however, the Supreme Court expressly rejected the "endorsement" test upon which the Defendants rely.  *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 532-536 (2022).  In *Kennedy*, the Supreme Court made clear that school officials cannot use a mistaken understanding of the Establishment Clause to abridge the free speech and free exercise rights of school employees.  *Id*.  And in holding that a public school football coach could pray at the fifty-yard line after games, the Court rejected the notion—supposedly rooted in the Establishment Clause—that a public school employee's personal religious expression must be banished from public school grounds.  *Id*.  Instead, the Court said that the Constitution and our traditions counseled "mutual respect and tolerance, not censorship and suppression, for religious and nonreligious views alike."  *Id.* at 514.

Ms. Castro seeks only to return to what she has done for thirty years: to serve the children of New Britain, Connecticut without silencing her religious expression. By demanding she choose otherwise, Defendants fail to appreciate that the First Amendment's protections for expression and worship are "fixed star[s]" in the constitutional firmament. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). This ongoing loss of religious and expressive freedoms "unquestionably constitutes irreparable injury" to Ms. Castro. *Paulsen v. Cnty. of Nassau*, 925 F.2d 65, 68 (2d Cir. 1991) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)). Furthermore, disciplining her for passively displaying her religious identity frustrates tolerance and diversity in the classroom and discourages those of faith from joining a beleaguered profession. Now, only this Court can vindicate Ms. Castro's rights under both the First Amendment and Connecticut's Act Concerning Religious Freedom.

## **BACKGROUND**

Plaintiff Marisol Arroyo-Castro is a tenured teacher employed by the Consolidated School District of New Britain (the "District"). Castro Decl. ¶ 4. She holds a Master's Degree in Elementary Education from Central Connecticut State University, with thirty hours of additional credits towards a Ph.D. in Counseling Psychology from Walden University. *Id.* ¶ 5. She is also a certified Master Teacher and has mentored student-teachers throughout the area for over ten years. *Id.* ¶ 6. As part of Ms. Castro's employment with the District, she has taught various ages and grades at DiLoreto Elementary & Middle School ("DiLoreto"). *Id.* ¶ 7. She has experience teaching 6th and 7th grades, but since 2004 she has mostly taught 3rd and 4th grades. *Id.*

According to her June 2024 evaluation, Ms. Castro is a teacher who "holds [her class] to high expectations" and whose students "showed growth." *Id.* ¶ 8. As a result, she has regularly received "proficient" or "exemplary" evaluations. *Id.* She is known for running a tight ship in her

classroom. *Id.* ¶ 9. This skill is necessary in a school district with significant academic and behavioral challenges among its students, which arise from serving an economically disadvantaged population and from the lingering learning-related impacts of the COVID-19 pandemic. *Id.*[1] Ms. Castro prioritizes students following rules in her classroom because she loves her students and wants them to succeed. *Id.* In her experience, students cannot learn to their best potential unless their classes are safe and well-organized. *Id.*

Defendants are officials of the Consolidated School District of New Britain with authority over Ms. Castro's employment and assignments. *Id.* ¶ 10. Defendant Anthony Gasper is Superintendent and CEO of the District, has unilateral authority over District personnel assignments and suspensions, and can commence termination proceedings against tenured teachers. *Id.* ¶ 11.[2] Defendant Maryellen Manning is Chief of Staff for Relationships and Accountability for the District and is Mr. Gasper's chief subordinate in personnel matters. *Id.* ¶ 12. Defendant Dario Soto is principal of DiLoreto Elementary & Middle School. *Id.* ¶ 13. The 2024-2025 school year was his third year at DiLoreto and Ms. Castro's third year working for him. *Id.* Finally, Defendant Andrew Mazzei is the newly installed vice principal of the middle school program at DiLoreto. *Id.* ¶ 14. He is Ms. Castro's immediate supervisor. *Id.*

In the summer of 2024, Defendant Soto reassigned Ms. Castro to teach 7th grade social studies after many years of mostly teaching 3rd and 4th grade classes. *Id.* ¶ 15. Despite Ms. Castro's preference to continue teaching at the elementary level, Mr. Soto told Ms. Castro that her abilities as a "strong" educator were needed because of a behaviorally challenged middle school

---

[1] Connecticut State Department of Education 2022-2023 statistics reflect that the Consolidated School District of New Britain's district-wide chronic absenteeism and suspension/expulsion rates exceed the state-wide rate. *See* Martens Decl. Ex. A. They further reflect that District Performance Indexes for English Language Arts, Math, and Science are at 46.4, 39.9, and 43.1 respectively, compared to the respective statewide indexes of 63.9, 59.7, and 61.6. *Id.*
[2] *See* Martens Decl. Ex. B; Conn. Gen. Stat. §§ 10-151(d); § 10-157(a).

student population and a shortage of qualified 7th grade teachers.  *Id.*  Accordingly, Ms. Castro began reporting to Mr. Mazzei and moved classrooms.  *Id.*

Moving classrooms also meant moving Ms. Castro's personal items.  *Id.* ¶ 16.  Most teachers at DiLoreto display personal expressive items on or near their desks, and Ms. Castro is no different.  *Id.*  Among Ms. Castro's personal items is a small crucifix that she has hung near her desk for the past ten years.  *Id.*  Besides her crucifix, Ms. Castro also displayed a New York Yankees team pennant and (around the holidays) a Christmas tree.  *Id.* ¶ 17.

In Ms. Castro's experience, personal expressive items—like university or sports pennants, family photos, inspirational quotes, or art—make the classroom environment more conducive to learning.  *Id.* ¶ 18.  The experience of remote learning during the COVID-19 pandemic impressed upon Ms. Castro the importance of students interacting with their teachers as human beings.  *Id.* Personal expressive items promote this goal by humanizing teachers to their students.  *Id.*

Crucifixes have long been a part of Ms. Castro's religious and personal identity.  *Id.* ¶ 19. Ms. Castro's grandmother taught her the importance of the crucifix.  *Id.*  Ms. Castro's grandmother had a crucifix in nearly every room of the house and taught Ms. Castro how important it was to treat the crucifix with respect.  *Id.*  She taught Ms. Castro to never put anything on top of the crucifix, and Ms. Castro taught her children and grandchildren the same.  *Id.*  In Ms. Castro's house, she has a crucifix in the entrance of the house, in the kitchen, and beside her bed.  *Id.* Additionally, she always wears a cross necklace.  *Id.*  Ms. Castro believes that once a crucifix has been blessed, it protects her.  *Id.*

The specific crucifix here has personal significance to Ms. Castro as well.  *Id.* ¶ 20.  The crucifix belonged to a late friend of Ms. Castro's whose family gave it to her because, as a practicing Catholic, she was particularly likely to treasure it.  *Id.*  During the school day, looking

at the crucifix has provided Ms. Castro with peace and strength, especially when the task of teaching students was particularly challenging.  *Id.*  During her lunch breaks, rather than going to the teachers' lounge, Ms. Castro would remain at her desk, look at the crucifix, and pray.  *Id.*  The crucifix reminds Ms. Castro of her grandmother, helps her pray silently in her personal time, and expresses her identity as a Christian.  *Id.* ¶ 21.

In August 2024, Ms. Castro hung the crucifix to the side of her desk at about waist height, at the very bottom of an adjacent whiteboard.



*Id.* ¶ 22; *see also* Castro Decl. Ex. A.  The crucifix was below the level of a nearby computer monitor, in a location vis-à-vis her desk that is similar to where other teachers display their personal items.  Castro Decl. ¶ 23.  The crucifix was hung in a similar location to where she placed it in prior years in other classrooms.  *Id.*

The vast majority of teachers at DiLoreto keep personal expressive items on or near their desks.  *Id.* ¶ 25.  Some items include:

- photos of family and pets;[3]

---

[3]  *See* Castro Decl. Exs. B.1, B.5-7.

MEMORANDUM OF LAW - ORAL ARGUMENTS REQUESTED

5

- inspirational phrases, such as "Yes you can!," "You are loved," "Keep calm and call Wonder Woman," and "Every Day Matters!";[4]
- a miniature picture of the Mona Lisa;[5]
- a Connecticut State University decal;[6]
- a New England Patriots football team pennant;[7]
- action figures and images of Wonder Woman;[8]
- a desk mat with images of Baby Yoda;[9] and
- items with religious origins or connotations, such as a picture of Santa Claus,[10] a coffee mug with a citation to chapter 31 of the biblical book of Proverbs,[11] a photograph of a statue of the Virgin Mary,[12] and a Christmas tree.[13]

*Id*. ¶ 25.

On December 3, 2024, Mr. Mazzei, in his capacity as vice principal, emailed Ms. Castro asking to have a discussion because of a "concern" regarding the crucifix:

> I wanted to reach out to discuss a concern that has been brought to my attention regarding a cross displayed in your classroom. Please know that this meeting is non-disciplinary in nature and is intended to review district policies to ensure clarity and consistency.

*Id*. ¶ 27.  The two met on Friday, December 6, and Mr. Mazzei told Ms. Castro that the First Amendment prohibited "any displays of religious symbols" in a public school.  *Id.* ¶ 28.  He ordered Ms. Castro to take down the crucifix by the following Monday.  *Id.*  Mr. Mazzei confirmed this directive with a follow-up email and warned that not taking down the crucifix "would lead to insubordination and disciplinary measures."  *Id.*  The email said:

---

[4]   *See* Castro Decl. Exs. B.1-2, B.5, B.8.
[5]   *See* Castro Decl. Ex. B.3.
[6]   *See* Castro Decl. Ex. B.4.
[7]   *See* Castro Decl. Ex. B.4.
[8]   *See* Castro Decl. Ex. B.1.
[9]   *See* Castro Decl. Ex. B.2.
[10]  *See* Castro Decl. Ex. B.5.
[11] *See* Castro Decl. Ex. B.7.
[12]  *See* Castro Decl. Ex. B.6.
[13] *See* Castro Decl. Ex. B.9.

