UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARISOL ARROYO-CASTRO, | No. 25-cv-00153 (SFR) |
| *Plaintiff*, | |
| v. | |
| ANTHONY GASPER et al., | |
| *Defendants.* | APRIL 14, 2025 |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO**
**<u>PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION</u>**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES..............................................................................................ii

INTRODUCTION .........................................................................................................1

BACKGROUND ...........................................................................................................2

   I.  The Underlying Events at DiLoreto Elementary & Middle School...................................2

     A.  Arroyo-Castro permanently hangs a crucifix on her seventh-grade classroom wall, prompting complaints.................................................................................2

     B.  School officials place Arroyo-Castro indefinitely on leave, with full pay, for refusing instructions to move the crucifix out of students' view.........................5

   II.  This Federal § 1983 Lawsuit ........................................................................8

     A.  The January 2025 complaint for declaratory and injunctive relief...................8

     B.  The March 2025 temporary reassignment and preliminary-injunction motion.................9

ARGUMENT ..............................................................................................................9

   I.  Arroyo-Castro Cannot Succeed in Showing that School Officials Violated the Law by Relocating the Classroom Crucifix. ...................................................10

     A.  The specific legal framework applying to public employees' expression precludes relief under the First Amendment...............................................12

       1.  A teacher's adorning classroom walls with expressive items constitutes job-related speech ineligible for First Amendment protection. ...................12

       2.  School officials permissibly deemed Arroyo-Castro's mode of expression to be incompatible with instructional goals. ...........................................18

     B.  The District's reaction to the classroom crucifix also satisfies strict scrutiny.................21

       1.  Permanently hanging an inherently religious symbol in a public middle-school classroom establishes religion under settled precedent. ...............................22

       2.  This teacher's crucifix openly broadcast a particular religion to a captive seventh-grade audience...............................................................24

       3.  Despite Arroyo-Castro's contentions, school officials justifiably proposed relocating the crucifix after exploring alternatives. ...........................28

       4.  The District had substantial grounds to conclude that a failure to act would violate the Establishment Clause. ...................................................33

     C.  Plaintiff's state-law claim is unlikely to prevail...........................................35

   II.  The Equities Strongly Disfavor Preliminary Injunctive Relief. ...........................37

CONCLUSION .............................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Agudath Israel of Am. v. Cuomo*,
    983 F.3d 620 (2d Cir. 2020) ........................................................................................ 29, 37

*Am. Legion v. Am. Humanist Ass'n*,
    588 U.S. 29 (2019) ....................................................................................................... 23, 25

*Braunfeld v. Brown*,
    366 U.S. 599 (1961) ............................................................................................................ 36

*Bronx Household of Faith v. Bd. of Educ*,
    650 F.3d 30 (2d Cir. 2011) ................................................................................................. 34

*Bronx Household of Faith v. Bd. of Educ.*,
    750 F.3d 184 (2d Cir. 2014) ......................................................................................... 33, 34

*Burwell v. Hobby Lobby Stores*,
    573 U.S. 682 (2014) ............................................................................................................ 36

*Cambodian Buddhist Society of Conn., Inc. v. Planning and Zoning Comm'n*,
    285 Conn. 381, (2008). ....................................................................................................... 35

*Carson ex rel. O.C. v. Makin*,
    596 U.S. 767 (2022) ....................................................................................................... 31, 35

*Connick v. Myers*,
    461 U.S. 138 (1983) ....................................................................................................... 18, 20

*Consol. Edison Co. of New York v. Pub. Serv. Comm'n of N.Y.*,
    447 U.S. 530 (1980) ............................................................................................................ 20

*Edwards v. Aguillard*,
    482 U.S. 578 (1987) ..................................................................................................... *passim*

*Employment Division v. Smith*,
    494 U.S. 872 (1990) ....................................................................................................... 35, 36

*Engel v. Vitale*,
    370 U.S. 421 (1962) ......................................................................................... 24, 27, 28, 33

*Epperson v. Arkansas*,
    393 U.S. 97 (1968) .............................................................................................................. 29

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006) ........................................................................................... 13, 14, 15, 17

*Good News Club v. Milford Cent. Sch.*,
    533 U.S. 98 (2001) .............................................................................................................. 27

*Grady v. Town of Somers*,
    294 Conn. 324 (2009) ................................................. 39

*Hazelwood Sch. Dist. v. Kuhlmeier*,
    484 U.S. 260 (1988) ............................................. 10, 17

*Heim v. Daniel*,
    81 F.4th 212 (2d Cir. 2023) ......................................... 17

*Hernandez v. Comm'r*,
    490 U.S. 680 (1989) ................................................. 36

*Horton v. Meskill*,
    172 Conn. 615 (1977) ............................................... 26

*In re Grand Jury Subpoenas Dated Sept. 13, 2023*,
    128 F.4th 127 (2d Cir. 2025) ....................................... 11

*Jeffery v. City of New York*,
    113 F.4th 176 (2d Cir. 2024) ....................................... 30

*Johnson v. Poway Unified Sch. Dist.*,
    658 F.3d 954 (9th Cir. 2011) ................................... 16, 19

*Jusino v. Fed'n of Cath. Teachers, Inc.*,
    54 F.4th 95 (2d Cir. 2022) ...................................... 11, 23

*Kane v. De Blasio*,
    19 F.4th 152 (2d Cir. 2021) ......................................... 37

*Kennedy v. Bremerton School Dist.*,
    597 U.S. 507 (2022) ............................................*passim*

*Knight v. Conn. Dep't of Pub. Health*,
    275 F.3d 156 (2d Cir. 2001) .......................... 14, 18, 20, 21

*Kravitz v. Purcell*,
    87 F.4th 111 (2d Cir. 2023) ..................................... 21, 36

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
    508 U.S. 384 (1993) ................................................. 35

*Lee v. Weisman*,
    505 U.S. 577 (1992) ............................................*passim*

*Lee v. York County Sch. Div.*,
    484 F.3d 687 (4th Cir. 2007) ....................................... 17

*Marchi v. Bd. of Coop. Educ. Servs. of Albany*,
    173 F.3d 469 (2d Cir. 1999) .............................. 11, 31, 34

*Mayer v. Monroe County Cmty. Sch. Corp.*,
    474 F.3d 477 (7th Cir. 2007) ......................................................... 14, 17, 19

*Illinois ex rel. McCollum v. Board of Educ.*,
    333 U.S. 203 (1948) ............................................................................ 31, 32

*McCarthy v. Fuller*,
    714 F.3d 971 (7th Cir. 2013) ..................................................................... 32

*McCreary County v. ACLU of Ky.*,
    545 U.S. 844 (2005) ..................................................................................... 28

*Melzer v. Bd. of Educ.*,
    336 F.3d 185 (2d Cir. 2003) ................................................................ 18, 20

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
    597 U.S. 1 (2022) ....................................................................................... 32, 33

*New Yorkers for Religious Liberty, Inc. v. New York*,
    125 F.4th 319 (2d Cir. 2024) ..................................................................... 37

*North Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*,
    883 F.3d 32 (2d Cir. 2018) ........................................................................ 10

*Packer ex rel. 1-800-Flowers.Com v. Raging Cap. Mgmt., LLC*,
    105 F.4th 46 (2d Cir. 2024) ....................................................................... 11

*Pickering v. Board of Education*,
    391 U.S. 563 (1968) ........................................................................ 18, 19, 20

*Rankin v. McPherson*,
    483 U.S. 378 (1987) ..................................................................................... 18

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) ............................................................................... 13, 19

*Rweyemamu v. Comm'n on Human Rights & Opportunities*,
    98 Conn. App. 646 (2006). ....................................................................... 36

*Schmidt v. Lessard*,
    414 U.S. 473 (1974) ..................................................................................... 40

*School District of Abington Township v. Schempp*,
    374 U.S. 203 (1963) ..................................................................................... 32

*Shara v. Maine-Endwell Cent. Sch. Dist.*,
    46 F.4th 77 (2d Cir. 2022) ......................................................................... 13

*Sherbert v. Verner*,
    374 U.S. 398 (1963) ..................................................................................... 35

*Silber v. Barbara's Bakery, Inc.*,
    950 F. Supp. 2d 432 (E.D.N.Y. 2013). ............................................................. 38

*Spillane v. Lamont*,
    350 Conn. 119 (2024) .................................................................................... 35, 36

*Stone v. Graham*,
    449 U.S. 39 (1980) ................................................................................. 22, 23, 24

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023) ............................................................................................ 32

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    582 U.S. 449 (2017) ............................................................................................ 31

*Tyler v. Hennepin County*,
    598 U.S. 631 (2023) ............................................................................................ 31

*United States v. Doggart*,
    947 F.3d 879 (6th Cir. 2020) .............................................................................. 32

*Wallace v. Jaffree*,
    472 U.S. 38 (1985) .............................................................................................. 33

*Washegesic v. Bloomingdale Pub. Sch.*,
    33 F.3d 679 (6th Cir. 1994) .................................................................... 22, 24, 28

*We The Patriots USA, Inc. v. Hochul*,
    17 F.4th 266 (2d Cir. 2021). .................................................................... 9, 31, 38

*Weintraub v. Bd. of Educ.*,
    593 F.3d 196 (2d Cir. 2010) .................................................................... 13, 15, 16

*Widmar v. Vincent*,
    454 U.S. 263 (1981) ............................................................................................ 22

*Worth v. Picard*,
    2021 WL 5447121 (D. Conn. 2021) .................................................................. 31

**Statutes**

42 U.S.C. § 1983 .............................................................................................................. 8

42 U.S.C. § 2000bb-1 .................................................................................................... 36

Conn. Gen. Stat. § 10-157 ......................................................................................... 2, 20

Conn. Gen. Stat. § 10-185 ............................................................................................ 27

Conn. Gen. Stat. § 10-198a .......................................................................................... 26

Conn. Gen. Stat. § 10-220 .............................................................................................. 2

Conn. Gen. Stat. § 46b-120...................................................................................................26

Conn. Gen. Stat. § 52-571b.................................................................................................8, 35

Conn. Gen. Stat. § 10-184..................................................................................................2, 26

**Rules**

Fed. R. Civ. P. 65..................................................................................................................40

## INTRODUCTION

Plaintiff Marisol Arroyo-Castro seeks the remarkable relief of a preliminary injunction commanding public-school officials to allow a crucifix to be displayed on a seventh-grade classroom wall, in view of students, as a form of purposeful religious expression. That remedy would turn the Establishment Clause upside down. This Court should deny the motion.