Thank you for taking the time to meet with me today from 2:18-2:35, in a nondisciplinary meeting involving the permanent display of a religious symbol. During the meeting,… I shared that any permanent displays of religious symbols are prohibited from public schools, based on the First Amendment of the United States Constitution. I shared the cross you have displayed in your classroom behind your desk must be taken down by Monday. You inquired if you could "think about it or pray on it," which I replied that you could, however, it would not change the outcome of the meeting. Your next question was, "what if I don't take it down?" I replied that it would lead to insubordination and disciplinary measures. I understand that the conversation and situation is difficult and I thank you in advance for complying with the expectation to remove the permanent religious display as public schools may not erect any type of religious display on school property. I will stop by your room on Monday at 8:00 am to observe if the cross is still displayed.

*Id.* ¶ 28. Ms. Castro did not take down the crucifix. *Id.* ¶ 29. Although she did not want to be considered insubordinate, she could not bring herself to take it down. *Id.*

On Tuesday, December 10, Ms. Castro met with Mr. Mazzei, Mr. Soto, Ms. Manning, and a union representative. *Id.* ¶ 30. Ms. Manning told Ms. Castro that, as a public school employee, she was required to avoid the "perception of promoting a particular religion." *Id.* She ordered Ms. Castro to remove the crucifix from beside her desk, saying that a religious item could not be hung on the walls of public school buildings. *Id.* Even though Ms. Castro pointed out that other teachers kept their personal items in similar places, Ms. Manning refused to change her order. *Id.* Ms. Manning went on to suggest that Ms. Castro put the crucifix in a desk drawer, only to be pulled out when Ms. Castro wished to "ground herself." *Id.* Mr. Soto pressured Ms. Castro to remove the crucifix from the wall by stating his own religious opinion that Christians are to worship no "idols." *Id.* He then asked if Ms. Castro wanted to stay "true" to that as a Christian. *Id.*

To accommodate her colleagues' wishes and avoid further trouble, Ms. Castro agreed to a compromise. *Id.* ¶ 31. Despite the crucifix already being obstructed from most students' view by a computer monitor and other items, Ms. Castro would re-hang the crucifix on her desk where it would be less visible to students, but where she could still see it. *Id.* All the meeting attendees

then walked to Ms. Castro's classroom, where Ms. Castro expected the others to propose a reasonable alternative location on her desk to attach the crucifix. *Id.*

But Ms. Castro was surprised and offended when Ms. Manning told her to attach the crucifix to the side of the kneehole of her desk, by her legs. *Id.* ¶ 32; Castro Decl. Ex. C. She was offended because no other teacher was required to move something so personally significant below their desk and by their feet just to keep it out of view. Castro Decl. ¶ 32. Ms. Castro felt that the kneehole of the desk would be demeaning for a family photo, let alone the crucifix. *Id.*

Ms. Castro's feelings were hurt, but she tried to do as she was told by Ms. Manning. *Id.* ¶ 33. As soon as she put her hand on the crucifix to move it, however, she felt sick to her stomach. *Id.* She felt so bad that she almost collapsed. *Id.* Although she tries not to cry in front of others, she broke down and began sobbing. *Id.* The other attendees left Ms. Castro crying only minutes before a scheduled parent-teacher conference. *Id.*

Ms. Castro left the crucifix under the desk that night and prayed about what to do. *Id.* ¶ 35. The next morning, Wednesday, December 11, Ms. Castro returned the crucifix to its place next to her desk. *Id.* She did so out of personal conscience and religious conviction that to do otherwise would be an affront to her faith. *Id.* Ms. Castro informed Defendants of her decision. *Id.*

That same day, Ms. Manning issued a Letter of Reprimand to Ms. Castro stating that her actions were "insubordinate." *Id.* ¶ 36. The letter stated Defendants' policy that:

> [S]chools should remain neutral when speaking of religion, so as to not have a perception of *endorsing* a particular religion…. Because public schools are run by the government, this means that public schools are not allowed, legally, to take any actions that would be seen as establishing or promoting a religion…. So, by hanging this on the classroom wall, you are, in effect, saying that "the New Britain Board of Education *endorses* this religion."

*Id.* (emphasis added); Castro Decl. Ex. D. The letter also told Ms. Castro that Mr. Soto would come into her class at the end of the day to "assist [Ms. Castro] with removing the cross from [her]

classroom." Castro Decl. ¶ 37.  Ms. Manning cc'd Mr. Gasper, Mr. Soto, and Mr. Mazzei, among

others.  *Id.*  Ms. Manning designated the letter to be included in Ms. Castro's disciplinary file.  *Id.*

When Mr. Soto came into her class, Ms. Castro told him that she would not remove the

cross.  *Id.* ¶ 39.  Again resorting to religious refrains, Mr. Soto stated that she must remove the

cross to properly "live out [her] faith" and exhorted her to "give Caesar what is Caesar's."[14]  *Id.*

Mr. Soto then instructed her that if she did not take down the cross, the next morning she should

come directly to his office.  *Id.*  He added that Ms. Castro could face suspension and eventually

termination for being insubordinate.  *Id.*  The crucifix remained on the wall when Ms. Castro left

her classroom that evening.  *Id.*

On Thursday, December 12, Ms. Castro arrived at school and paused in her classroom to

pick up some personal items.  *Id.* ¶ 41.  She noticed the crucifix had been removed.  *Id.*  Ms. Castro

then attended another meeting in the principal's office with Ms. Manning, Mr. Soto, and Mr.

Mazzei.  *Id.*  At that meeting, Ms. Manning told Ms. Castro that a few days without pay would

help her better "reflect" on whether it was in her "best interest" to keep hanging the crucifix on the

wall.  *Id.*  Ms. Manning then suspended Ms. Castro for two days without pay.  *Id.*  Ms. Castro was

sent home with her crucifix in a box.  *Id.*

That same day, Ms. Manning issued a written Notice of Suspension to Ms. Castro.  *Id.* ¶ 43.

The Notice reiterated that Ms. Castro's actions were "insubordinate" and further stated

Defendants' policy that:

> When a public school employee hangs a religious artifact in their classroom, it
> sends the message that the school district (which is an arm of the government) is
> promoting that religion, so putting that religious artifact on the wall of the school
> building is not legally permissible.

---

[14] *Mark* 12:17.

*Id.*; Castro Decl. Ex. E. The Notice stated Ms. Castro could return to work on Monday, December 16, only if she agreed to remove the crucifix from its location on the wall next to her desk. Castro Decl. ¶ 44. Ms. Manning cc'd Mr. Gasper, Mr. Soto, and Mr. Mazzei, among others, on the Notice. *Id*. Ms. Manning designated the Notice to be included in Ms. Castro's disciplinary file. *Id*.

On Monday, December 16, Ms. Castro emailed Defendants, stating that she could not in good conscience conceal the crucifix. *Id*. ¶ 35. She told Defendants that:

> For me to take my crucifix down and put it under my desk made me feel like, instead of letting my light shine as Jesus told me to do, I was putting it under a bushel. I had to put it back up.

*Id*. (citing *Matthew* 5:15). In defending her actions, Ms. Castro specifically cited the Supreme Court's recent decision in *Kennedy*, which rejected the "endorsement" test on which the District had relied in disciplining Ms. Castro.[15] *Id*. That same day, Ms. Castro was placed on indefinite paid administrative leave. *Id*. ¶ 48. On or before December 20th, an unknown employee of the District communicated, through Ms. Castro's union representative, that one of Ms. Castro's "options" was to resign (or retire early) and sign an agreement not to sue the District. *Id.* ¶ 49.

On January 24, 2025, over a month into her leave, Ms. Castro attended a videoconference with Mr. Gasper and Ms. Manning. *Id*. ¶ 50. Seven times, Mr. Gasper asked Ms. Castro whether she would continue refusing to remove or relocate the crucifix to a hidden place in her classroom completely out of view of students—for example, in a drawer or in her pocket. *Id*. Ms. Castro confirmed through counsel that she would not agree to removing or relocating the crucifix within

---

[15] Ms. Castro also noted for Defendants that Connecticut state law, specifically its Act Concerning Religious Freedom, protected her religious exercise. *Id.* ¶ 35 (citing Conn. Gen. Stat. § 52-571b(a)–(b), (f)). Ms. Castro also cited 2023 guidance from the Department of Education, which states:

> In contexts where a school permits teachers, coaches, and other employees to engage in personal speech … it may not prohibit those employees from engaging in prayer [or other personal expression] merely because it is religious or because some observers, including students, might misperceive the school as endorsing that expression.

Castro Decl. ¶ 47; *see also* Martens Decl. Exhibit C.

the classroom so long as other teachers were permitted to keep personal expressive items in similar locations as where she had the crucifix before. *Id.* Expressly based on her responses, Mr. Gasper confirmed the imposition of administrative leave. *Id.* At no point in Ms. Castro's discussions with Defendants about her suspension or placement on administrative leave did they ever mention a motivation for these decisions other than concerns over the crucifix hanging by her desk. *Id.*

Ms. Castro filed this lawsuit on January 30, 2025. Castro Decl. ¶ 51; Dkt. 1. In response, an unknown individual with the District improperly released confidential teacher evaluation and performance information concerning Ms. Castro to the media.[16] Castro Decl. ¶ 52. As of January 30, her school email address was de-activated. *Id.* ¶ 53. Then, on March 6, 2025, Defendants met with Ms. Castro to advise her that she was being "involuntarily" reassigned to a "curriculum information" non-teaching role because of "concerns about [her] instructional pedagogy and [her] personal beliefs that we need to look into." *Id.* ¶ 54.