Defendants all are administrators within the Consolidated School District of New Britain (the "District"), where Arroyo-Castro most recently taught social studies to seventh graders. After fielding complaints about a crucifix displayed in her classroom, the District negotiated with Arroyo-Castro to relocate this item out of students' view during instructional hours. Time and again, she refused. To comply with its well-settled legal obligations to avoid an Establishment Clause violation, the District placed Arroyo-Castro on paid leave from teaching until she agreed to follow her supervisors' instructions by relocating the crucifix in class.

In challenging this response, Arroyo-Castro relies heavily on a recent Supreme Court decision recognizing a high-school football coach's First Amendment right to engage in a brief and quiet on-field postgame prayer during his personal time. That decision did not overturn, expressly or impliedly, the litany of authority precluding inherently sectarian classroom displays inside public schools or explicitly religious messaging to captive student audiences. Arroyo-Castro's position that her visible, non-curricular classroom crucifix transmitted an intended and easily understood religious message only underscores why the school district felt compelled to take it down—and why a federal district court should not intervene.

Equally fundamental, because the District controlled its middle school's physical appearance, administrators could impose their classroom design prerogatives without any First Amendment issue. And on balance, the situation's equities independently counsel against an injunction that would effectively reinstall the cross on the wall during this lawsuit.

# BACKGROUND

## I.    The Underlying Events at DiLoreto Elementary & Middle School

### A.    Arroyo-Castro permanently hangs a crucifix on her seventh-grade classroom wall, prompting complaints

In Connecticut, each local board of education "shall maintain good public elementary and secondary schools" that "provide an appropriate learning environment for all its students." Conn. Gen. Stat. § 10-220. DiLoreto Elementary & Middle School is a combined public elementary and secondary school in New Britain. Decl. of Maryellen Manning ("Manning Decl.") ¶ 3. Arroyo-Castro has taught in the District since 2003 and at DiLoreto since 2008. *Id.* ¶ 5. For much of the past decade, Arroyo-Castro taught third and fourth graders, and in some years, she taught English-language learners. *Id.* ¶ 10; Decl. of Marisol Arroyo-Castro ("Pl. Decl.") ¶ 7.

Per state law and districtwide policy, "[a]ll students enrolled in the Consolidated School District of New Britain are required to attend school on a regular basis," for which "parents are legally responsible." Decl. of Eric Del Pozo ("Del Pozo Decl.") Ex. A (attendance policy); *see* Conn. Gen. Stat. § 10-184. Thus, DiLoreto's Parent and Student Handbook for 2024-2025 stresses the mandatory nature of school attendance. Decl. of Andrew Mazzei ("Mazzei Decl.") Ex. A at 9. The Handbook warns parents that a child's excessive absences may prompt a meeting to discuss attendance concerns and that, "[i]f the attendance issue continues, a referral will be made" to the state child protective agency "due to educational neglect." *Id.* at 9-11.

The Superintendent possesses supervisory authority over all schools that are in the District and thus "under its control." Conn. Gen. Stat. § 10-157(a). Administrators have broad discretion to assign unionized teachers annually, based on enrollment patterns and educational needs, to teach classes that the teachers are qualified to instruct. Manning Decl. ¶ 8 & Exs. A-B. Teachers may be given new assignments from one year to the next, and there is no guarantee that

a placement will continue into a later school year. *See id*. Arroyo-Castro belongs to the local teachers' union. *See* Pl. Decl. ¶¶ 30, 41, 49.

In the summer of 2024, the District assigned Arroyo-Castro to teach seventh-grade social studies, despite her alleged preference to continue teaching younger students. *See id.* ¶ 15. During the fall 2024 semester, Arroyo-Castro had a homeroom class, taught four sections of social studies, and taught an advisory class of students needing reading and math support. Mazzei Decl. ¶ 4. Each section had at least twenty-five students, and the class sessions all were forty-eight minutes long. *Id*. In all, about 100 students attended at least one class session daily with Arroyo-Castro, and some attended more than one session daily. *See id.* That semester, Arroyo-Castro was DiLoreto's only seventh-grade social studies teacher. *See id.* Ex. A at 6.

On the wall near her teacher's desk, Arroyo-Castro displayed a poster for a social studies textbook, instructions for operating laptop computers, a printout entitled "Student Daily Schedule," and various drawings of scenes and animals, some by students. Pl. Decl. Ex. A. On the same wall was what Arroyo-Castro labels "a small crucifix."[1] *Id.* ¶ 16 & Ex. A. As she explains, objects such as the crucifix "make the classroom environment more conducive to learning" and enhance student-teacher interactions. *Id.* ¶ 18.

Approximately a foot tall and half the width, Mazzei Decl. ¶ 10, the crucifix permanently rested on the wall "at about waist height," Pl. Decl. ¶ 22. Arroyo-Castro would "look at the crucifix" during the school day, "when the task of teaching young students proved particularly challenging." *Id.* ¶ 20. The crucifix helped her "pray silently in [her] personal time," including while on "lunch breaks." *Id.* ¶¶ 20-21. During the fall 2024 semester, Arroyo-Castro had a

---

[1] Although Arroyo-Castro asserts that this crucifix resided "in a similar location" in previous classrooms filled with third and fourth graders, Pl. Decl. ¶ 23, she offers no information about where this crucifix allegedly was in any prior classroom, or the classroom's size or layout.

thirty-minute daily lunch break and three-and-a-half hours of aggregate weekly "planning" time—or time spent on school grounds, free from other responsibilities, in which to prepare lessons and review students' work. Manning Decl. ¶ 12.

It is undisputed that students could see the crucifix in the classroom during instructional hours. *See* Pl. Decl. ¶ 31. Multiple student desks—arranged by Arroyo-Castro to facilitate group instruction—had direct lines of sight to the crucifix. Mazzei Decl. ¶ 22 & Ex. D. Handouts and other educational materials sat atop a small file cabinet and table, both near the teacher's desk, and thus near the crucifix. Pl. Decl. Ex. A; Mazzei Decl. Ex. D.

According to Arroyo-Castro, a majority of DiLoreto's teachers display personal objects in their official workspaces. Pl. Decl. ¶ 25. Such other items include family photos; inspirational phrases like, "Yes you can!"; miniature cutouts of Wonder Woman and Baby Yoda; a New England Patriots pennant; a photo of the Virgin Mary; and a mug with the following citation from Proverbs: "She opens her mouth in wisdom; kindly instruction is on her tongue." *Id.* & Ex. B; Del Pozo Decl. Ex. D at 2 n.3.

District policy additionally dictates that teachers "shall teach within the approved curricula." Del Pozo Decl. Ex. B at 1 (curriculum policy). In fall 2024, the District's seventh-grade social studies curriculum, focusing on the European colonization of Africa, did not require that a crucifix be displayed in class throughout the semester (or at all), *see* Mazzei Decl. ¶ 5, nor did the school supply or approve the crucifix as a learning aid, *see* Pl. Decl. ¶ 20.

Arroyo-Castro's non-curricular crucifix attracted complaints. In a conversation with seventh-grade science teacher Ayla Duve, two students—at least one of whom was not a Christian—complained that Arroyo-Castro had been exposing students to religion in the classroom. Decl. of Ayla Duve ("Duve Decl.") ¶ 6. Appearing upset, these students specifically

mentioned the cross near the teacher's desk. *Id.* ¶¶ 6-7. In addition, they complained that Arroyo-Castro had been making religious comments in their presence in class, for example, saying that students needed Jesus or making other references to God, in a chastising manner and not in a joking way. *Id.*

On November 26, 2024, Duve shared the students' complaints with DiLoreto's Assistant Principal, Andrew Mazzei, and also expressed concern about middle schoolers' being subjected to any teacher's religious ideologies, or religious items like a crucifix, unconnected to the curriculum's content. Mazzei Decl. ¶ 9; Duve Decl. ¶ 8. In the days after, Mazzei heard directly from students that Arroyo-Castro had told students in class things such as "You need Jesus"; or that "Papa God doesn't like liars"; or that "Papa God is probably disappointed in you"; or calling them sinners. Mazzei Decl. ¶ 11.

Mazzei elevated the complaints about the crucifix to District Chief of Staff Maryellen Manning. *Id.* ¶ 12. The two administrators sought to reach a consensus with their employee.

### B. School officials place Arroyo-Castro indefinitely on leave, with full pay, for refusing instructions to move the crucifix out of students' view

On December 3, 2024, Assistant Principal Mazzei emailed Arroyo-Castro "to discuss a concern that has been brought to my attention regarding a cross displayed in your classroom." Pl. Decl. ¶ 27. They met a few days later, on a Friday, after which Mazzei sent an email memorializing "that any permanent displays of religious symbols are prohibited from public schools, based on the First Amendment of the United States Constitution." *Id.* ¶ 28. Mazzei instructed Arroyo-Castro to take down the crucifix by Monday morning, or risk discipline for insubordination, but she refused. *Id.* ¶¶ 28-29.

The following Tuesday, December 10, Arroyo-Castro again met with Mazzei, joined by DiLoreto's Principal, Dario Soto, District Chief of Staff Manning, and a representative from the

teacher's union. *See id.* ¶ 30. Manning explained that the crucifix gave the perception of promoting Christianity as a religion and favoring it over others. Manning Decl. ¶ 16; Mazzei Decl. ¶ 16 & Ex. B at 1. Manning proposed placing the crucifix in a desk drawer, from where Arroyo-Castro could pull it out when alone. Mazzei Decl. ¶ 16 & Ex. B at 2. When that idea was rejected, the union representative then suggested hanging the crucifix from the desk drawers—which Arroyo-Castro entertained insofar as she still could "walk near it and see it." *Id.* Towards the meeting's end, the union representative and Ms. Arroyo-Castro left the room for about five minutes; when they returned, the union representative proposed that Ms. Arroyo-Castro hang the crucifix underneath her desk, next to the drawers, with magnets, a proposal that Manning seconded. *See id.* Ex. B at 3; Manning Decl. ¶ 16.

That afternoon, Arroyo-Castro initially hung the crucifix underneath the desktop, alongside the drawers. Pl. Decl. ¶ 32 & Ex. C. By the next morning, however, Arroyo-Castro had "returned the crucifix to its place on the wall." *Id.* ¶ 35.

The District responded with a letter of reprimand, dated December 11, 2024. Among other things, this letter reiterated several key messages that administrators had discussed with Arroyo-Castro the day before—for example that:

- "When a public school employee hangs a religious artifact in their classroom, it sends the message that the school district (which is an arm of the government) is promoting that religion, so putting that religious artifact on the wall of the school building is not legally permissible."