Both before and during this lawsuit, Mr. Mazzei, Mr. Soto, Ms. Manning, and Mr. Gasper each threatened, participated in, or authorized disciplinary action against Ms. Castro unless she agreed to remove the crucifix. *Id.* ¶ 55. At each instance (until March 6), Defendants exclusively justified their conduct against her by citing the now-defunct "endorsement" test. *Id.* Defendants have not similarly disciplined, threatened, or retaliated against other DiLoreto teachers for their expression or displays of personal identity. *Id.*

Because of the ongoing discipline, threats of termination, deactivation of email, release of confidential files, involuntary reassignment, and pressure to resign or retire, Defendants made Ms.

---

[16] The notes were purportedly released pursuant to Connecticut's Freedom of Information statute. Conn. Gen. Stat. § 1-210. The records include evaluations of Ms. Castro's teaching performance from August 2024 through the present, appear to be written from the perspective of Mr. Mazzei, and generally reflect Mr. Mazzei's intake of parent and student complaints as well as his efforts to coach Ms. Castro as to her teaching style. Section 10-151c prohibits disclosure of "records of teacher performance and evaluation" without the teacher's knowledge and consent. Conn. Gen. Stat. § 10-151c.

Castro's choices clear: she can keep her job as a teacher, or she can display her crucifix in her personal space; but she cannot do both. *Id*. ¶ 56.

Following her recent involuntary reassignment, Ms. Castro seeks to restore the status quo ante as it existed when she received Vice Principal Mazzei's first email about her crucifix on December 3, 2024. *See Daileader v. Certain Underwriters at Lloyds London Syndicate* 1861, 96 F.4th 351, 356 (2d Cir. 2024) ("[T]he 'status quo ante' [is] 'the last actual, peaceable, uncontested status which preceded the pending controversy.'"). She now moves this Court to enjoin Defendants from suspending or removing her from the classroom teaching position she held as of December 3, 2024, and to enjoin Defendants from punishing her under a policy that precludes her from displaying her crucifix in her personal workspace.

## SUMMARY OF THE ARGUMENT

Ms. Castro is entitled to a preliminary injunction under the Second Circuit's three-part test for such relief. **First**, she can demonstrate a likelihood of success on the merits. In violation of both the federal Constitution and Connecticut state law, and in contradiction to recent Supreme Court precedent, Ms. Castro was suspended without pay, placed on leave for several months, and involuntarily reassigned to a non-classroom position for displaying a crucifix in her personal work area. Pursuant to the First Amendment's Free Exercise Clause, acts by school officials that burden a teacher's religious exercise must satisfy strict scrutiny unless the acts are both neutral and generally applicable. Meanwhile, Connecticut's Act Concerning Religious Freedom requires school officials to overcome strict scrutiny for *any* burden on a teacher's religious practice. Defendants' acts here were neither neutral nor generally applicable—Defendants did not apply a general policy regarding teachers' personal expression, but instead targeted Ms. Castro's religious expression. So under both the federal Constitution and Connecticut statute, strict scrutiny applies.

Defendants have not shown a compelling state interest and thus fail strict scrutiny.  Their only stated justification for disciplining Ms. Castro was a concern that allowing the crucifix to remain in place would violate the Establishment Clause because the crucifix would purportedly make it appear as if the school endorsed religion.  But as explained by the Supreme Court in *Kennedy*, school officials may not rely on an outdated interpretation of the Establishment Clause— the so-called "endorsement test"—to suppress the visible religious expression of their employees. Therefore, Defendants' stated reason for disciplining Ms. Castro is not even a constitutionally valid one, much less a compelling state interest.

Furthermore, the First Amendment's Free Speech Clause restricts when and how public school employers can discipline teachers for their speech.  Under the two-step *Pickering-Garcetti* framework, a government employer cannot discipline an employee for her speech (1) if the speech both is personal (*i.e.*, non-governmental) and relates to matters of public concern, and (2) if the speaker's interests outweigh the government employer's interests.  At step one, Ms. Castro's speech was undoubtedly personal, and numerous courts have held that personal religious expression is related to matters of public concern.  Alternatively, religious expression engenders unique constitutional concerns that may automatically entitle the speaker to interest balancing, even without an express finding that the speech related to matters of public concern.  In either event, Ms. Castro's religious expression is entitled to a balancing of interests.  And at step two, *Kennedy* tips the scales in Ms. Castro's favor: Defendants' mistaken view of the Establishment Clause (based on the overruled endorsement test) cannot outweigh Ms. Castro's right to her religious speech, and Defendants' viewpoint discrimination against religious speech is impermissible in its own right.  Furthermore, their actions are contrary to our nation's history and tradition of permitting public educators to engage in personal religious expression.  Thus, under

any framework, Defendants' actions violate the Free Exercise and Free Speech Clauses, as well as Connecticut's Act Concerning Religious Freedom.

**Second**, Ms. Castro will face irreparable harm absent preliminary injunctive relief.  Indeed, the ongoing and various measures to keep Ms. Castro from her classroom continues to irreparably harm her.  Under binding circuit precedent, the ongoing deprivation of First Amendment rights is *per se* "irreparable harm" that justifies preliminary injunctive relief.  Furthermore, Ms. Castro is near the end of a thirty-year career as a teacher; each day she cannot teach students is a day of dignity and service to her community lost forever, non-compensable by money damages.

**Third**, a preliminary injunction would serve the public interest.  Permitting a flagrant violation of Ms. Castro's constitutional rights is decidedly against the public interest.  While that constitutional violation alone should suffice, a preliminary injunction would further serve the public interest by returning a veteran educator to serving those students who are in need of experienced teachers.

## ARGUMENT

Where, as here, a party moves to preliminarily enjoin government action, the movant must establish (1) "a likelihood of success on the merits," (2) "irreparable harm absent injunctive relief," and (3) "public interest weighing in favor of granting the injunction."  *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020).  All factors here favor Ms. Castro.

### I.    Likelihood Of Success On The Merits

Ms. Castro is likely to succeed on the merits of both her Free Exercise and Free Speech claims against Defendants who, acting under color of state law,[17] have violated and continue to violate Ms. Castro's federal constitutional rights, rendering them liable under 42 U.S.C. § 1983.

---

[17] As officials of Connecticut's public school system wielding their authority, Defendants are all state actors.  *West v. Atkins*, 487 U.S. 42, 50 (1988).

Just a few years ago, the Supreme Court confirmed that "the First Amendment doubly protects religious speech." *Kennedy*, 597 U.S. at 523. "Where the Free Exercise Clause protects religious exercises, whether communicative or not, the Free Speech Clause provides overlapping protection for expressive religious activities." *Id.* By removing Ms. Castro from her teaching position because of her religious expression, Defendants have violated Ms. Castro's rights under both the First Amendment's Free Exercise Clause and its Free Speech Clause. Additionally, they have violated Connecticut's Act Concerning Religious Freedom.

### A. Defendants Violated Ms. Castro's First Amendment Rights To Religious Free Exercise

The Free Exercise Clause declares that "Congress shall make no law … prohibiting the free exercise" of religion. U.S. Const. amend. I. Via the Fourteenth Amendment, this command also applies to state actors, including public school administrators such as Defendants. *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940); *Skoros v. City of New York*, 437 F.3d 1, 4 (2d Cir. 2006). When state actors burden a person's sincere religious practice in a way that is neither neutral nor generally applicable, the state actors have violated that person's rights under the Free Exercise Clause unless they demonstrate that their action burdening religion was narrowly tailored to pursue a compelling government interest. *See Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 531-532 (1993); *Cent. Rabbinical Cong. of U.S. & Can. v. N.Y. City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 193 (2d Cir. 2014).

#### 1. Defendants have burdened Ms. Castro's sincere religious exercise

By demanding that Ms. Castro remove the crucifix from the wall around her workspace, and by punishing her for refusing to do so, Defendants have burdened Ms. Castro's sincere religious exercise in at least two respects.

First, and most simply, Defendants burdened Ms. Castro's religious exercise by removing her from her classroom to punish her religious expression and to incentivize her to abandon it.  As Ms. Manning said from the beginning, the point of Ms. Castro's initial suspension was to force her to "reflect" on whether it was in her "best interest" to keep hanging the crucifix on the wall.  Castro Decl. ¶ 42.  Since then, Defendants have reaffirmed that Ms. Castro's initial suspension, months-long leave, and involuntary reassignment were direct responses to her insistence on her right to personal religious expression.  *Id.* ¶¶ 28, 30, 36, 43, 50, 55-56; *see also* Castro Decl. Exs. D, E.  Suspending, demoting, or otherwise altering the terms of an employee's employment due to her religious exercise is a quintessential burden.  *See Kennedy*, 597 U.S. at 525.