- "You have told the administration that you are hanging this cross permanently."

- "You have also told the administration that this cross is not tied to a specific curricular unit."

- "The Board of Education owns and controls the classroom walls. So, by hanging this on the classroom wall, you are, in effect, saying that 'the New Britain Board of Education endorses this religion.'"

*Id.* Ex. D at 1-2. The letter emphasized the District's position that allowing such a religious display in the classroom would violate the Establishment Clause. *See id.*

That day, Principal Soto personally implored Arroyo-Castro to relocate the crucifix from the wall, but she replied that she "would not remove the cross." *Id.* ¶ 39. Her supervisors did so, then after negotiating with her again on December 12, to no avail, the District suspended Arroyo-Castro for two days without pay, confirmed by written notice dated that same day. *Id.* ¶¶ 41-43. The suspension notice reiterated that "putting that religious artifact on the wall of the school building is not legally permissible." *Id.* Ex. E.

The District invited Arroyo-Castro to return to work on December 16, provided that she "compl[ied] with the request from [he]r employer." *Id.* When she no-showed, the District placed her on indefinite paid leave.[2] *Id.* ¶¶ 46-48. On December 20, in a text message sent via the student communication portal, Arroyo-Castro collectively informed her seventh-grade homeroom class that "I have been placed on Administrative Leave for refusing to remove a Crucifix from my desk area. The lesson to learn here is that doing what is right is not always easy." Mazzei Decl. Ex. C. A student shared this message with a teacher, who relayed the posting to administrators. *Id.* ¶ 21. A student's parent later told Mazzei that Arroyo-Castro's text message was an inappropriate thing to send to families. *Id.*

During a conference on January 24, 2025, District Superintendent Dr. Anthony Gasper attempted yet again to reach an accommodation, asking "seven times" whether Arroyo-Castro could simply "relocate the crucifix." Pl. Decl. ¶ 50. Gasper variously proposed placing the

---

[2] Rather than report to work, Arroyo-Castro emailed that the U.S Supreme Court had "rejected the 'endorsement' test" from pre-2022 Establishment Clause case law. Pl. Decl. ¶ 47. That assertion is a non-sequitur: as will be demonstrated, the District properly justified its actions on the grounds that public-school classroom walls belong to a school district, which may, consistent with the First Amendment, direct teachers to refrain from permanently hanging religious artifacts on the walls.

crucifix in a desk drawer, under the desk with a magnet, in her pocket to be a source of comfort, or behind a screen that would obscure the crucifix from the view of students who were sitting at nearby desks or sitting near the teacher's desk for individual instruction. Manning Decl. ¶ 18. Through counsel, Arroyo-Castro responded "that [she] would not agree to removing or relocating the crucifix within the classroom so long as other teachers were permitted to keep personal expressive items in similar locations as where [she] had the crucifix before." Pl. Decl. ¶ 50.

## II.    This Federal § 1983 Lawsuit

### A.    The January 2025 complaint for declaratory and injunctive relief

On January 30, 2025, Arroyo-Castro filed this lawsuit for declaratory and injunctive relief under 42 U.S.C. § 1983 against defendants Gasper, Manning, Soto, and Mazzei, in their individual and official capacities.[3]

The complaint's first and second claims assert violations of freedom of speech and religious exercise under the First Amendment, each based on the District's disallowing Arroyo-Castro from displaying a visible crucifix on her middle-school classroom wall. *See* Compl. at 12-15, ECF No. 1. The complaint's third claim is for violation of Connecticut's Act Concerning Religious Freedom, Conn. Gen. Stat. § 52-571b, based on the same alleged transgression. *See* Compl. at 15-17.

Among the relief sought is a "mandatory injunction" requiring school officials to assign Arroyo-Castro once more "to full-time teaching, without any condition that she cease hanging her crucifix on her classroom wall aside her desk in the same location as it was prior." *Id.* at 17. When filing the complaint, however, Arroyo-Castro did not seek any preliminary relief. Rather, for over a month, she remained out on the paid leave that had started in December.

---

[3] The publicity attending this lawsuit prompted freedom of information requests from reporters and others, to which the District responded, as it must, by disclosing non-exempt materials. *See* Pl. Decl. ¶ 52.

**B.**    **The March 2025 temporary reassignment and preliminary-injunction motion**

In a meeting held on March 6, 2025, school officials told Arroyo-Castro that, while on paid leave, the District required her services to help update the curriculum. Manning Decl. ¶ 19. During that meeting, Arroyo-Castro was informed that the reassignment would be temporary, due to a pending investigation into complaints about her classroom interactions. *See id.* ¶¶ 19-20. A teacher's temporary reassignment during such an investigation is a common protocol.[4] *Id.* ¶ 20.

As Deputy Superintendent Ivelise Velasquez explained, this temporary role would involve creating documents for use by school staff, to ensure fidelity to the District's approved lessons and to assist in preparing students for statewide examinations. *Id.* ¶ 19. Administrators gave Arroyo-Castro access to electronic models and online resources to help complete these tasks. *Id.* Arroyo-Castro's temporary office is located in District headquarters, which students cannot visit, and in which the crucifix hangs. *Id.* ¶ 21. Arroyo-Castro now seeks a preliminary injunction, to return to teaching and hang the crucifix in the classroom instead.

## ARGUMENT

To obtain a preliminary injunction on governmental action taken in the public interest, the applicant must establish a likelihood of success on the merits, irreparable harm without an injunction, and that the public interest favors injunctive relief. *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 279 (2d Cir. 2021). Such a remedy is "extraordinary and drastic." *Id.* (quotation marks omitted). All the more so in the classroom setting, given that "the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school

---

[4] Any references made at the March 6, 2025, meeting to Arroyo-Castro's pedagogy or personal beliefs, Pl. Decl. ¶ 54, simply reiterated the nature of complaints from students and staff that had prompted the investigation and subsequent temporary reassignment, Manning Decl. ¶ 20.

officials, and not of federal judges." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988).

The standard here is even higher than usual. Arroyo-Castro expressly seeks an order reassembling her classroom as it "stood on December 3rd, 2024." Pl.'s Mot. for Prelim. Inj. ("Mot."), ECF No. 38. This relief would bar defendants "from suspending, holding on leave, reassigning, or otherwise disciplining" her, *id.*, for "displaying her crucifix" on that classroom's wall, Mem. Supporting Pl.'s Mot. for Prelim. Inj. ("Br.") at 12, ECF No. 38. But the school year is nearing an end, and Arroyo-Castro has no enforceable expectation to continue teaching that same subject or grade, let alone in that same classroom, with or without a sectarian symbol.[5] *See* Manning Decl. ¶¶ 7-9. She thus appears to request what is known as a "mandatory injunction"— in part by dictating the District's prospective assignment choice.

"Because mandatory injunctions disrupt the status quo, a party seeking one must meet a heightened legal standard by showing a *clear* or *substantial* likelihood of success on the merits." *North Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) (emphasis added and quotation marks omitted) (applying this heightened standard where, as here, the requested preliminary injunction would preclude defendant, during the lawsuit, from "decid[ing] anew" plaintiff's status "each year"). No matter the standard, Arroyo-Castro's request for injunctive relief fails, for several mutually reinforcing reasons.

## I.    Arroyo-Castro Cannot Succeed in Showing that School Officials Violated the Law by Relocating the Classroom Crucifix.

The First Amendment does not authorize a teacher to enshrine on a public middle-school classroom wall an overtly sectarian symbol, visible to students, as a purposeful means of

---

[5] Indeed, Arroyo-Castro admits that the District assigned her in the summer of 2024 to teach seventh-grade social studies for the coming year, notwithstanding her "preference to continue" teaching grade schoolers in the classroom where she was. Pl. Decl. ¶ 15.

religious expression. Not only does Arroyo-Castro fail to identify any prior decision supporting her contrary position, but her brief entirely omits binding Supreme Court and Second Circuit decisions that foreclose relief. Under settled principles, public-school officials "may direct teachers to refrain from expression of religious viewpoints in the classroom." *Marchi v. Bd. of Coop. Educ. Servs. of Albany*, 173 F.3d 469, 475 (2d Cir. 1999) (quotation marks omitted). The inquiry into her claims' likelihood of success could begin and end there.

In pressing onward, Arroyo-Castro repeatedly notes that the Supreme Court abandoned the three-pronged Establishment Clause test from *Lemon v. Kurtzman*, 403 U.S. 602 (1971), "and its endorsement test offshoot," in *Kennedy v. Bremerton School District*, 597 U.S. 507, 534 (2022). *See* Br. at 1, 10, 13, 19, 23, 39. But that development does not wipe the whole slate clean. The Second Circuit has "cautioned District Courts against preemptively declaring that [circuit] caselaw has been abrogated by intervening Supreme Court decisions." *Packer ex rel. 1-800-Flowers.Com v. Raging Cap. Mgmt., LLC*, 105 F.4th 46, 54 (2d Cir. 2024). The Supreme Court has likewise instructed federal appellate and district courts, whenever in doubt, to continue to "'follow [a] case which directly controls, leaving to the Supreme Court the prerogative of overruling its own decisions.'" *In re Grand Jury Subpoenas Dated Sept. 13, 2023*, 128 F.4th 127, 140 (2d Cir. 2025) (brackets omitted) (quoting *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989)). Thus, even after *Kennedy*, the Second Circuit has held that a prior Supreme Court decision exempting church-operated schools from aspects of federal labor law "remain[ed] good law notwithstanding its reliance on *Lemon*." *Jusino v. Fed'n of Cath. Teachers, Inc.*, 54 F.4th 95, 102 (2d Cir. 2022) (citation omitted).

Simply pointing to *Lemon*'s downfall does nothing to advance the case for a preliminary injunction here. For one thing, a teacher who, like Arroyo-Castro, practices religion by affixing a

symbol to a middle-school classroom wall engages in work-related expression that is wholly ineligible for First Amendment protection. At a minimum, that form of classroom expression must yield to the District's undeniable interests in maintaining harmony and religious neutrality in instructional settings. These conclusions are not unique to the Establishment Clause, but rather flow from the features of Arroyo-Castro's teaching job and the District's license to manage its workplace.

For another thing, when formally imposing discipline, District officials neither cited *Lemon* nor "exclusively" invoked the endorsement test that *Kennedy* deemed abrogated. *See* Br. at 11, 31. Rather, these officials informed Arroyo-Castro that, as a basic constitutional principle, hanging a religious artifact on a classroom wall without a valid pedagogical purpose would impermissibly promote or establish religion. For its part, *Kennedy* did not address classroom religious displays, which have long violated the Establishment Clause. So too has forcing captive students to witness religious exercises during official school events—not the case in *Kennedy*.