Second, Ms. Castro's free exercise of her religion has been burdened by Defendants' demand that she act contrary to her religious conviction.  Defendants continue to insist that Ms. Castro conceal her crucifix and thereby her religious identity.  Castro Decl. ¶¶ 28, 30, 36, 43, 50, 55-56; *see also* Castro Decl. Exs. D, E.  Ms. Castro sincerely believes that her religion compels her to display her crucifix, not hide it under her desktop.  Castro Decl. ¶ 35.  As she put it, quoting the New Testament's Sermon on the Mount (*Matthew* 5:15), she cannot hide her light "under a bushel."  *Id.* ¶ 46.  Stifling her religious expression through concealment of the crucifix "would be an affront to [her] faith."  *Id.* ¶ 35.  Consistent with this conviction, Ms. Castro has hung a crucifix near her desk for over ten years.  *Id.* ¶ 16.  Ms. Castro's belief in this regard reflects her "honest conviction," and "it is not for [the government]" to second guess whether that belief is reasonable, "mistaken or insubstantial."  *Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 725 (2014).  Indeed, Defendants have never even insinuated that Ms. Castro's insistence on displaying the crucifix stems from anything but her sincere religious conviction.  Requiring Ms. Castro to act in a manner contrary to that conviction itself imposes a burden on her religious exercise.  As the Supreme Court

put it, "a burden upon religion exists" when an "employee was put to a choice between fidelity to religious belief or cessation of work." *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 717-718 (1981).

But since December 2024, Defendants have put her to a choice: hide the crucifix or face discipline. When Ms. Castro chose her faith, Defendants punished her: Mr. Mazzei and Mr. Soto began disciplinary proceedings against her, Ms. Manning suspended her without pay for two days and then placed her on an administrative leave lasting several months, and Mr. Gasper confirmed the administrative leave as a response to Ms. Castro's religious expression. Castro Decl. ¶¶ 28, 30, 36, 43, 50, 55-56; *see also* Castro Decl. Exs. D, E. Then, after the filing of this lawsuit, Defendants advised Ms. Castro that she was "involuntarily" reassigned because of "concerns about ... [her] personal beliefs." Castro Decl. ¶ 54. All these disciplinary actions trample Ms. Castro's religious rights.

### 2. *Disciplining Ms. Castro for her religious exercise is neither neutral nor generally applicable*

The District has no neutral rule or generally applicable policy that precludes teachers from displaying personal items in their workspace. To the contrary, teachers regularly display such items without question or interruption. *See id.* ¶¶ 4-5. Some even have displayed items with religious origins or connotations, like a coffee mug citing the book of Proverbs. *See* Castro Decl. Ex. B.7. Defendants have not similarly disciplined other teachers for their personal expressive displays, which confirms that there is no general prohibition against expressive displays of personal items. Castro Decl. ¶ 55. Instead, Defendants have singled out Ms. Castro's expressive display of a personal item (*i.e.*, the crucifix) expressly *because of* the religious nature of the crucifix. *Id.* ¶¶ 28, 30, 36, 43, 50, 55-56; *see also* Castro Decl. Exs. D, E. In other words, Defendants have admitted that they "'target[ed] religious conduct for distinctive treatment.'"

*Cent. Rabbinical Cong.*, 763 F.3d at 194 (citation omitted); *see also Kennedy*, 597 U.S. at 526 (holding that the school district's letters that prohibited the plaintiff coach from "appearing to a reasonable observer to endorse" religion were not neutral).   That targeted punishment of an expressive display because of its religious content is the opposite of neutral.

Defendants have also not acted pursuant to a generally applicable policy.  A policy "is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'"  *Fulton v. City of Phila.*, 593 U.S. 522, 533-534 (2021).  Exercising unbound discretion with regard to teachers' personal expressive displays in their workspaces, Defendants considered the religious character of Ms. Castro's display and punished only her.  Defendants have not approached these displays in "an evenhanded, across-the-board way."  *Kennedy*, 597 U.S. at 526-527.  Thus, Defendants' actions are far from generally applicable.  And because Defendants' actions are neither neutral nor generally applicable, their actions trigger strict scrutiny.

### 3.   *Justified only by a mistaken view of the Establishment Clause, Defendants' actions do not withstand strict scrutiny*

To overcome strict scrutiny, Defendants bear the burden of showing the challenged act was justified by a compelling state interest and that its means were narrowly tailored.  *Kennedy*, 597 U.S. at 525; *see, e.g.*, *Agudath Israel*, 983 F.3d at 625 ("The Governor's order is subject to strict scrutiny because it is not neutral on its face and imposes greater restrictions on religious activities than on secular ones.").  Defendants have shown nothing of the sort.  In their communications with Ms. Castro, Defendants have repeatedly stated just one reason for their demand that she not display the crucifix—namely, a concern that Ms. Castro's personal religious expression would make the school appear to endorse religion.  Castro Decl. ¶¶ 28, 30, 36, 43, 50, 55-56; *see also* Castro Decl.

Exs. D, E. But the Supreme Court rejected that erroneous understanding of the Establishment Clause in *Kennedy*.[18] 597 U.S. at 532-536.

*Kennedy* also concerned a public school employee's religious expression. There, a public school placed its football coach, Joseph Kennedy, on administrative leave for praying quietly at midfield after three games. *Id.* at 525-526. In its letters to Coach Kennedy, the school district asserted that, under its view of the Establishment Clause, the district had to "avoid the perception of endorsement" of religious activities. *Id.* at 516; *see also id.* at 517-519. To avoid any such perception, the district offered Coach Kennedy just one option—to move his prayer "behind closed doors." *Id.* at 519. When he refused, the school district disciplined him. *Id.* at 519-520.

But the Supreme Court rejected the school district's premise. Tolerating Coach Kennedy's visible religious expression, even on the fifty-yard line after school football games, did not violate the Establishment Clause. *Id.* at 532-536. The Court confirmed that "long ago" it had abandoned the endorsement test and the line of cases from which it came. *Id.* at 534. It said, "[a]n Establishment Clause violation does not automatically follow whenever a public school or other government entity 'fail[s] to censor' private religious speech." *Id.* at 534-535. So the district's endorsement rationale presented "only the 'mere shadow' of a conflict, a false choice premised on a misconstruction of the Establishment Clause." *Id.* at 543 (citation omitted). Absent a genuine violation of the Establishment Clause, failing to tolerate Coach Kennedy's religious expression violated both the Free Exercise and Free Speech Clauses. *Id.* at 543-544.

*Kennedy* squarely governs here. Like the district's letters to Coach Kennedy, Defendants' communications with Ms. Castro underscore their concern with appearing to endorse religion. On

---

[18] In *Kennedy*, the Court found it unnecessary to reach the school district's request that the Court soften the standard in free exercise cases involving public employees, because a mistaken and overbroad view of the Establishment Clause does not pass muster under any of those standards. *Kennedy*, 597 U.S. at 532.

December 6, Mr. Mazzei emailed Ms. Castro that "any permanent displays of religious symbols are prohibited from public schools, *based on the First Amendment of the United States Constitution*." Castro Decl. ¶ 28 (emphasis added). On December 11, Ms. Manning sent Ms. Castro a letter of reprimand stating that, under the Establishment Clause, "schools should remain neutral when speaking of religion, *so as to not have a perception of endorsing a particular religion*." Castro Decl. Ex. D (emphasis added). The next day, Ms. Manning notified Ms. Castro of her suspension, saying that the Establishment Clause prohibited Ms. Castro from hanging a "religious artifact" since doing so "*sends the message* that the school district (which is an arm of the government) is *promoting* that religion." Castro Decl. Ex. D (emphasis added).

Given their singular concern over the crucifix, Defendants gave Ms. Castro only the alternative of hiding it in or under her desk, just as the school district offered Coach Kennedy only the alternative of moving his prayer "behind closed doors." *Kennedy*, 597 U.S. at 519. Before confirming Ms. Castro's administrative leave on January 24, Mr. Gasper asked Ms. Castro seven times if she would relocate the crucifix out of view, and seven times Ms. Castro said no. Castro Decl. ¶ 50. Through and through, Defendants have justified disciplining Ms. Castro based only on their mistaken understanding of the Establishment Clause. *Id.* ¶¶ 28, 30, 36, 43, 50, 55-56; *see also* Castro Decl. Exs. D, E

The Court in *Kennedy* rejected out of hand the notion that "*any* visible religious conduct by a teacher or coach" violates the Establishment Clause. *Kennedy*, 597 U.S. at 540. The Court explained: "Such a rule would be a sure sign that our Establishment Clause jurisprudence had gone off the rails. In the name of protecting religious liberty, the District would have us suppress it." *Id.* The Court refused to adopt a rule that would allow, nay *require*, schools to "fire teachers for praying quietly over their lunch, for wearing a yarmulke to school, or for offering a midday prayer

during a break before practice," simply for being within view of students. *Id.* But that is why Defendants are disciplining Ms. Castro: She seeks to pray quietly by herself during lunch or breaks with the help of a religious item placed, like a yarmulke, where her religious faith requires her to place it. *See* Castro Decl. ¶¶ 20-21, 35. To discipline Ms. Castro for that reason alone, as Defendants have, is to discipline her for a constitutionally impermissible reason, much less a compelling government interest.

### B. Defendants Violated Connecticut's Act Concerning Religious Freedom

For similar reasons, disciplining Ms. Castro violates Connecticut's Act Concerning Religious Freedom. *See* Conn. Gen. Stat. § 52-571b. Connecticut was the first state to pass a statute of this kind, doing so around the same time that the federal government was enacting the analogous Religious Freedom Restoration Act. Adrienne Fulco, *Under the Radar: Connecticut's First-in-the-Nation State Religious Freedom Law*, 50 Conn. L. Rev. 927, 929 (2018). Connecticut did so "to ensure greater protection for the free exercise of religion under state law than is provided under the federal constitution" by subjecting even generally applicable laws to strict scrutiny. *Trinity Christian Sch. v. Comm'n on Hum. Rts. & Opportunities*, 189 A.3d 79, 83-84 (Conn. 2018).