Under separately controlling precedent, so much as an objectively substantial risk of an Establishment Clause violation would have justified the District's preventative action. Nor do the equities support issuing a truly extraordinary preliminary injunction that would effectively allow a teacher to appropriate a classroom wall for religious expression during instructional hours.

### A.    The specific legal framework applying to public employees' expression precludes relief under the First Amendment.

#### 1.    A teacher's adorning classroom walls with expressive items constitutes job-related speech ineligible for First Amendment protection.

Although someone's accepting a government job does not forfeit all First Amendment protections, "none of this means the speech rights of public school employees are so boundless

that they may deliver any message to anyone anytime they wish." *Kennedy*, 597 U.S. at 527. "In addition to being private citizens, teachers . . . are also government employees paid in part to speak on the government's behalf and convey its intended messages." *Id.* Despite "occupy[ing] trusted positions in society," such public employees "can express views that contravene governmental policies or impair the proper performance of governmental functions." *Garcetti v. Ceballos,* 547 U.S. 410, 419 (2006). The State as speaker may intervene "to ensure that its message is neither garbled nor distorted." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995).

As a rule, "speech that owes its existence to a public employee's professional responsibilities," and is thus made "pursuant to [her] official duties," *Garcetti*, 547 U.S. at 421, is "ineligible for First Amendment protection," *Kennedy*, 597 U.S. at 528-29. Whether a public employee speaks as such, or conversely as a citizen, turns on two relevant inquiries: "First, courts may consider whether the employee's speech falls outside of h[er] official responsibilities; second, they may ask whether a civilian analogue to the employee's speech exists." *Shara v. Maine-Endwell Cent. Sch. Dist.*, 46 F.4th 77, 83 (2d Cir. 2022) (quotation marks omitted). In general, for a secondary school teacher, the outcome depends on whether the expression in question "was a means to fulfill, and undertaken in the course of performing, h[er] primary employment responsibility of teaching." *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 203 (2d Cir. 2010) (citations omitted). And for *this* middle-school teacher, the question becomes: Did she "offer h[er] prayers in h[er] capacity as a private citizen, or did they amount to government speech attributable to the District?" *Kennedy*, 597 U.S. at 428.

Arroyo-Castro cannot meet her threshold burden of establishing that her religious expression came in her capacity as a citizen versus a schoolteacher. To begin, her complaint and

motion center on the premise that the classroom crucifix was an "expressive item[]." Pl. Decl. ¶¶ 18, 25-26, 50. In her words, hanging the crucifix in sight of herself and others was "symbolic speech" (Br. at 24), or "speech [that] was symbolic religious expression" (*id.* at 25), or "devotional religious speech (*id.* at 29). Thus, "in displaying her crucifix by her desk, [she] was speaking" (*id.* at 24); and in doing so, she "intended to convey a particularized message" of Christian faith that "was very likely to be understood" by viewers (*id.* at 23).

For present purposes, accepting that characterization means this case is therefore governed by "the constitutional protections accorded to public employee speech." *Garcetti*, 547 U.S. at 418. That is so whether the claim is viewed as a free-speech claim, a free-exercise claim, or both—when the alleged "comments are limited to the public employee context." *Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156, 167 (2d Cir. 2001). And because decorating her seventh-grade classroom was part and parcel of her teaching duties, Arroyo-Castro "has no First Amendment cause of action based on . . . her employer's reaction to the speech." *Garcetti*, 547 U.S. at 418. Put another way, "[t]he Constitution does not entitle teachers to present personal views to captive audiences against the instructions of elected officials."[6] *Mayer v. Monroe County Cmty. Sch. Corp.*, 474 F.3d 477, 480 (7th Cir. 2007).

In arguing otherwise, Arroyo-Castro starts from the mistaken premise that the location in question was *her* classroom only. *See* Br. at 1. The classroom instead belonged to the students, the teacher, the District, and the taxpayers. As Arroyo-Castro declares, DiLoreto's Principal had assigned her that year to teach seventh-grade social studies, against her preference, which entailed "[m]oving classrooms." Pl. Decl. ¶ 15. In other words, the District dictated both where she would be and what she would say when there. And during instructional hours, she was

---

[6] State law compels public-school attendance by enrolled students. *See infra* at 26-27.

subject to "the exercise of employer control over what the employer itself ha[d] commissioned." *Garcetti*, 547 U.S. at 411.

This control extended to decisions to adorn the classroom with objects of whatever type. As the District explicitly reminded Arroyo-Castro, the "Board of Education owns and controls the classroom walls." Pl. Decl. Ex. D at 2. A seventh-grade teacher cannot section off part of a classroom wall for a permanent religious display over supervisors' contrary wishes. Especially not when that teacher openly touts the symbol's "importance" as a means to enhance student-teacher interactions and "make the classroom environment more conducive to learning." *Id.* ¶ 18. *See Weintraub*, 593 F.3d at 203 (holding that First Amendment did not protect teacher's grievance about student discipline, "an indispensable prerequisite to effective teaching and classroom learning").

Reinforcing this result, a District policy on physical classroom design officially "recognizes that the classroom environment has a powerful influence on student performance." Del Pozo Decl. Ex. C. For this purpose, "[t]he physical aspects of a classroom include, but are not limited to, room arrangement, seating, bulletin boards, and artifacts related to instructional areas"—all of which "should be carefully considered with both individual students' needs and instructional goals in mind." *Id.* More broadly, teachers must ensure that the classroom's physical design "[r]eflects the diverse cultural and linguistic characteristics" of the District's students. *Id.*

Arroyo-Castro would be hard-pressed to deny that her crucifix qualified among "artifacts related to instructional areas." In general, "the classroom is inherently an instructional setting." *Lee v. Weisman*, 505 U.S. 577, 643 (1992) (Scalia, J. dissenting). In this case, the crucifix was stationed next to the teacher herself—the classroom's font of knowledge—and "was visible to anyone who would have seen [her] desk." Br. at 27. Instructional paraphernalia and a whiteboard

were nearby. Even so, the published policy's list of "physical aspects of a classroom" is illustrative only. And anyway, "under the First Amendment, speech can be 'pursuant to' a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer." *Weintraub*, 593 F.3d at 203. Supervisors had the discretion to instruct a teacher to relocate a visible crucifix, to have the classroom in *their* view better achieve the District's educational mission—just as supervisors could order a teacher to relocate a New England Patriots pennant or a Baby Yoda figurine, for example, out of an aversion to branded merchandise.

Nor does a classroom wall hanging have any true private analog. "An ordinary citizen could not have walked into [the] classroom and decorated the walls as he or she saw fit, anymore than an ordinary citizen could demand that students remain in their seats and listen to whatever idiosyncratic perspective or sectarian viewpoints he or she wished to share." *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 968 (9th Cir. 2011); *see id.* at 967 (holding that teacher lacked First Amendment claim against school supervisors for removing classroom banners with nonsectarian religious messaging, despite that other teachers had "some freedom in decorating their classrooms"). Whether Arroyo-Castro keeps a crucifix beside her bed at home, Pl. Decl. ¶ 19, is beside the point in school.

Also immaterial is whether Arroyo-Castro always wears a cross necklace. *See id.*; *cf. Kennedy*, 597 U.S. at 531 (commenting that Muslim teacher's "wearing a headscarf in the classroom" would count as personal speech). There is no evidence that anyone disciplined Arroyo-Castro for wearing a cross necklace to school. Moreover, the necklace would come and go with the teacher, and countless private citizens could wear the same accessory.[7] By contrast,

---

[7] There may come a point at which a cross pendant becomes so large or conspicuous as to make the wearer resemble a clergy member, thereby permitting regulation.

the classroom walls represented an immutable feature of the educational environment—a uniquely governmental medium of expression.

Finally, although *Garcetti* posited that "expression related to academic scholarship or classroom instruction" could implicate "additional constitutional interests" in this analysis, 547 U.S. at 425, no such interests are present here. The Supreme Court in *Kennedy* summarized these interests as "questions of academic freedom." 597 U.S. at 528 (citing *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)). The Second Circuit has thus declined to extend *Garcetti*'s reach to public university professors' teaching and academic writing. *See Heim v. Daniel*, 81 F.4th 212, 227-28 (2d Cir. 2023). By contrast, because Arroyo-Castro insists that her crucifix emitted messaging not a part of any curricular instruction, this item does not raise questions of academic freedom under *Garcetti*. *See* Br. at 23-24. In any event, middle schools are not bastions of "the expansive freedoms of speech and thought associated with the university environment." *Heim*, 81 F.4th at 227-28. Far from constricted, a local school board's power to control messaging "that occurs within a compulsory classroom setting" generally "*exceeds* the permissible regulation of speech in other governmental workplaces." *Lee v. York County Sch. Div.*, 484 F.3d 687, 700 (4th Cir. 2007) (emphasis added); *see Kuhlmeier*, 484 U.S. at 273 n.7.

The public middle "school system does not 'regulate' teachers' speech as much as it *hires* that speech," to transmit messages acceptable to school officials. *Mayer*, 474 F.3d at 479. Here, for example, the District mandates that teachers shall teach within the approved curricula. *See* Del Pozo Decl. Ex. B at 1. Thus, "[a] teacher hired to lead a social-studies class can't use it as a platform for a revisionist perspective that Benedict Arnold wasn't really a traitor, when the approved program calls him one." *Mayer*, 474 F.3d at 479. Nor does the First Amendment anoint middle-school teachers the final arbiters of messaging on classroom walls.

### 2. School officials permissibly deemed Arroyo-Castro's mode of expression to be incompatible with instructional goals.

Public-employee speech that clears *Garcetti*'s threshold hurdle is not automatically shielded from regulation. To qualify, the speech must also survive the interest-balancing test imposed by *Pickering v. Board of Education*, 391 U.S. 563 (1968), and related decisions.[8] To prevail, defendants must demonstrate that the government employer's interests in maintaining an efficient and effective public workplace outweigh the employee's "interest in making her statement." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). This analysis looks beyond the statement itself to "the manner, time, and place of the employee's expression," as well as to "the context in which the dispute arose." *Id.*

In the Second Circuit, "comments [that] are limited to the public employee context . . . are subject to the *Pickering* balancing test," even if the governmental response allegedly "infringes more than one of a public employee's constitutional rights." *Knight*, 275 F.3d at 167 (freedom of speech and religious exercise); *see also Melzer v. Bd. of Educ.*, 336 F.3d 185, 193-96 (2d Cir. 2003) (freedom of speech and association). Step-two *Pickering* balancing thus applies here—notwithstanding that Arroyo-Castro asserts "rights under both the First Amendment's Free Exercise Clause and its Free Speech Clause." Br. at 15. This balancing is "more lenient" to the government than strict scrutiny is. *Kennedy*, 597 U.S. at 532. And the balancing takes into account that the role of a "teacher in a public school" entails a "degree of public trust" greater than in most public jobs. *Melzer*, 336 F.3d at 198.