Under Connecticut's statute, a "political subdivision" of Connecticut "shall not burden a person's exercise of religion" unless the government actor demonstrates that it has used "the least restrictive means" of furthering "a compelling government interest." Conn. Gen. Stat. § 52-571b(a), (b). The statute defines Connecticut's political subdivisions to include their officers and employees. *Id.* § 52-571b(f). If such a state actor violates the act, the burdened individual "may assert that violation as a claim" and "obtain appropriate relief" in court. *Id.* § 52-571b(c).

Defendants are subject to the Act because they are officers or employees of a political subdivision of Connecticut, the Consolidated School District of New Britain. As explained *supra*,

pp. 18-21, Ms. Castro's religious exercise was burdened, thus triggering the statute's requirement that Defendants overcome strict scrutiny.  And since Defendants have only attempted to justify their actions based on a mistaken view of the Establishment Clause—which *Kennedy* expressly forbids—Ms. Castro is likely to succeed under the Connecticut statute.  *See Knights of Columbus Council 2616 v. Fairfield*, No. 3:22-cv-1579, 2024 WL 3900102, at *17 (D. Conn. Aug. 22, 2024).

### C.  Defendants Violated Ms. Castro's First Amendment Rights To Free Speech

Defendants also violated (and continue to violate) Ms. Castro's rights under the Free Speech Clause of the First Amendment.  Made applicable to state actors by the Fourteenth Amendment, the Free Speech Clause states that "Congress shall make no law … abridging the freedom of speech."  U.S. Const. amend. I; *see Gitlow v. New York*, 268 U.S. 652, 666 (1925); *IMS Health Inc. v. Sorrell*, 630 F.3d 263, 271 (2d Cir. 2010).  Though they work for the government, public school teachers do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."  *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).  And not "everything teachers and coaches say in the workplace [is] government speech subject to government control."  *Kennedy*, 597 U.S. at 530-531.

Courts generally analyze public employee free speech claims under the so-called *Pickering-Garcetti* framework.  Under "step one" of that framework, speech is entitled to protection upon a threshold showing that the speech is made in the employee's personal capacity on matters related to public concerns.  *Id.* at 527 (citing *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty.*, 391 U.S. 563 (1968); *Garcetti v. Ceballos*, 547 U.S. 410 (2006)).  Here, Ms. Castro's devotional display in the workspace around her desk was personal, and courts have held that religious speech is inherently a matter of public concern.  *See, e.g.*, *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 966 (9th Cir. 2011).  Therefore, it meets *Pickering-Garcetti*'s first step.

Alternatively, devotional speech may automatically reach the second step of the *Pickering-Garcetti* framework without a finding that it related to matters of public concern because such speech—which the Free Exercise Clause also protects—implicates unique constitutional concerns. *Kennedy*, 597 U.S. at 544 (Thomas, J., concurring).

At "step two," once employee speech is entitled to First Amendment protection under *Pickering-Garcetti*, the government may only burden that speech if the government's interests as an employer outweigh the employee's interest in speaking. *Id.* at 527. Fatally for Defendants, however, *Kennedy* expressly holds that a mistaken view of the Establishment Clause cannot outweigh an employee's interests. *Id.* Because Defendants only relied on the "endorsement" test to justify punishing Ms. Castro, while permitting similar secular speech, Defendants have violated Ms. Castro's free speech rights under the *Pickering-Garcetti* balancing approach.

### 1. *Ms. Castro expressed herself in her personal capacity*

At the first step of the *Pickering-Garcetti* framework, Ms. Castro's display of her crucifix was prototypical personal speech because it was not delivered in her governmental capacity. Visible symbols or expressive conduct are treated as "speech" under the First Amendment if there is (1) an intent to convey a particularized message and (2) a great likelihood of viewers understanding the intended message. *See Texas v. Johnson*, 491 U.S. 397, 404 (1989). Here, both conditions were satisfied. First, Ms. Castro intended to convey a particularized message because displaying a crucifix expressed, among other things, her identity as a devout Catholic. *See* Castro Decl. ¶¶ 3, 21. Second, Ms. Castro's intended message was very likely to be understood because the crucifix is one of the most ubiquitous symbols in Western society, identifying the owner of a display as likely to be expressing their Christian faith. *See Draper v. Logan Cnty. Pub. Libr.*, 403 F. Supp. 2d 608, 613 (W.D. Ky. 2005) ("[T]he Christian cross is one of several inherently expressive religious symbols that cannot seriously be considered to ever be devoid of message.").

Ms. Castro's symbolic speech was personal in nature and not made on behalf of the government.  A government employee speaks in his or her personal capacity as a private citizen when the speech is not made in the ordinary course of duty.  *Lane v. Franks*, 573 U.S. 228, 240 (2014).  Conversely, speech may be attributed to the government when it "owes its existence" to the employee's professional responsibilities.  *Garcetti*, 547 U.S. at 421.  A public school teacher's speech that is "'part-and-parcel of his concerns' about his ability to 'properly execute his duties'" is not private speech.  *Weintraub v. Bd. of Educ. of City of N.Y.*, 593 F.3d 196, 203 (2d Cir. 2010); *see also Jackler v. Byrne*, 658 F.3d 225, 237 (2d Cir. 2011) ("As a rule of thumb, activities required of the employee as part of his employment duties are not performed 'as a citizen' if they are not 'the kind of activity engaged in by citizens who do not work for the government.'" (citations omitted)).

Here, there can be no dispute that Ms. Castro's crucifix display did not "owe its existence" to her role as a public school teacher, nor was it "part and parcel" of her teaching duties.  *Garcetti*, 547 U.S. at 421; *Weintraub*, 593 F.3d at 203.  The crucifix was not used as part of Ms. Castro's curricular instruction.  *See* Castro Decl. ¶ 21.  The crucifix was a gift from a family friend rather than a pedagogical tool provided by the school.  *Id*. ¶ 20.  For ten years, Ms. Castro placed the crucifix in the workspace nearby her desk, just as other teachers displayed personal family photos, sport memorabilia, pop culture references, inspirational quotes, and other personal items over which Defendants did not maintain active oversight or control.  *Id.* ¶¶ 16, 25.  Finally, displaying a crucifix is an activity engaged in by many private citizens (*e.g.*, by wearing a cross around the neck or on their suit lapels) whether they are in a government building or not.  *See Jackler*, 658 F.3d at 237.  Therefore, in displaying her crucifix by her desk, Ms. Castro was speaking for herself, not the government, satisfying the first step of the *Pickering-Garcetti* framework.

2.  *Ms. Castro's symbolic expression was on a matter of public concern*

Also under step one of the *Pickering-Garcetti* framework, Ms. Castro's religious self-expression related to a matter of public concern.  To determine if a matter is of public concern, courts consider the content, form, and context of the employee's speech.  *Singer v. Ferro*, 711 F.3d 334, 339 (2d Cir. 2013).  Speech relates to matters of public concern if, considering content, form, and context, it can "'be fairly considered as relating to *any* matter of political, social, or other concern to the community,'" *Lane*, 573 U.S. at 241 (emphasis added), or so long as it has "'a broader public purpose,'" *Singer*, 711 F.3d at 339.  In contrast, speech does not relate to public concerns when it has solely to do with "internal employment policies," *Singh v. City of New York*, 524 F.3d 361, 372 (2d Cir. 2008), "internal power struggles within the workplace," *Tucker v. State of Cal. Dep't of Educ.*, 97 F.3d 1204, 1210 (9th Cir. 1996), "internal office management," *Nat'l Treasury Emps. Union v. United States*, 990 F.2d 1271 (D.C. Cir. 1993), *aff'd in relevant part*, 513 U.S. 454 (1995), or "employee morale," *Sanguigni v. Pittsburgh Bd. of Pub. Educ.*, 968 F.2d 393, 399 (3d Cir. 1992).  An employee's speech may be on matters of public concern even if the speech is motivated by personal desires.  *Sousa v. Roque*, 578 F.3d 164, 173 (2d Cir. 2009).

The first factor to consider is content.  Ms. Castro's speech was symbolic religious expression that had nothing to do with employment grievances or office politics.  Just as some subject matters are "inherently of public concern," *see Connick v. Myers*, 461 U.S. 138, 148 n.8 (1983) (race relations); *Huth v. Haslun*, 598 F.3d 70, 75 (2d Cir. 2010) (discrimination generally, systemic public misconduct), religious speech is *per se* of public concern.  *See Johnson*, 658 F.3d at 966 (religious speech is "unquestionably of inherent public concern"); *Tucker*, 97 F.3d at 1210 (calling it a "red herring" to say religious speech is not of public concern); *Nichol v. ARIN Intermediate Unit 28*, 268 F. Supp. 2d 536, 559 (W.D. Pa. 2003).

In *Nichol v. ARIN Intermediate Unit 28*, a Pennsylvania federal district court held that a teacher's expression of her religious faith (wearing a necklace with a cross) was symbolic speech on a matter of public concern. 268 F. Supp. 2d at 559. In considering the constitutionality of a flat ban on religious attire and accessories, the court first noted that "public concern speech is measured more by what it is not than by what it is." *Id*. at 558. It held that the plaintiff's symbolic speech was related to matters of public concern:

> There is no doubt that the religious content or viewpoint of plaintiff's symbolic speech makes it a matter of public concern relating to social or community interests, as contrasted with speech about "mundane employment grievances" expressing personal employment complaints and office critiques important only (or primarily) to the speaker.