---

[8] A separate precondition for protection is that the speech regard a matter of public concern. *See Connick v. Myers*, 461 U.S. 138, 147 (1983). Defendants do not contest that element here, obviating any need to decide whether "religious speech is *per se* of public concern" (Br. at 25), or "bypasses the public concern requirement" (*id.* at 29). The Supreme Court has left those questions open. *Kennedy*, 597 U.S. at 531 n.2.

There is no likelihood—let alone a clear one—that this balancing will shake out in favor of Arroyo-Castro's classroom expression. To begin, as established, the District has formally recognized how a classroom's physical aspects have a "powerful influence on student performance." Del Pozo Decl. Ex. C. The school thus can take "appropriate steps to ensure that its message is neither garbled nor distorted." *Rosenberger*, 515 U.S. at 833. Even if a First Amendment claim is not entirely foreclosed, the school may still control the backdrop against which a middle-school teacher imparts knowledge of world affairs.[9] That interest is significantly greater than the school's interest would be in relocating private citizens' religious artifacts. *See Pickering*, 391 U.S. at 573.

Further, for *Pickering* balancing, "the statement will not be considered in a vacuum." *Rankin*, 482 U.S. at 388. Enlivening the crucifix, Arroyo-Castro said aloud in class that students needed Jesus, were sinners, or should not disappoint "Papa God." *E.g.*, Mazzei Decl. ¶ 11. Although not cited as a ground for her discipline, these types of comments may have appeared more pointed—or more overtly religious—in the presence of a nearly foot-tall crucifix. These comments only underscore the government's interest in limiting Arroyo-Castro's simultaneous in-class expression through religious iconography. A public-school teacher cannot "conduct just a little proselytizing on the theory that it did not do very much harm to the educational mission." *Mayer*, 474 F.3d at 480 (quotation marks omitted).

On the heels of being suspended and placed on paid leave, Arroyo-Castro created a spectacle by informing students, through a text-message application, that "I have been placed on

---

[9] Despite Arroyo-Castro's offhand suggestion, a middle-school classroom is not "the public square." Br. at 28. She does not actually assert that DiLoreto's schoolroom walls constituted a public forum under the First Amendment, nor would such an argument make sense. *See Johnson*, 658 F.3d at 969 (rejecting argument that a "school had created a limited public forum either by allowing teachers to post materials of their choosing" on classroom walls "or by not 'strictly policing' those materials posted").

Administrative Leave for refusing to remove a Crucifix from my desk area." Mazzei Decl. Ex. C. In this mass text, she characterized the "lesson" as being that resisting orders from above was "doing what is right." *Id.* In other words, this teacher boasted to students about *defying the Superintendent*—the official with ultimate authority "for the supervision of the schools under [the District's] control." Conn. Gen. Stat. § 10-157(a). Whatever the leadup, that gratuitous action inherently "interfered with the regular operation of the school[]," *Pickering*, 391 U.S. at 573, and "threaten[ed] to undermine its ability to perform its legitimate functions," *Knight*, 275 F.3d at 163 (quotation marks omitted). Indeed, a student reported the message to a teacher, and a parent decried the message to the Assistant Principal as inappropriate. *See* Mazzei Decl. ¶ 21.

All of this shows the clear disruptive potential of Arroyo-Castro's activities, and a likely interference with school operations is enough. *See Melzer*, 336 F.3d at 197; *Knight*, 275 F.3d at 164. An employer need not "allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick*, 461 U.S. at 152. Nor must a school district allow a classroom to devolve into strife before taking action to preserve an environment of regularity and neutrality. Nevertheless, multiple students and staff expressed concern to the Assistant Principal about the crucifix's sectarian religious nature. *See* Mazzei Decl. ¶¶ 9, 11.

Moreover, "[w]here a single speaker communicates to many listeners," the speaker's First Amendment interest wanes if a "'captive' audience cannot avoid objectional speech." *Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 541-42 (1980). Arroyo-Castro taught five subject sections, in total comprising more than 100 students, whose school attendance was compulsory.[10] A single speaker subjected this captive audience of dozens at a time to

---

[10] For 2022-2023, the District's rate of chronic absenteeism—defined as a student's missing ten percent or greater of the total number of days in the school year—was almost double the statewide rate. *See* Decl. of

continual religious expression for almost an hour at a time. Taken off the wall, and stored in a drawer during class hours, the crucifix still could have fulfilled her alleged interest in "pray[ing] silently in [her] personal time," including during "lunch breaks." Pl. Decl. ¶¶ 20-21.

In the end, however, the desire to avoid an Establishment Clause violation independently tilts the *Pickering* balance for the District. Where, as here, a public employee has indisputably "promoted religious messages while working with clients on state business, raising a legitimate Establishment Clause concern," this fact "permits the state to place a slight burden" on the employee's speech: she "may not share [her] religious beliefs with clients while conducting state business." *Knight*, 275 F.3d at 166. Simple as that.

## B.     The District's reaction to the classroom crucifix also satisfies strict scrutiny.

Even if strict scrutiny were to apply to Arroyo-Castro's discipline, the District's actions would satisfy that standard of review. In general, "a plaintiff may carry the burden of proving a free exercise violation . . . by showing that a government entity has burdened [her] sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kravitz v. Purcell*, 87 F.4th 111, 124 (2d Cir. 2023) (quoting *Kennedy*, 597 U.S. at 525). In that event, "a government entity normally must satisfy at least 'strict scrutiny,' showing that its restrictions on the plaintiff's protected rights serve a compelling interest and are narrowly tailored to that end." *Kennedy*, 597 U.S. at 532. "A similar standard generally obtains under the Free Speech Clause," for evaluating content-based speech restrictions. *Id.*

As Arroyo-Castro acknowledges (Br. at 19), the government has a compelling interest in complying with the Constitution, including the Establishment Clause. *E.g.*, *Widmar v. Vincent*,

---

Matthew Martens ("Martens Decl."), Ex. A at 1. At DiLoreto, an attendance team meets weekly to plan to improve attendance, and the school offers incentives (such as recess or craft time, sweatshirt raffles, or recognition over the loudspeaker) for achieving attendance benchmarks. Mazzei Decl. ¶ 6. These incentives further coaxed middle schoolers to come to class, only to encounter a crucifix.

454 U.S. 263, 271 (1981). Here, school officials' interest in avoiding an Establishment Clause violation was demonstrably compelling, and their reaction to the classroom crucifix was altogether justified.

    **1.**     **Permanently hanging an inherently religious symbol in a public middle-school classroom establishes religion under settled precedent.**

For close to half a century, the Establishment Clause has barred permanently displaying undeniably sacred religious items on public "schoolroom walls," unless "integrated into the school curriculum" through "appropriate study of history, civilization, ethics, comparative religion, or the like." *Stone v. Graham*, 449 U.S. 39, 41-42 (1980). *Stone* thus held that public schools could not constitutionally display on classroom walls a copy of the Ten Commandments—even though funded by private contributions, and even with an accompanying notation that the display had a "'secular application.'" *Id.*

Easing this Court's task, Arroyo-Castro concedes that "[t]he crucifix was not used as part of [her] curricular instruction." Br. at 21; *see* Pl. Decl. Ex. D at 1 (reciting Arroyo-Castro's similar statement to District administrators).[11] Rather, this crucifix "has personal significance," as a bequest from a friend who figured that Arroyo-Castro would be "likely to treasure it." Pl. Decl. ¶ 21. Arroyo-Castro exalted this item to the point of mounting it on her seventh-grade classroom wall, in plain view of many students. *See* Mazzei Decl. ¶ 10 & Ex. D; *see also* Pl. Decl. ¶ 31 & Ex. A; Br. at 23. The Constitution has long forbid such activity, "[h]owever desirable this might be as a matter of private devotion." *Stone*, 449 U.S. at 42; *accord Washegesic v. Bloomingdale Pub. Sch.*, 33 F.3d 679, 683 (6th Cir. 1994) (holding that

---

[11] If this religious artifact had been used as "a pedagogical tool" (Br. at 24), the case would be closed for a different reason: injecting Christian precepts into public-school lessons plans violates the Establishment Clause. *See Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 76 (2d Cir. 2001). In the curriculum or on the wall, such a religious artifact must be woven into objectively neutral study to be permissible.

Establishment Clause barred display in public-school hallway of portrait of Jesus that was "not integrated into any course of study").

Arroyo-Castro's brief entirely omits mention of *Stone*. More to the point, the Supreme Court in *Kennedy* did too. That decision dealt with the distinct situation of a school employee's brief postgame prayer, on a football field, outside the building, in his personal time. *Stone* thus controls—and precludes a preliminary injunction. *See Jusino*, 54 F.4th at 102 ("[R]egardless of whether *Kennedy* actively overruled *Lemon* or simply recognized that *Lemon* was already a dead letter, one thing it indisputably did not do was overrule—or even mention—*Catholic Bishop*. Thus, unless and until the Supreme Court sees fit to overrule *Catholic Bishop* directly, it remains binding on this Court.").

According to Arroyo-Castro, "the religious nature of the crucifix" would not be lost on anyone. Br at 17. Indeed, just as the "Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths," *Stone*, 449 U.S. at 41, the "cross is undoubtedly a Christian symbol," *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 66 (2019). Arroyo-Castro touts "the widely recognizable nature of [her] crucifix" (Br. at 27), "one of the most ubiquitous symbols in Western society," exuding a message of Christian devotion (*id.* at 23). This teacher's wall-mounted crucifix is unlike a cross "that has stood undisturbed for nearly a century," assuming a secular meaning as part of an outdoor memorial. *Am. Legion*, 588 U.S. at 65. Both cross and teacher had first arrived in that classroom that very semester. Pl. Decl. ¶ 15.

Arroyo-Castro's whole claim rests on the notion that her in-class practice of religion necessitated visibly displaying the crucifix during instructional hours. Storing this item in a drawer, to be taken out during preparatory time or lunch breaks, allegedly would impose a "burden on her religious exercise" and "trample [her] religious rights." Br. at 16-17. But if

"looking at the crucifix" during class hours provided this teacher with "peace and strength," Pl. Decl. ¶ 20, it stands to reason that the same sectarian artifact would be likely to "induce the schoolchildren" to "meditate" and "perhaps to venerate and obey," *Stone*, 449 U.S. at 41.