*Id.*

Similarly, in *Draper v. Logan County Public Library*, a Kentucky federal district court held that a library employee's necklace with a cross on it was symbolic speech on a matter of public concern, and she could not be prohibited from wearing it. 403 F. Supp. 2d at 617. In so holding, the court considered the expansive definition that the Supreme Court has given to the term "public concern," only excluding matters related to personal status in the workplace. *Id*. The district court further concluded that the display of a personal religious identity is just as related to matters of public concern as would be displays of personal *political* identity, which would unquestionably be protected. *Id*. ("[P]olitical ideology is an unmistakably individualized choice; yet there is no doubt that a button bearing the words 'Go Dems!' or 'Proud Republican' would constitute public concern speech.").[19]

---

[19] Notably, the court in *Draper* considered a split between a Ninth Circuit rule that religious speech was *per se* of public concern and a Fifth Circuit case that held otherwise. *Compare Tucker*, 97 F.3d at 1210 ("Here, the speech is religious expression and it is obviously of public concern.") *with Daniels v. City of Arlington*, 246 F.3d 500, 504 (5th Cir. 2001) (holding that a religious pin on a police uniform was not speech on a matter of public concern). The *Draper* court rejected the Fifth Circuit's holding because the Fifth Circuit elided its constitutional duty to *first* identify whether speech related to matters of public concern and *then* to balance the government's interests as an employer against the

Ms. Castro's crucifix resembles the cross necklaces in *Nichol* and *Draper*.  Like the cross displayed on necklaces, the crucifix Ms. Castro displayed in her workspace communicated her faith, rather than the "private ventings of [a] disgruntled public employee[]."  *Singer*, 711 F.3d at 340.  Specifically, Ms. Castro's speech communicated her identity as a Christian, an "intensely personal" status that, regardless, carries public importance as an expression of one of our most cherished liberties: freedom of conscience.  *Draper*, 403 F. Supp. 2d at 617.  Therefore, just like "praying quietly over … lunch," "wearing a yarmulke," or "offering a midday prayer," *Kennedy*, 597 U.S. at 540, Ms. Castro's religious expression touches on "a subject of general interest and of value and concern to the public."  *City of San Diego v. Roe*, 543 U.S. 77, 84 (2004).

Next, as to form, the widely recognizable nature of a crucifix makes it related to a matter of public concern.  A government employee's private speech is more likely to relate to matters of public concern when its form would make it comprehensible to a wider public, instead of only to employment insiders.  *See Singer*, 711 F.3d at 340.  In *Singer v. Ferro*, for example, the form of a correctional officer's parodical cartoon about his bosses was not related to matters of public concern when it was it was "vague" in its execution and shared with only five other employees, and when only those employees knew who the satirical targets were anyways.  *Id*.  In contrast, the crucifix Ms. Castro displayed in her classroom, small though it may be, is both a ubiquitous and historic symbol in Western society and was visible to anyone who would have seen Ms. Castro's desk over the past decade.  Thus, the form of the crucifix also renders it a matter of public concern.

Finally, as to context, the fact that Ms. Castro's speech forms part of a broader national conversation makes it more likely related to a matter of public concern.  The context of speech

---

employee's interests as a speaker.  *Draper*, 403 F. Supp. 2d at 616-617 ("*Daniels* seems to compress both the public concern analysis and *Pickering* balancing of interests into a single step when discussing the form and context of Daniels's message…. [T]hat portion of the *Daniels* court's public concern analysis is flawed…."); *see also id*. at 616 (equating *Daniels*' reasoning to that of *Moscowitz v. Brown*, 850 F. Supp. 1185, 1194 (S.D.N.Y. 1994)).

contributes to its public nature when it is "calculated to advance an important issue in a meaningful way." *See Singer*, 711 F.3d at 341.  For instance, in a post-*Kennedy* decision, a federal district court in Florida held that a teacher sharing her pronouns with her class was speech on a matter of public concern because transgenderism is a topic of serious political and cultural debate and because her speech was intended to bring attention to her identity as a transgender woman.  *Wood v. Fla. Dep't of Educ.*, 729 F. Supp. 3d 1255, 1281 (N.D. Fla. 2024).  The court in *Wood* compared the teacher's speech to that of the plaintiff coach in *Kennedy*, arguing that much like how the sharing of pronouns was intended to send a message about the teacher's gender identity, Coach Kennedy's visible devotion at the fifty-yard line was "apparently inten[ded] to send a message about his religious identity," rendering both related to matters of public concern.  *Id.* at 1281 n.18.

Similarly, here Ms. Castro's religious expression comes in the broader context of a public debate about the proper place of religion in public life.  *See generally* Philip Gorski, *American Covenant: A History of Civil Religion from the Puritans to the Present* (2017) (arguing that there is a long-standing tension in American history between "religious nationalism" and "radical secularism").  Ms. Castro's crucifix, intentionally or not, contributed to this debate by affirming her religious identity in the public square: in other words, her crucifix implicitly argued against the idea that public employees cannot express their faith within view of the public without violating the Establishment Clause.  Furthermore, the crucifix was displayed in a personal workspace to those in which all DiLoreto teachers had the opportunity to express themselves and important aspects of their identities.  The speech was thus not made in a forum where teachers are expected to communicate "mundane employment grievances."  *Nichol*, 268 F. Supp. 2d at 558.  In sum, by its content, form, and context, Ms. Castro's crucifix was not speech merely related to internal office politics, but rather was speech on a matter of public concern.

3.  *Ms. Castro's devotional expression may bypass the* Pickering-Garcetti *requirement that speech relate to a matter of public concern*

In the alternative, were this Court to decide that Ms. Castro's speech did not satisfy *Pickering-Garcetti*'s step one requirement that speech relate to a matter of public concern, it should still hold that her symbolic expression is protected—and thus requires balancing under *Pickering-Garcetti*'s second step—because it was devotional religious speech.  Devotional speech that is protected both by the Free Exercise and Free Speech Clauses may demand a different analysis at the first step of *Pickering-Garcetti*.  *See id.* at 544 (Thomas, J., concurring).  Specifically, religious devotional speech may not need to be found to be related to matters of public concern to be protected under the Free Speech Clause.  *See Borough of Duryea v. Guarnieri*, 564 U.S. 379, 406 (2011) (Scalia, J., concurring in judgment in part and dissenting in part) (in the context of the Petitions Clause of the First Amendment, arguing against "shoehorning the 'public concern' doctrine … where it does not fit.").  This may explain why the Supreme Court in *Kennedy* expressly held open the question of whether devotional speech required a different analytical lens than the *Pickering-Garcetti* framework.  *Kennedy*, 597 U.S. at 531 n.2.

This Court could hold that devotional speech like Ms. Castro's bypasses the public concern requirement of *Pickering-Garcetti* because that test is not well-suited to evaluate such speech.  On the one hand, the public concern requirement prioritizes speech addressing well-debated political subjects, especially when delivered to substantial audiences.  *See*, *e.g.*, *Specht v. City of New York*, 15 F.4th 594, 601 (2d Cir. 2021) (fire marshal's complaints of government malfeasance delivered to the press); *Snyder v. Phelps*, 562 U.S. 443, 454 (2011) (televised protest of a soldier's funeral).  On the other hand, devotional expression need not relate to society's most divisive issues, nor must it address any audience at all.  *See*, *e.g.*, *Kennedy*, 597 U.S. at 518 (kneeling in silent prayer); *Nichol*, 268 F. Supp. 2d at 559 (necklace with a cross); *Draper*, 403 F. Supp. 2d at 617 (same).

Yet less noisy devotional speech is not necessarily less worthy of protection. After all, the First Amendment "doubly protects" an employee's religious speech. *Kennedy*, 597 U.S. at 523. A public employee wearing a necklace self-identifying as a Christian, or a head covering self-identifying the wearer as a Jew or Muslim, is entitled to at least as much protection as the public employee who wears a shirt identifying as a Democrat or a sticker showing they voted. *See Draper*, 403 F. Supp. 2d at 617. But *Pickering-Garcetti* requires courts to make value judgments about specific instances of religious speech, a task that they, as arms of the government, are ill-suited to make. Therefore, because the speech at issue here is devotional religious speech, this Court could proceed to *Pickering-Garcetti* balancing without addressing whether Ms. Castro's speech is a matter of public concern. *Cf. Brown v. Polk Cnty.*, 61 F.3d 650, 658 (8th Cir. 1995) (applying *Pickering-Garcetti* balancing to a public employee's Free Exercise challenge).

### 4. Defendants burdened Ms. Castro's speech without valid justification

Whether or not both of *Pickering-Garcetti*'s step one requirements apply, Defendants were constitutionally required to offer a valid justification for disciplining Ms. Castro. They did not. Under the *Pickering-Garcetti* framework, a public school may only abridge its employees' retained free speech rights if the government's interests—particularly its need to promote "the efficiency of the public services it performs through its employees"—outweigh those rights. *Kennedy*, 597 U.S. at 528. As discussed *supra*, pp. 18-21, in *Kennedy* the Supreme Court made clear that a misunderstanding of the Establishment Clause does not outweigh the free speech rights of teachers when they express themselves visibly as people of faith. *Id.* at 532. In other words, *Kennedy* held that sealing off religious speech from the view of students, when secular speech is permitted in similar forms, fails the *Pickering-Garcetti* balancing test.