The Establishment Clause is indifferent to whether classroom religious messages "are merely posted on the wall, rather than read aloud." *Id.* at 42. While Arroyo-Castro minimizes the item in question as "a small crucifix" (Br. at 1, 4), that description is both incorrect (it's nearly a foot high) and not dispositive. "'[I]t is no defense to urge that the religious practices here may be relatively minor encroachments on the First Amendment.'" *Stone*, 449 U.S. at 42 (quoting *Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 225 (1963)); *see also Washegesic*, 33 F.3d at 684 (rejecting idea that single portrait of Jesus in school hallway was "de minimis" from constitutional perspective).[12] The District properly took action to relocate the classroom crucifix, to comply with the law.

>        **2.    This teacher's crucifix openly broadcast a particular religion to a captive seventh-grade audience.**

Other aspects of this controversy reinforce the District's compelling interest in insisting that Arroyo-Castro relocate the crucifix from the classroom wall. This is not a case merely about a religious symbol in a generic public place. Rather, the dispute arose over a non-curricular crucifix inside a middle-school classroom. In these environs, courts have "been particularly vigilant in monitoring compliance with the Establishment Clause," specifically because

---

[12] As James Madison—a driving force behind the First Amendment—said of promoting religion through state sponsorship, "'[i]t is proper to take alarm at the first experiment on our liberties.'" *Engel v. Vitale*, 370 U.S. 421, 436 (1962) (quoting Memorial and Remonstrance Against Religious Assessments (1785), II Writings of Madison 183, at 185-186). As the Supreme Court since has observed, the Establishment Clause's "first and most immediate purpose rested on the belief that a union of government and religion tends to destroy government and to degrade religion." *Engel*, 370 U.S. at 431.

"[s]tudents in such institutions are impressionable and their attendance is involuntary." *Edwards v. Aguillard*, 482 U.S. 578, 583-84 (1987).

In *Lee v. Weisman*, the Supreme Court held that a school-sponsored nondenominational prayer given at a public high-school graduation ceremony violated the Establishment Clause. 505 U.S. at 593-58. The Court held that the prayer "bore the imprint of the State and thus put school-age children who objected in an untenable position." *Id.* at 590. It observed that a request that students respect religious practices in a school context could come off as "an attempt to employ the machinery of the State to enforce a religious orthodoxy." *Id.* at 595. Given the graduation ceremony's importance, the Court emphasized that students "had no real alternative to avoid" attending—and becoming tacitly complicit in the religious exercise. *Id.* at 598.

These same principles profoundly support the District's actions here. *Lee* reaffirmed that, "at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise." 505 U.S. at 587. And this "prominent modern case on that subject . . . did not rely on *Lemon.*" *Am. Legion*, 588 U.S. at 70 (Gorsuch, J., concurring). The Supreme Court in *Kennedy* had "[n]o doubt" that coerced attendance at formal religious exercises "was among the foremost hallmarks of religious establishments the framers sought to prohibit," but added that the Court's members "have sometimes disagreed on what exactly qualifies as impermissible coercion in light of the original meaning of the Establishment Clause." 597 U.S. at 537. To illustrate this divergence, the Court pointed to *Lee*'s majority and dissenting opinions. *See id.* Here, Arroyo-Castro's in-class religious practice had at least three features that the dissenting opinion deemed missing from the ceremony in *Lee*, which together serve to highlight the Establishment Clause problem this crucifix posed.

25

First, Arroyo-Castro's religious messaging came inside the classroom, raising "special concerns regarding state interference with the liberty of parents to direct the religious upbringing of their children." *Lee*, 505 U.S. at 643 (Scalia, J. dissenting). "'Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family.'" *Id.* at 633-34 (quoting *Edwards*, 482 U.S. at 584). Arroyo-Castro openly practiced religion through a visible symbol while "teaching young students." Pl. Decl. ¶ 20.

Second, those seventh-grade students faced "legal coercion to attend school," under "threat of penalty" to parents or guardians for nonattendance. *Lee*, 505 U.S. at 643 (Scalia, J. dissenting). Relevant to *Lee*'s holding, the students' attendance at graduation there had been in "every practical sense compelled." 505 U.S. at 598 (majority op.). But the State of Connecticut views education as "so important that the state has made it compulsory"—in reality—"through a requirement of attendance." *Horton v. Meskill*, 172 Conn. 615, 647 (1977). More specifically, each parent or guardian of a minor child enrolled in a public school "shall cause such child to attend [that] public school regularly" while in session. Conn. Gen. Stat. § 10-184.

Thus, parents and guardians are legally responsible for ensuring that students enrolled in the District attend school regularly. State law also tasks boards of education with developing procedures to mitigate truancy. Conn. Gen. Stat. § 10-198a(b). Accordingly, at DiLoreto, excessive absences may lead to meetings with parents to discuss attendance concerns and, if the absences persist, a referral for investigation due to educational neglect. Mazzei Decl. Ex. A at 9-11. *See* Conn. Gen. Stat. § 46b-120(4)(B) (defining neglected child as one "being denied proper care and attention, physically, *educationally*, emotionally or morally" (emphasis added));

*see also id.* § 10-185 (designating "[e]ach day's failure" to ensure public-school student's attendance as "a distinct offense, punishable by a fine not exceeding twenty-five dollars"). As DiLoreto's Handbook naturally stresses, "[s]tudents need to be present in order to learn." Mazzei Decl. Ex. A at 9. The State "exerts great authority and coercive power" to make that happen.[13] *Edwards*, 482 U.S. at 584.

In displaying the crucifix, Arroyo-Castro "intended to convey" to her seventh graders a particularized message of "Christian faith." Br. at 23. A problem is that this religious communication was "broadcast . . . to a captive audience." *Kennedy*, 597 U.S. at 542. In addition, students would "understand[] the intended message" of religiosity that this "ubiquitous symbol[]" beamed to them. Br. at 23. And they would receive this message for nearly an hour uninterrupted, if the students sat in view of the crucifix, or else whenever approaching the teacher's desk to ask a question, retrieve a laptop, collect a handout, or turn in an assignment. *See* Mazzei Decl. ¶ 10 & Ex. D. Nor could DiLoreto's seventh-graders be excused from learning social studies, to avoid the intended message. *See Lee*, 505 U.S. at 594 (making students hear one-time, two-minute prayer violated Establishment Clause); *Engel*, 370 U.S. at 430 (making students hear one-sentence, daily classroom prayer violated Establishment Clause).

Third, Arroyo-Castro's crucifix conveyed a "sectarian religious belief." *Lee*, 505 U.S. at 643 (Scalia, J. dissenting). Absent from *Lee*, that characteristic cuts "against the central meaning of the Religion Clauses of the First Amendment, which is that all creeds must be tolerated and none favored." *Id.* at 590 (majority op.). After all, seventh graders have free-exercise rights too. On this subject, "the principle of neutrality has provided a good sense of direction: the

---

[13] *Cf. Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 115 (2001) ("Because the children cannot attend without their parents' permission, they cannot be coerced into engaging in the Good News Club's religious activities.").

government may not favor one religion over another, or religion over irreligion, religious choice being the prerogative of individuals." *McCreary County v. ACLU of Ky.*, 545 U.S. 844, 875 (2005). James Madison famously warned "'that the same authority which can establish Christianity, in exclusion of all other Religions, may establish with the same ease any particular sect of Christians, in exclusion of all other Sects.'" *Engel*, 370 U.S. at 436 (quoting Memorial and Remonstrance Against Religious Assessments (1785), II Writings of Madison 183, at 185-186). Combined, *Stone* and *Lee* fully supported the District's interest in relocating this inherently sectarian, in-class image. *See Washegesic*, 33 F.3d at 683.

### 3. Despite Arroyo-Castro's contentions, school officials justifiably proposed relocating the crucifix after exploring alternatives.

None of Arroyo-Castro's few counterarguments would be likely to succeed on the merits if strict scrutiny applied. *See, e.g.*, Br. at 18-21, 30-36. To the contrary, they are meritless.

First and foremost, Arroyo-Castro mischaracterizes events by accusing District officials of basing her discipline solely on *Lemon*'s now-abrogated "endorsement" test. *See id.* at 18-19. From the outset, defendants described the more basic issue as being that the crucifix sent an official, in-class signal of "promoting" and "favoring" Christianity, to the exclusion of other religions. Mazzei Decl. ¶ 16. The District's reprimand letter reminded Arroyo-Castro that the "Establishment Clause includes employees of the public schools, including administrators *and teachers*." Pl. Decl. Ex. D at 2. The letter continued: "When a public school employee hangs a religious artifact in their classroom, it sends the message that the school district (which is an arm of the government) is promoting that religion," which "is not legally permissible." *Id.*

The District wrote that given the lack of any "pedagogical justification for hanging this cross," along with the District's ownership and control of the classroom walls, a teacher's hanging a crucifix there was, "in effect, saying that 'the New Britain Board of Education

endorses this religion.'" *Id.* Read in context, this use (and stray others) of "endorse" referred to the message the teacher's in-class crucifix would directly send to students on the school's behalf—not that the District exclusively sought refuge in an outmoded legal standard. Indeed, the District's communications mentioned several related reasons why failing to move the crucifix would violate the Establishment Clause. In doing so, they echoed general concepts long used in the Establishment Clause context.[14] And the word "endorse" makes no cameo in the suspension notice. *See* Pl. Decl. Ex. E.

Rooted in controlling law, these real-time justifications support the District's narrowly tailored response to the predicament Arroyo-Castro's crucifix had caused. Narrow tailoring requires showing that no lesser restriction would achieve the government's genuine, compelling objective. *See Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 633 (2d Cir. 2020). To satisfy this test, the government must have meaningfully considered alternatives "imposing lesser burdens on religious activity," without success. *See id.* (citing *McCullen v. Coakley*, 573 U.S. 464, 494 (2014)).

This element is met here (and plaintiff does not contend otherwise). Over more than a month, school officials proposed several alternative locations for the crucifix that would respect Arroyo-Castro's right to practice religion, but keep the item from students' view during instructional hours. These options included placing the crucifix in or near the desk drawer, which would have permitted Arroyo-Castro to "pray silently in [her] personal time" and "[d]uring [her] lunch breaks."[15] Pl. Decl. ¶¶ 20-21. But Arroyo-Castro reneged and resisted, restoring the

---

[14] *See, e.g.*, *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968) (synthesizing past decisions as affirming that government "may not aid, foster, or promote one religion or religious theory against another").