Defendants have pointed to no valid justification that outweighs Ms. Castro's speech. As to Defendants' constitutional concerns, *Kennedy* foreclosed schools from assuming that private

expressions of faith—even those on school grounds during school activities—pose Establishment Clause concerns merely because they are visible to students.  *See id.* at 534.  Indeed, rather than assume the worst outcomes for student welfare were teachers to express their faiths in public, the *Kennedy* Court stated that generally allowing such expressions had a salutary pedagogical purpose; specifically, that "learning how to tolerate speech or prayer of all kinds is 'part of learning how to live in a pluralistic society,' a trait of character essential to 'a tolerant citizenry.'"  *Id. at* 538; *see also Skoros*, 437 F.3d at 18-19 (stating a school district policy was in the public interest when it allowed religious symbolism during the holidays to "teach the lesson of pluralism by showing children the rich cultural diversity of the city in which they live and … encouraging them to show tolerance and respect for traditions other than their own").

Defendants expressly and exclusively claimed in their communications with Ms. Castro that the mere placement of the crucifix on the wall violated the Establishment Clause because it might make some observers think the school endorsed Catholicism.  *See* Castro Decl. ¶¶ 28, 30, 36, 43, 50, 55-56; *see also* Castro Decl. Exs. D, E.  But the mere fact that religious expression is visible on public school grounds does not mean that the school tolerating such expression would violate the Establishment Clause.  *See Kennedy*, 597 U.S. at 538-539.  Moreover, even evidence of students taking personal offense to viewing religious expression on school grounds is not sufficient to create an Establishment Clause violation.  *Id.* at 534 ("[T]he Establishment Clause does not include anything like a 'modified heckler's veto, in which ... religious activity can be proscribed' based on 'perceptions' or 'discomfort.'" (citation omitted)).  Thus, Defendants' concern that students were able to see Ms. Castro's crucifix on the wall next to her desk does not outweigh Ms. Castro's right to symbolically express her faith and her identity.

Further demonstrating that Defendants had no valid justification for suppressing Ms. Castro's speech is the fact that they tolerated secular speech from other teachers in similar formats and locations as Ms. Castro's crucifix.  The Supreme Court has repeatedly struck down government actions that specifically discriminate against religion, even where an overbroad understanding of the Establishment Clause was raised as a defense.  *See, e.g.*, *Kennedy*, 597 U.S. at 526 (permitting a coach's visible prayer when other staff were allowed to attend to personal matters); *Shurtleff v. City of Bos.*, 596 U.S. 243, 258 (2022) (allowing private religious flags in front of City Hall where private secular flags were flown); *Carson v. Makin*, 596 U.S. 767, 781 (2022) (requiring state funding for private sectarian schools when the state provided funding for private secular schools); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 845 (1995) (mandating access to university facilities for religious as well as non-religious student groups); *see also Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 331 F.3d 342, 356 (2d Cir. 2003) (prohibiting exclusion of a Sunday school from renting public school facilities when other community programs could do so).

In fact, the Court has noted on multiple occasions that attempts to scrub religion from public life for the supposed purpose of promoting religious "neutrality" (as Defendants attempted here) may have the opposite of their intended effect; instead, doing so often evinces official *hostility* to religion and to those of faith.  *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 56 (2019); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 118 (2001); *Van Orden v. Perry*, 545 U.S. 677, 704 (2005) (Breyer, J., concurring) ("[D]isputes concerning the removal of longstanding depictions of the Ten Commandments from public buildings across the Nation .... [could] create the very kind of religiously based divisiveness that the Establishment Clause seeks to avoid.").

Furthermore, whether or not a state interest in avoiding an Establishment Clause violation may justify content-based discrimination, no Supreme Court or Second Circuit case has held that a state's interest in avoiding an Establishment Clause violation justifies *viewpoint* discrimination. *See Good News Club*, 533 U.S. at 112-113; *Bronx Household of Faith v. Bd. of Educ. of City of New York*, 650 F.3d 30, 39 (2d Cir. 2011). Here, Defendants have engaged in (and continue to engage in) impermissible viewpoint discrimination. DiLoreto Elementary and Middle School, like many schools, has a long-standing policy of allowing teachers to place items that express their personal identities or other messages on or near their desks, including on their walls. These items include, but are not limited to, action figures and images of Wonder Woman, sports team pennants, university decals, photos of family and pets, inspirational phrases, non-student artwork, and Christmas trees. Castro Decl. ¶ 17; Castro Decl. Exs. B.1-9. Like the crucifix, some of these items are three-dimensional. *See id.* Exs. B.1, B.7, B.9. Like the crucifix, some display content with religious connotations. *Id.* Exs. B.5, B.6, B.7, B.9. Like the crucifix, some are hung up on the wall of the classroom in view of the students. *Id.* Exs. B.1-2, B.4-9. And like the crucifix, some are pure symbolic speech. *Id.* Exs. B.1, B.3, B.5-9. Each of these personal items humanize teachers to their students and express aspects of the teachers' identities. *See* Castro Decl. ¶ 18. Yet Defendants have only punished Ms. Castro for her crucifix display, making this a textbook case of viewpoint discrimination. *Shurtleff*, 596 U.S. at 258 ("When [the] government does not speak for itself, it may not exclude [private] speech based on 'religious viewpoint'; doing so 'constitutes impermissible viewpoint discrimination.'" (citations omitted)). As *Kennedy* made clear, Defendants' interest in discriminating against a religious viewpoint cannot outweigh Ms. Castro's right to her religious expression.

### D. Defendants' Actions Contradict The First Amendment's History And Tradition

Whatever doctrinal approach this Court takes to the Free Exercise or Free Speech Clauses, it should also hold Defendants' actions unconstitutional for running directly against the history and tradition of the First Amendment.  The Supreme Court has expressly looked to history and tradition in recent terms to determine whether certain instances or categories of speech are protected under the First Amendment.  *See, e.g.*, *Vidal v. Elster*, 602 U.S. 286, 295-308 (2024) (analyzing the history and tradition of trademarks to adjudicate the constitutionality of the Lanham Act); *Shurtleff*, 596 U.S. at 253 (examining the history of flag-flying in front of government buildings to help evaluate whether a flag was government or private speech).  In *Kennedy*, the Court specifically stated that such an analysis is necessary in policing the bounds of the Free Speech, Free Exercise, and Establishment Clauses.  597 U.S. at 536; *see also id.* at 544 (Thomas, J., concurring).  Furthermore, in certain Free Speech contexts, the government bears the burden of pointing to historical evidence that categories of speech are unprotected.  *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24-25 (2022) ("[W]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.'  In some cases, that burden includes showing whether the expressive conduct falls outside of the category of protected speech.  And to carry that burden, the government must generally point to historical evidence about the reach of the First Amendment's protections." (citations omitted)).

Public educators like Ms. Castro have long been permitted to engage in private religious speech and worship without fear of discipline.  Indeed, much of the early motivations for and practices of American public schooling were religious, indicating it would have been absurd for most of our history to punish teachers for visibly expressing their personal faiths.  Before the Founding, among the first government-funded schools were those established in colonial

Connecticut under Ludlow's Code, which mandated lessons in reading, citizenship, and religion. Conn. Code of 1650 ("Forasmuch as the good Education of Children is of singular behoofe and benefitt to any Common wealth … [i]t is therefore ordered … that all Masters of familyes doe once a weeke at least, catechise theire children and servants in the grounds and principles of religion….").[20]   Indeed, at the Founding "there was no such thing as a secular school; all schools used curriculum that was embued with religion."   Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2171 (2003); *see also* Northwest Territory Ordinance, art. 1, 3 (July 13, 1787) ("Religion, morality, and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged.").

    In the 19th century, the first wave of modern public school educators were trained in religious institutions to teach in school systems imbued with religious practice.  The modern public school system grew out of the "common school" movement of the 1830s, which itself grew out of the Second Great Awakening.  David Komline, *The Common School Awakening* 3-4, 11 (2020). As a result, the first professional public school teachers either trained at seminary or learned their craft at teacher colleges sponsored by religious entities.  *See generally id.* at 122-166 (recounting the history of the first state-sponsored teacher training colleges in Massachusetts as explicitly Christian, though non-denominational, institutions); *see also id.* at 164 ("In the late 1830s, the movement to found a board of education and state-sponsored normal schools had a religious core.").  And those public school systems that were founded right at the time of the Fourteenth Amendment included the freeman's schools in the Reconstruction South, which were "run by Protestant missionary societies, including Presbyterians, Methodists, Baptists, and

---

[20] Available at *Constitutions / Historical References*, Conn. Gen. Assem., https://www.cga.ct.gov/asp/Content/ constitutions/1650_Code_of_Laws.pdf (last visited Mar. 12, 2025).

Congregationalists." McConnell, 44 Wm. & Mary L. Rev. at 2171. Finally, the first Supreme Court case ending the practice of teacher-led prayer in public schools was not decided until 1962, suggesting that for nearly a century after the Fourteenth Amendment was ratified, teachers were (at a minimum) regularly permitted to privately express their *own* faiths, without any concern as to the constitutionality of doing so. *See Engel v. Vitale*, 370 U.S. 421, 424 (1962).

Moving beyond history, bedrock First Amendment principles demand heightened protections for religious speech and exercise. It is foundational to the First Amendment that personal conscience and religious expression garner more protection, not less, than does secular speech. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943); *Wisconsin v. Yoder*, 406 U.S. 205, 215-216 (1972). For it to be otherwise would be to invite the very suppression of core liberties that the Framers drafted the First Amendment to prevent. *Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995) ("[I]n Anglo-American history ... government suppression of speech has so commonly been directed precisely at religious speech that a free-speech clause without religion would be Hamlet without the prince."); *see also Connick*, 461 U.S. at 144 ("[I]t [i]s already 'too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege.'").