[15] These options aligned with the 2023 federal agency guidance that Arroyo-Castro cites (Br. at 10 n.15), which counsels that the Constitution does not "prohibit school employees themselves from engaging in private prayer during the workday where they are not acting in their official capacities," such as "[b]efore school or during breaks." Martens Decl. Ex. C at 9 of 19. This guidance cautions, however, that

crucifix to the wall, from where she "would not remove the cross." *Id.* ¶ 39. Initially out of

options, the District suspended her for two days, then placed her on indefinite leave with full pay.

Even afterward, the District continued to explore whether Arroyo-Castro would agree to remove

or relocate the crucifix. *See id.* ¶ 50. Unsuccessful suggestions included placing the crucifix in

her pocket (if it could fit there), in a desk drawer (to view it when students were away), under the

desk (attached with a magnet), or behind a screen (that would obscure the crucifix from nearby

students' view). *See* Manning Decl. ¶ 18. The District thus imposed, and maintained, the

discipline "only after contemplating alternative courses of action," which evidences narrow

tailoring. *Jeffery v. City of New York*, 113 F.4th 176, 195 (2d Cir. 2024).

      While ignoring *Stone* and *Lee*, Arroyo-Castro further maintains that "*Kennedy* squarely

governs." Br. at 19. If the football coach in *Kennedy* had triumphed after hanging a crucifix in a

locker room, then maybe. But that is not what happened; indeed, the coach ceased his practice of

praying in the locker room with students, once the administration told him to stop. *See Kennedy*,

597 U.S. at 520. The decision addresses the coach's ephemeral, quiet, on-field prayers, after a

football games that were optional to attend, at a time "when students were engaged in other

activities," and "coaches were free to attend briefly to personal matters." *Id.* at 530. By contrast,

Arroyo-Castro wants to hang a crucifix in a classroom, as a message to captive students, during

instructional hours.

      Nor has the District impermissibly discriminated based on viewpoint, which would not

change the result in any event. *See* Br. at 32-33. In this regard, Arroyo-Castro gains no aid from

decisions holding that when allowing public access to school property, or distributing

---

"[s]chools must also maintain neutrality among faiths rather than preferring one or more religions over
others," *id.* at 5, and that "a school may take reasonable measures to ensure that students are not pressured
or encouraged to join in the private prayer of their teachers," *id.* at 9.

education-related funding, the government cannot "exclude some members of the community from [the] otherwise generally available public benefit because of their religious exercise." *Carson ex rel. O.C. v. Makin*, 596 U.S. 767, 781 (2022). Here, however, nobody "is put to the choice between being a church and receiving a government benefit." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 465 (2017). Rather, seventh graders are put to the choice of a classroom with a crucifix or penalties for absences.

As a rule, "schools may direct teachers to refrain from expression of religious viewpoints in the classroom." *Marchi*, 173 F.3d at 475 (quotation marks omitted). At any rate, Arroyo-Castro does not specify what viewpoint, exactly, the District has suppressed. At most, any distinction is between unmistakably religious objects and other types of displays. Disentitling public schools from aiding "religious faiths or sects in the dissemination of their doctrines and ideals does not, as counsel urge, manifest a governmental hostility to religion." *Illinois ex rel. McCollum v. Bd. of Educ.*, 333 U.S. 203, 211 (1948). Indeed, Arroyo-Castro's own submission reveals that District officials left undisturbed a Santa Claus hat, two Christmas trees, and a picture of the Virgin Mary—none of which garnered complaints. There is also no allegation that anyone ever complained about teachers' more secular personal effects either.[16]

Failing all else, Arroyo-Castro demands that New Britain's school administrators supply historical evidence of public educators' "being disciplined for their private devotional speech at

---

[16] While plaintiff obliquely refers to isolated comments that Principal Soto allegedly made in meetings after she had already ignored a directive to move the crucifix (Mot. at 7, 9), her brief contains no legal argument about them, forfeiting the point. *See Worth v. Picard*, 2021 WL 5447121, at *2 n.3 (D. Conn. 2021). For example, Arroyo-Castro does not specifically contend that these alleged comments show any sort of animosity, versus a supervisor's trying to connect with and manage a familiar employee. *See We The Patriots*, 17 F.4th at 283-84 (holding that elected official's loosely analogous comments to encourage vaccination over religious objections did not evince animosity). Indeed, the Principal's alleged Biblical reference—to "give Caesar what is Caesar's" (Pl. Decl. ¶ 39)—is popularly understood to mean that certain secular duties to government must be honored, as distinct from a person's faith, with no trace of animosity intended. *See Tyler v. Hennepin County*, 598 U.S. 631, 647 (2023) ("The taxpayer must render

the time of the Founding and Fourteenth Amendment." Br. at 36. In other words, she would have this Court replace a century's worth of precedent with a quest for historical analogs, akin to the Second Amendment standard from *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). This argument misses the mark—no matter how many schools around the Founding were "imbued with religious practice." Br. at 35. "Colonial schools certainly started with a religious orientation," but the "democratic response of the American community to the particular needs of a young and growing nation" over time produced a "sharp confinement of the public schools to secular education." *McCollum*, 333 U.S. at 214-15 (Frankfurter, J., concurring).

A court cannot ignore that evolution. To be sure, *Kennedy* reiterated that the Establishment Clause's meaning has to "accord with history and faithfully reflect the understanding of the Founding Fathers." 597 U.S. at 535-36 (cleaned up). Notably, *Kennedy* traced this language to a concurring opinion in a decision nullifying a daily classroom prayer, *School District of Abington Township v. Schempp*, 374 U.S. 203 (1963).[17] Observing that "American education has greatly changed since the First Amendment was adopted," that opinion called it irrelevant if "devotional exercises in the schools of the young Republic did not provoke criticism." *Id.* at 238-39 (Brennan. J., concurring). That same opinion also described as "futile and misdirected" any "too literal quest for the advice of the Founding Fathers upon the issues of these cases." *Id.*; *accord Edwards*, 482 U.S. at 583 n.7. "Since there then existed few

unto Caesar what is Caesar's, but no more."); *United States v. Doggart*, 947 F.3d 879, 884 (6th Cir. 2020) ("A house of worship must comply with governmental building and safety codes that apply to commercial buildings. (Give to Caesar what is Caesar's.)"); *McCarthy v. Fuller*, 714 F.3d 971, 976 (7th Cir. 2013) (Posner, J.) (describing this phrase as regarding the lack of "commingling of [the] religious and secular").

[17] The dissenting opinion in *Kennedy* noted that that the majority there had described its analysis as treading no new legal ground. 597 U.S. at 573 (Sotomayor, J., dissenting). Insofar as the dissenting opinion made predictions about where the doctrine may be headed, "[a] dissenting opinion is generally not the best source of legal advice on how to comply with the majority opinion." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023).

government-run schools, it is unlikely that the persons who drafted the First Amendment, or the

state legislators who ratified it, anticipated the problems of interaction of church and state in the

public schools." *Wallace v. Jaffree*, 472 U.S. 38, 80 (1985) (O'Connor, J., concurring). Thus, any

absence of early case law does not signal "that the practice of prayer in public schools enjoyed

uninterrupted government endorsement from the time of enactment of the Bill of Rights to the

present era."[18] *Id.* In all, controlling precedent forecloses Arroyo-Castro's federal claims.

> **4.    The District had substantial grounds to conclude that a failure to act
> would violate the Establishment Clause.**

For purposes of this motion, the parties agree that Arroyo-Castro's classroom crucifix

sent a message to onlookers, but disagree over whether the Establishment Clause permitted as

much in that time and place. The District's view is correct. But even if not, Arroyo-Castro is

incorrect to suggest that any inability to show "a genuine violation of the Establishment Clause"

necessitates a preliminary injunction. Br. at 19. To the contrary, the objectively substantial risk of

such a violation precludes injunctive relief.

The Second Circuit has rejected the idea that school officials are powerless to "steer[]

clear of conduct" that might offend the Establishment Clause, "unless the excluded practice

would *in fact* constitute a violation." *Bronx Household of Faith v. Bd. of Educ.*, 750 F.3d 184,

197 (2d Cir. 2014) (emphasis added). Rather, where, as here, a school district "makes a

reasonable, good faith judgment that it runs a substantial risk of incurring a violation of the

Establishment Clause" by permitting a religious practice on school grounds, the district may

---

[18] Relatedly, whereas the Second Amendment was "meant to codify a *pre-existing* right," *Bruen*, 597 U.S. at 26, plaintiff points to nothing indicating that the framers intended for the Establishment Clause to cement the existing order. The opposite is true: "the successful Revolution against English political domination was shortly followed by intense *opposition* to the practice of establishing religion by law." *Engel*, 370 U.S. at 428 (emphasis added). Where "apply[ing] to circumstances beyond those the Founders specifically anticipated," as here, any and every Amendment "may require a more nuanced approach" than scouring for precise historical analogs. *Bruen*, 597 U.S. at 27.

"decline to do so" without threat of an injunction. *Id.* at 198. In this context, a school district

"must be accorded some leeway" and "breathing space to regulate," even if "the conduct it

forbids might not inevitably be determined to violate the Establishment Clause." *Marchi*, 173

F.3d at 476; *accord Bronx Household of Faith v. Bd. of Educ.*, 650 F.3d 30, 43 (2d Cir. 2011)

(applying this rule to religious-speech claim).

      This case exemplifies why the Second Circuit allows this breathing room. Arroyo-Castro,

a public middle-school teacher, has insisted on hanging a crucifix on a classroom wall,

prompting objections from others in the school. *See* Duve Decl. ¶¶ 6-7; Mazzei Decl. ¶¶ 9, 11.

The District's administrators consistently, and more than defensibly, instructed her to relocate the

crucifix out of view during class hours, "so as to not violate the Establishment Clause." Pl. Decl.

Ex. D at 2, Ex. E at 2; *see* Manning Decl. ¶ 15. The claim that this response had no valid

justification "contradicts the most nearly comparable Supreme Court authority, as well as clear

Second Circuit authority." *Bronx Household*, 750 F.3d at 197. Conversely, accepting

Arroyo-Castro's position would upend the law, to enable her to "deliver [her] message to anyone

anytime [she] wish[es]." *Kennedy*, 597 U.S. at 527.

      In these circumstances, subjecting a public-school district to an injunction (plus potential

attorney's fees liability down the line) "would unfairly put the Board in an impossible position of

being compelled at its peril to risk violating one Religion Clause or the other if it wrongly

guessed the Establishment Clause's exact contours." *Bronx Household*, 750 F.3d at 197.