Given the foregoing history and tradition of devotional speech, this Court should require that Defendants affirmatively provide historical evidence of public employees being disciplined for their private devotional speech at the time of the Founding and Fourteenth Amendment, or else hold Defendants' actions unconstitutional. *See Bruen*, 597 U.S. at 24-25.

## II.   Irreparable Harm

Ms. Castro seeks to end Defendants' ongoing violations of the First Amendment and Connecticut's Act Concerning Religious Freedom. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath.*

*Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam); *see also Tandon v. Newsom*, 593 U.S. 61, 64 (2021) (per curiam); *Paulsen*, 925 F.2d at 68 (citing *Elrod*, 427 U.S. at 373 (1976)).   "Religious adherents are not required to establish irreparable harm independent of showing a Free Exercise Clause violation because a 'presumption of irreparable injury … flows from a violation of constitutional rights.'"  *Agudath Israel*, 983 F.3d at 636-637; *see also Bronx Household of Faith*, 331 F.3d at 350 (presuming irreparable harm where "the alleged deprivation of plaintiffs' First Amendment rights results directly from a policy of the defendant Board of Education that prohibits 'religious services or religious instruction' in school facilities"); 11A Charles Allen Wright & Arthur R. Miller, Federal Practice & Procedure § 2948.1 (3d ed. 2020) ("When an alleged deprivation of a constitutional right is involved, such as the right to free speech or freedom of religion, most courts hold that no further showing of irreparable injury is necessary." (footnotes omitted)).   Ms. Castro has shown a likelihood of success under both the Free Exercise and Free Speech Clauses.   That is enough to show that she faces irreparable harm.

But there is more.  Defendants chain' of disciplinary steps to keep Ms. Castro from her classroom also amounts to irreparable injury.  Some adverse employment actions, even just "the threat of permanent discharge," "can cause irreparable harm in the First Amendment context."  *New Yorkers for Religious Liberty, Inc. v. New York*, 125 F.4th 319, 328 (2d Cir. 2024) (per curiam) (citation omitted); *see also Elrod*, 427 U.S. at 373-374.  Defendants have more than just threatened to remove Ms. Castro from her tenured teaching position or pressured her to resign.  Castro Decl. ¶¶ 40, 49, 55.  They effectively already have removed her from that position, first by suspending her without pay, imposing a leave lasting several months, and then by involuntarily reassigning her.  *Id*. ¶¶ 42, 48, 54.

Defendants' efforts to hold Ms. Castro on leave and then reassignment resembles New York City's attempt to force teachers into an extended leave in *Kane v. De Blasio*, 19 F.4th 152 (2d Cir. 2021) (per curiam).   Considering New York's COVID-19 vaccine mandate for public school workers, the Second Circuit enjoined the city from requiring teachers to opt into an extended leave program and waive their right to sue while the city reconsidered their requests for religious accommodations.  *Id.* at 162-163, 169-170.  A prior motions panel had given the city two weeks to reconsider religious accommodation requests.  *Id.*  While the subsequent merits panel declined to order immediate reinstatement, it emphasized that the teachers and administrators had to wait only "a few additional weeks" at most.  *Id.* at 170-172.  The court took care not to address whether irreparable harm would flow from a longer leave.  *Id.* at 171 n.19.

Ms. Castro faces such a leave.  From December 16, 2024, to March 10, 2025, Defendants placed Ms. Castro on administrative leave for about six times the length of the two-week interval in *Kane*.  Afterwards, Ms. Castro was involuntarily reassigned to a non-classroom position.  Castro Decl. ¶¶ 48, 54.  It appears Defendants will continue to do all in their power to keep Ms. Castro from her classroom until she caves to their unconstitutional demand that she hide her crucifix, unless this Court intervenes.

The merits panel in *Kane* viewed the staff members' interim injury as a couple weeks *without pay*, a harm compensable later by damages rather than one that was irreparable.  *Kane*, 19 F.4th at 169-171.  But to Ms. Castro, her indefinite leave is about more than money.  Ms. Castro seeks immediate reinstatement to do what she loves and what she has spent a lifetime gaining expertise in, teaching young people.  *See* Castro Decl. ¶¶ 3-8.  Ms. Castro's months-long leave and involuntary reassignment exclude her from her classroom for the closing chapter of her long career as a public school educator.  Every day away from her classroom is a day of teaching that Ms.

Castro will forever lose. And the choice to which Defendants have put Ms. Castro is abandonment of her religious self-expression or abandonment of a career she loves. There is no subsequent monetary damage remedy that can make up for these alternative losses. Unlike the two-week unpaid leave in *Kane*, Ms. Castro's banishment from the classroom is not a mere "economic harm[]" compensable with a check down the road. 19 F.4th at 171-172.

Ms. Castro's compelled leave and involuntary reassignment put her to a choice—her calling to her profession or the convictions of her faith—just as other laws have forced individuals to choose between risking legal penalties or stopping to attend religious services. *See, e.g.*, *Roman Cath. Diocese of Brooklyn*, 592 U.S. at 19; *Agudath Israel*, 983 F.3d at 636-637. The choice itself violates Ms. Castro's First Amendment rights. And even *Kane* purported not to "gainsay the principle that those who are unable to exercise their First Amendment rights are irreparably injured *per se*." *Kane*, 19 F.4th at 171.

Accordingly, Defendants' ongoing discipline of Ms. Castro constitutes irreparable harm, only redressable by a preliminary injunction ending Defendants' never-ending string of adverse employment actions to keep her from her classroom.

### III.  Public Interest

The public interest favors a preliminary injunction prohibiting Defendants from keeping Ms. Castro out of her classroom teaching position and from punishing her for displaying her crucifix. In their communications with Ms. Castro (until March 6), Defendants have given just *one* reason for their disciplinary actions—that Ms. Castro's crucifix might lead observers to believe the school endorses religion. Castro Decl. ¶¶ 28, 30, 36, 43, 50, 55-56; *see also* Castro Decl. Exs. D, E. As explained *supra*, pp. 18-21, *Kennedy* renders that basis for disciplining Ms. Castro not just "constitutionally suspect" but constitutionally bankrupt, so "the public interest favors affording [Ms. Castro] an opportunity for reconsideration." *Kane*, 19 F.4th at 172. The

school's crusade against Ms. Castro's crucifix "specially and disproportionately burden[s] religious exercise, and thus 'strike[s] at the very heart of the First Amendment's guarantee of religious liberty.'" *Agudath Israel*, 983 F.3d at 637 (citation omitted). "Such a direct and severe constitutional violation weighs heavily in favor of granting injunctive relief." *Id.* And while such a clear constitutional violation alone should be sufficient, the public interest would also be served by a preliminary injunction because it would allow a dedicated and skilled educator to serve young people and student-teachers in a community that especially needs such educators. *See* Castro Decl. ¶¶ 6, 9; *see also* Martens Decl. Ex. A.

## **CONCLUSION**

"Respect for religious expressions is indispensable to life in a free and diverse Republic— whether those expressions take place in a sanctuary or on a field, and whether they manifest through the spoken word or a bowed head." *Kennedy*, 597 U.S. at 543. Here as in *Kennedy*, public school officials "sought to punish an individual for engaging in a brief, quiet, personal religious observance doubly protected by the Free Exercise and Free Speech Clauses of the First Amendment." *Id.* Here as in *Kennedy*, "the only meaningful justification the government offered for its reprisal rested on a mistaken view that it had a duty to ferret out and suppress religious observances even as it allows comparable secular speech." *Id.* at 543-544. "The Constitution neither mandates nor tolerates that kind of discrimination." *Id.* at 544.

Ms. Castro requests that this Court return all parties to the status quo ante as it existed on December 3, 2024, and enjoin Defendants from continuing to penalize her for displaying her crucifix in her personal workspace. The motion for a preliminary injunction should be granted.

///

Respectfully submitted,

March 14, 2025

By:   /s/Matthew Martens
Matthew Martens, *pro hac vice*
*of counsel for Plaintiff Marisol Arroyo-Castro*

Matthew Martens (*pro hac vice*)
   *Of counsel for Plaintiff Marisol Arroyo-Castro*
Alyssa DaCunha (*pro hac vice*)
Jonathan Ellison (*pro hac vice*)
Paul Piazza (*pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: 202-663-6921
matthew.martens@wilmerhale.com
alyssa.dacunha@wilmerhale.com

A. William Caporizzo, Bar No. 207995
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: 617-526-6411
Facsimile: 617-526-5000
william.caporizzo@wilmerhale.com

Jeremiah G. Dys (*pro hac vice*)
Keisha T. Russell (*pro hac vice*)
FIRST LIBERTY INSTITUTE
2001 West Plano Parkway, Suite 1600
Plano, TX 75075
Telephone: 972-941-4444
krussell@firstliberty.org

Rebecca R. Dummermuth (*pro hac vice*)
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Avenue NW, Suite 1410
Washington, D.C. 20004
Telephone: 202-921-4105

<u>**CERTIFICATE OF SERVICE**</u>

I, Matthew Martens, hereby certify that this 14th day of March, 2025, copies of the Motion for a Preliminary Injunction, Memorandum of Law in Support of the Motion for a Preliminary Injunction, Declaration of Marisol Arroyo-Castro, Declaration of Matthew T. Martens, and Proposed Order, were filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

By:    /s/Matthew Martens
Matthew Martens, *pro hac vice*
*of counsel for Plaintiff Marisol Arroyo-Castro*
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: 202-663-6921
matthew.martens@wilmerhale.com