      The Second Circuit's rule from *Bronx Household* remains good law. The Supreme Court

has sometimes held that *unreasonable* fears of Establishment Clause liability cannot justify

actions that bar or disfavor religious activity. In *Kennedy*, for example, the Court made clear that

the coach's postgame "religious exercise did not come close to crossing any line one might

imagine separating protected private expression from impermissible government coercion." 597 U.S. at 537; *see also Carson*, 596 U.S. at 781 (noting that prior Supreme Court authority squarely addressed exact question under review); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 395 (1993) (concluding that, under settled law, "the posited fears of an Establishment Clause violation are unfounded"). By contrast, this case hardly involves concerns about "phantom constitutional violations." *Kennedy*, 597 U.S. at 537. However trailblazing, Arroyo-Castro's arguments cannot support relief, given the District's substantial legal position.

**C.    Plaintiff's state-law claim is unlikely to prevail.**

Arroyo-Castro is unlikely to succeed on her claim that relocating the classroom crucifix violated Connecticut's Act Concerning Religious Freedom, which provides that neither the State nor any political subdivision may "burden a person's exercise of religion," unless in furtherance of a compelling government interest and the least restrictive means of achieving that goal. Conn. Gen. Stat. § 52-571b(b)(1)-(2).

Arroyo-Castro has not shown—and cannot show—that defendants burdened her exercise of religion within the meaning of this statute. "The scope and meaning of the word 'burden' as used in § 52-571b is a question of statutory interpretation." *Cambodian Buddhist Society of Conn., Inc. v. Planning and Zoning Comm'n*, 285 Conn. 381, 422 (2008). Because the word "burden" lacks a "plain and unambiguous meaning," this Court must "look to the statute's purpose and history to ascertain [its] meaning." *Id.* at 423. Like the federal Religious Freedom Restoration Act ("RFRA"), "'§ 52-571b was enacted in response to'" the U.S. Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872 (1990); and the "'purpose of § 52-571b was to restore the balancing standard'" for free-exercise claims from prior decisions such as *Sherbert v. Verner*, 374 U.S. 398 (1963). *Spillane v. Lamont*, 350 Conn. 119, 157 (2024) (quoting *Cambodian Buddhist Society*, 285 Conn. at 423-24). "Under the *Sherbert* test, governmental

actions that *substantially* burden a religious practice must be justified by a compelling governmental interest." *Smith*, 494 U.S. at 883 (emphasis added); *accord Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989). As the legislative history confirms, § 52-571b "does not expand, contract or alter [that] compelling interest test prior to *Smith*." *Spillane*, 350 Conn. at 157 (cleaned up).[19]

Thus, at the threshold, this state-law claim demands a showing that a public actor "substantially burdened" the plaintiff's religious exercise without a compelling state interest. *Rweyemamu v. Comm'n on Human Rights & Opportunities*, 98 Conn. App. 646, 658 (2006). Like under the analogous RFRA, the standard entails "an objective inquiry into the extent of the governmental pressure on the plaintiff's exercise of religion." *Kravitz*, 87 F.4th at 126; *see Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 719-20 (2014) (holding that "substantial economic consequences" for adherence to religious belief qualified as substantial burden).

Here, the District did not preclude Arroyo-Castro from practicing religion as she generally pleases. It prevented her only from mounting a nearly foot-tall, ornate crucifix on her seventh-grade classroom wall, in students' sight during instructional time. Supervisors told her repeatedly that she could keep the crucifix nearby, to use to pray during lunch or other breaks, but these options apparently did not satisfy her. After suspending her for two days without pay, the District then "placed [her] indefinitely on paid administrative leave." Pl. Decl. ¶ 48. Under the circumstances, any burden on religion cannot qualify as substantial. This public employee is not even suffering a "financial sacrifice in order to observe [her] religious beliefs." *Braunfeld v.*

---

[19] The substantial burden standard also applies under "the analogous Religious Freedom Restoration Act." Br. at 21. That Congress saw fit in RFRA to use the word "substantially," 42 U.S.C. § 2000bb-1(a), does not alter the meaning of Connecticut's law, as conclusively interpreted by the State Supreme Court.

*Brown*, 366 U.S. 599, 606 (1961). In any event, even if strict scrutiny were to apply, that standard would be met for the reasons already given.

## II.    The Equities Strongly Disfavor Preliminary Injunctive Relief.

The claims' lack of merit aside, this Court should deny a preliminary injunction for the independent reason that the equities tilt overwhelmingly against awarding such relief. Any alleged harm from teaching middle-schoolers without a crucifix in plain sight would be narrow and negligible, whereas a preliminary injunction would injure the public interest on balance.

The Second Circuit applies "a particularly stringent standard for irreparable injury" in public-employee lawsuits, to avoid substituting equitable injunctions for injuries better redressed by available forms of monetary relief. *Kane v. De Blasio*, 19 F.4th 152, 171 (2d Cir. 2021) (quotation marks omitted); *accord New Yorkers for Religious Liberty, Inc. v. New York*, 125 F.4th 319, 329 (2d Cir. 2024). Since before this lawsuit began, Arroyo-Castro has been on paid administrative leave. Pl. Decl. ¶ 48. Thus, she professes, her motion "is about more than money"; she wants the court to allow her to resume "teaching young people." Br. at 38. Yet she does not claim to have any First Amendment right to teach elementary or middle schoolers in New Britain. And she may resume that calling at any time—just not while "broadcast[ing]" a sectarian religious message "to a captive audience." *Kennedy*, 597 U.S. at 542.

In dismissing that option, she invokes the same presumption of irreparable harm that attaches when the government denies congregants or others the ability to attend religious services or perform religious instruction. *See* Br. at 36-37. Undoubtedly, the government's tamping down on group worship "'strike[s] at the very heart of the First Amendment's guarantee of religious liberty.'" *Agudath Israel*, 983 F.3d at 637 (quoting *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020)). In those cases, however, unlike in this one, individuals were prohibited wholesale from practicing religion in certain locations. To the extent that

Arroyo-Castro likens her homeroom or social studies class to a religious service, that is all the more reason to deny relief.

Nor does Arroyo-Castro explain why she waited to file this motion until after being made to develop curriculum, a month and a half after this lawsuit began, and three months after her paid leave began. "[M]onths-long delays in seeking preliminary injunctions have repeatedly been held by courts in the Second Circuit to undercut the sense of urgency accompanying a motion for preliminary relief." *Silber v. Barbara's Bakery, Inc.*, 950 F. Supp. 2d 432, 439 (E.D.N.Y. 2013). Indeed, Arroyo-Castro has been free to hang the crucifix in her temporary new office without administrative interference. *See* Manning Decl. ¶ 21.

Further undermining her argument, Arroyo-Castro has taken the position that she will "agree to removing or relocating the crucifix within the classroom" if the District revokes other teachers' permission "to keep personal expressive items in similar locations." Pl. Decl. ¶ 50. Thus, Arroyo-Castro's "sincere religious conviction" that teaching requires a wall-mounted crucifix is explicitly conditioned on other teachers' ability to display unrelated items. *Id.* ¶ 35. It is unclear why other classrooms' absence of decorations should make it any less of "an affront to [her] faith and religious identity" to remove the crucifix from "its place on the wall." *Id.* It would be like the congregants in *Agudath Israel* inviting the State to shutter their houses of worship so long as the State also shuttered secular businesses, then claiming irreparable injury to religious practice if the State declined to do so. While unequal treatment may sometimes trigger heightened scrutiny, a claim of irreparable harm is doubtful where the plaintiff would willingly comply with a functionally similar restriction that applied more broadly.

The potential harms from an injunction and the overall public interest outweigh any ongoing harms to Arroyo-Castro. *See We the Patriots*, 17 F.4th at 295 (stating that equitable

balancing and public-interest analysis merge in governmental cases). As demonstrated, students had to attend school on penalty of compulsion. "[T]heir parents were thus statutorily required to relinquish their custody to [school] officials during those hours." *Grady v. Town of Somers*, 294 Conn. 324, 352 (2009). As these students' daily caretakers, administrators determined that a visible crucifix on unfettered display in a classroom would advertise Christianity to seventh graders who could not opt out of witnessing this religious exhibition. In general, "local school boards are generally afforded considerable discretion in operating public schools." *Edwards*, 482 U.S. at 583. The District exercised its discretion in favor of Arroyo-Castro's hundred or so students, all of whom possess free-exercise rights of their own, as well as in favor of their parents and guardians, who entrusted the school with their children's wellbeing. This Court should decline to disturb that choice as this lawsuit plays out.

A preliminary injunction also would override school officials' discretion in ways not directly tied to any religious harm. Under the governing collective bargaining agreement, the District retains the default right to transfer teachers from year to year, even involuntarily, to meet operational needs. *See* Manning Decl. ¶¶ 7-9 & Ex. A-B. This happened to Arroyo-Castro in the summer of 2024. Enjoining defendants "from suspending, holding on leave, reassigning, or otherwise disciplining [her] in any way that alters" the situation "as it stood on December 3rd, 2024" (Mot. at 1) would freeze her in place as a seventh-grade social studies teacher in a specific classroom at a specific school during this lawsuit, circumscribing the District's ability to redeploy her as needed. That result would afford her a remedy above and beyond what her claims could reasonably justify.

Alternatively, a preliminary injunction would need to direct school officials to permit Arroyo-Castro to hang a crucifix in an indeterminate but visible location in any as-yet unknown

classroom. Crafting such an injunction with the requisite specificity would be difficult to say the least. *See* Fed. R. Civ. P. 65(d)(1) (injunction must "describe in reasonable detail . . . the act or acts restrained or required"); *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (injunction must be detailed enough to avoid "uncertainty and confusion"). All of this counsels against issuing the truly extraordinary provisional remedy requested here, without the clearest showing of an entitlement to relief, which Arroyo-Castro has not made.

## <u>CONCLUSION</u>

The Court should deny plaintiff's motion for a preliminary injunction.


Respectfully submitted,


By:  /s/ *Eric Del Pozo*
         Eric Del Pozo (ct31359)
         Peter J. Murphy (ct26825)
         Sarah Niemiroski (ct31281)
         SHIPMAN & GOODWIN LLP
         One Constitution Plaza
         Hartford, CT 06103
         Tel.: (860) 251-5331
         edelpozo@goodwin.com
         pmurphy@goodwin.com
         sniemiroski@goodwin.com

         *Attorneys for defendants*
         *Anthony Gasper, Maryellen Manning,*
         *Dario Soto, and Andrew Mazzei*