UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------------------  x

MARISOL ARROYO-CASTRO,                          :
                                                :
                        Plaintiff,              :
                                                :
        v.                                      :        3:25-CV-00153 (SFR)
                                                :
ANTHONY GASPER, ET AL.,                         :
                                                :
                        Defendants.             :
---------------------------------------------------------------  x

**MEMORANDUM & ORDER**

Marisol Arroyo-Castro, a teacher employed by the Consolidated School District of New Britain (the "District"), has brought this action against Anthony Gasper, Maryellen Manning, Dario Soto, and Andrew Mazzei (collectively "Defendants") in their individual and official capacities as employees and administrators of the District. The complaint asserts claims against Defendants pursuant to 42 U.S.C. § 1983 for violating Ms. Castro's[1] rights under the Free Speech and Free Exercise Clauses of the First Amendment to the U.S. Constitution. The complaint, which seeks injunctive and equitable relief, also raises a claim under Connecticut's Act Concerning Religious Freedom, Conn. Gen. Stat. § 52-571b.

The dispute centers around whether Ms. Castro has the right to affix an approximately foot-high crucifix to the wall near the teacher's desk in a classroom of a public middle school. Ms. Castro has moved for a preliminary injunction seeking an order from this Court prohibiting Defendants from removing Ms. Castro from the classroom or otherwise disciplining her for having the crucifix displayed in a classroom in a manner similar to how it was displayed in the

---

[1] Plaintiff's papers refer to Plaintiff as "Ms. Castro."

1

classroom where she taught on December 3, 2024, preceding the pending controversy.[2] Defendants have opposed the request for a preliminary injunction.

The parties do not dispute that the crucifix display on the classroom wall is "speech" within the meaning of the First Amendment. At issue is whether the crucifix display is protected speech. When "a public employee speaks 'pursuant to [his or her] official duties,' . . . the Free Speech Clause generally will not shield the individual from an employer's control and discipline because that kind of speech is—for constitutional purposes at least—the government's own speech." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527 (2022) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). Here, Ms. Castro's job duties specifically included decorating the classroom walls to make the physical classroom environment conducive to student learning. Under these circumstances, based on the existing evidentiary record, I conclude that Ms. Castro acted pursuant to her official duties when she posted items on the classroom wall that students would see during instructional time. The classroom wall decorations are thus speech pursuant to Ms. Castro's official duties and subject to the District's control. For these reasons, I conclude that Ms. Castro is unlikely to prevail on the merits of her free speech and free exercise claims and is not entitled to the extraordinary remedy of a preliminary injunction. Ms. Castro's motion for a preliminary injunction is denied.

---

[2] Ms. Castro's motion for a preliminary injunction seeks an injunction returning Ms. Castro to the "status quo ante as it stood on December 3rd, 2024." ECF No. 38. At oral argument, Ms. Castro's counsel acknowledged the impossibility of returning to the exact status quo as of that date, given that teaching assignments adjust with the needs of the school. Counsel clarified that Ms. Castro seeks a preliminary injunction "to enjoin the defendants from continuing to adversely [a]ffect Ms. Castro's employment but-for the crucifix in her personal space." Tr. 3, ECF No. 72. *See also id.* at 6-7 (acknowledging that "it would not be a requirement," if the injunction were granted, "that [Ms. Castro] be based back in that particular classroom teaching seventh grade students social studies and so forth in that particular room").

I.    **BACKGROUND**

A.    **Factual Background**[3]

The parties ask the court to consider the facts set forth in the exhibits and declarations attached to the motion for preliminary injunction, ECF No. 38, and Defendants' memorandum in opposition, ECF No. 50. The parties declined the opportunity to have an evidentiary hearing on the motion. ECF No. 52.

Ms. Castro is a tenured teacher employed by the Consolidated School District of New Britain. Castro Decl. ¶ 4, ECF No. 38-2. Defendants are administrators of the District: Anthony Gasper is Superintendent and CEO of the District, Maryellen Manning is Chief of Staff for Relationships and Accountability for the District, Dario Soto is principal of DiLoreto Elementary & Middle School ("DiLoreto"), and Andrew Mazzei is the vice principal of the middle school program at DiLoreto. *Id.* ¶¶ 10-14.

Ms. Castro has taught in the District since 2003 and at DiLoreto since 2008. Manning Decl. ¶¶ 3, 5, ECF No. 50-1. For much of the past decade, Ms. Castro has taught third and fourth graders. *Id.* ¶ 10; Castro Decl. ¶ 7. For the 2024-2025 school year, Ms. Castro was assigned to teach seventh grade social studies at DiLoreto. *Id.* ¶ 15. At this time, Ms. Castro moved classrooms and began reporting to Mazzei. *Id.*

In the fall 2024 semester, Ms. Castro had a homeroom class, taught four sections of social studies, and taught an advisory class of students needing reading and math support. Mazzei Decl. ¶ 4. Each section had at least 25 students and all class sessions were 48 minutes long. *Id.* In the fall 2024 semester, Ms. Castro was DiLoreto's only seventh grade social studies

---

[3] Citations to declarations are by paragraph number. With respect to other documents, page citations are to the page number generated by the ECF system.

teacher. ECF No. 50-2, at 12. In addition to a 30-minute daily lunch break, Ms. Castro had three-and-a-half hours total each week for planning when she was required to be on school grounds but was free from other responsibilities. Manning Decl. ¶ 12.

Connecticut law requires that "each parent or other person having control of a child five years of age and over and under eighteen years of age shall cause such child to attend a public school regularly during the hours and terms the public school in the district in which such child resides is in session, unless such child is a high school graduate or the parent or person having control of such child is able to show that the child is elsewhere receiving equivalent instruction in the studies taught in the public schools." Conn. Gen. Stat. § 10-184. Students enrolled in the District are required to attend school regularly per District policy. ECF No. 50-4, at 4.

A District policy statement recognizes that the "classroom environment has a powerful influence on student performance and behavior." ECF No. 50-4, at 9. The policy states that the "physical aspects of a classroom include, but are not limited to, room arrangement, seating, bulletin boards, and artifacts relating to instructional areas" and "[e]ach of these should be carefully considered with both individual students' needs and instructional goals in mind." *Id.* The policy provides a "checklist" as a "tool to ensure that the physical arrangement of the classroom is student-centered and task-focused." *Id.* The checklist asks teachers to ensure that the classroom: "[a]ddresses academic and social needs of our students," "[r]eflects the diverse cultural and linguistic characteristics of our students," "[e]nsures clean, and attractive settings that stimulate learning and help build a classroom community," and "[e]stablishes emotionally, socially, and physically safe environments for learning and encourages students' growth and development." *Id.*

Ms. Castro decorated the classroom walls when she moved to the new classroom in fall 2024. Castro Decl. ¶¶ 15-16. Near the teacher's desk, Ms. Castro displayed a poster for a social studies textbook, instructions relating to operating Chrome Book computers, a printout entitled "Student Daily Schedule," a painting containing a Puerto Rican flag, and various drawings of scenes and animals that appear to have been made by children. ECF No. 38-3.[4] On the same wall, near the desk, Ms. Castro affixed a crucifix. *Id.*; Castro Decl. ¶¶ 16-17, 21. A crucifix is a representation of the figure of Jesus Christ crucified on the cross. The crucifix Ms. Castro affixed to the classroom wall is approximately a foot tall and half a foot wide. Mazzei Decl. ¶ 10. The crucifix was hung on the wall "at about waist height." Castro Decl. ¶ 22. The crucifix was not part of the seventh grade social studies curriculum, and the school did not approve of the crucifix as a learning aid. *See id*. ¶¶ 16, 20; Mazzei Decl. ¶ 5.

In addition to the crucifix, which Ms. Castro calls a "personal expressive item," Castro Decl. ¶ 16, Ms. Castro displayed on the classroom wall other "personal expressive items" including a New York Yankees team pennant and her church calendar. Ms. Castro also had a small Christmas tree in the classroom around the holidays. *Id.* ¶ 17. Near the Christmas tree was an angel figurine, a small cross, and a Merry Christmas sign in the shape of a Santa hat. ECF No. 38-3, at 2. Ms. Castro states that based on her experience, displaying "[p]ersonal expressive items" such as these "make the classroom environment more conducive to learning." *Id.* ¶ 18. Ms. Castro says that the experience of remote learning during the pandemic showed her the importance of "students interacting with their teachers as human beings" and

---

[4] ECF No. 38-3 appears as Appendix 1 to this opinion.

"[p]ersonal expressive items promote this goal by humanizing teachers to their students." *Id.*
¶ 19.

Ms. Castro states that she has hung that same crucifix "in a similar location" for the
past 10 years, Castro Decl. ¶ 16, 23, but provides no further details about the location of the
crucifix in the other classrooms or the size or layout of those classrooms. This specific crucifix
has personal significance to Ms. Castro because it belonged to a friend whose family gave it
to Ms. Castro after the friend's death. *Id.* ¶ 20. Ms. Castro's grandmother taught her how
important it is to treat a crucifix with respect and "never to put anything on top of the crucifix."
*Id.* ¶ 19. Ms. Castro states: "During the school day, looking at the crucifix provided me with
peace and strength, especially when the task of teaching young students proved particularly
challenging." *Id.* ¶ 20. In addition, during lunch breaks, rather than going to the teachers'
lounge, Ms. Castro "would remain at [the] desk, look at the crucifix, and pray." *Id.* Ms. Castro
says: "I hang the crucifix on the wall in the personal space next to my desk for multiple reasons.
It reminds me of my grandmother, helps me pray silently in my personal time, and express[es]
my identity as a Christian." *Id.* ¶ 21.

Multiple student desks in the classroom had direct lines of sight to the crucifix. *See*
ECF No. 50-2, at 24;[5] *see* Mazzei Decl. ¶ 22 (noting that ECF No. 50-2 portrays the classroom
as it appeared when Ms. Castro was teaching, but for the crucifix). It appears that materials for
students were placed on top of a small file cabinet next to the desk. ECF No. 38-3; ECF No.
50-2; Mazzei Decl. ¶ 22. Papers appear on a small table sitting immediately to the right of the
crucifix and to the left of the door. *Id*. Ms. Castro does not dispute that students could see the

---

[5] ECF No. 50-2, at 24 appears as Appendix 2 to this opinion.

crucifix while in the classroom during instructional time but asserts that the crucifix was "blocked from most students' view by a computer monitor and other items." Castro Decl. ¶ 31.

Ms. Castro has supplied photos showing items she says other teachers have displayed at DiLoreto including athletic team pennants, inspirational phrases, college decals, family and pet photos, action figures of Wonder Woman, a picture of the Mona Lisa, and a desk mat with images of Baby Yoda. *Id.* ¶ 25; ECF No. 38-4. In addition, Ms. Castro points to items she says have "religious origins or connotations" including a picture of Santa Claus, a coffee mug,[6] a Christmas tree, and a small photograph of a statue of the Virgin Mary. *Id.* The placement of the items varies, with some items displayed on or near desks, ECF No. 38-4, at 2-4, 6-7, 9, near doors, *id.* at 5, or near windows, *id.* at 8, 10. Ms. Castro does not assert that all the photos are from classrooms and some photos show spaces that may instead be offices. *See id.* at 2, 4.

During the fall 2024 semester, in a conversation with a seventh-grade science teacher, two students complained that Ms. Castro was exposing students to religion in the classroom. The students mentioned the crucifix and also said that Ms. Castro was making religious comments to students in the classroom. Duve Decl. ¶¶ 6, 7.[7] The science teacher expressed her

---

[6] Defendants' memorandum says the mug has "Teacher" printed on it along with a citation to Proverbs 31:26 ("She opens her mouth in wisdom; kindly instruction is on her tongue.") Defs.' Mem. 12 n.3. The reference to the Proverbs is not visible in the photo.

[7] Ms. Duve's declaration details complaints from students who alleged that Ms. Castro made religion-based comments to students in the classroom. Duve Decl. ¶¶ 6-7, ECF No. 50-3. Mr. Mazzei then heard complaints directly from students. Mazzei Decl. ¶ 11. Ms. Castro denies directing religious comments to students. Castro Supp. Decl. ¶¶ 3-5, ECF No. 60-1. At oral argument, Defendants' counsel made clear that Defendants were not relying on the alleged comments for purposes of opposing Ms. Castro's preliminary injunction motion, noting that the matter was still under investigation. Tr. 60-61.

concern to Mr. Mazzei, who notified Ms. Manning. *Id.* ¶ 8; Manning Decl. ¶ 13. Mr. Mazzei and Ms. Manning decided to convene an "informational meeting" with Ms. Castro. Manning Decl. ¶¶ 13, 14.

On December 3, 2024, Mr. Mazzei emailed Ms. Castro asking to discuss a "concern" that had been brought to his attention "regarding a cross displayed in your classroom." Castro Decl. ¶ 27. Mr. Mazzei added: "Please know that this meeting is non-disciplinary in nature and is intended to review district polices to ensure clarity and consistency." *Id.* At the meeting, Mr. Mazzei instructed Ms. Castro to remove the crucifix. *Id.* ¶ 28. Thereafter, Mr. Mazzei sent Ms. Castro an email recounting the "nondisciplinary meeting involving the permanent display of a religious symbol." *Id.* Mr. Mazzei stated that "any permanent displays of religious symbols are prohibited from public schools, based on the First Amendment of the United States Constitution" and instructed that Ms. Castro's crucifix must be removed by December 9. *Id.* Mr. Mazzei stated that noncompliance would "lead to insubordination and disciplinary measures." *Id.*

Ms. Castro did not remove the crucifix by the deadline. On December 10, 2024, Ms. Castro met with Mr. Mazzei, Mr. Soto, and Ms. Manning. *Id.* ¶¶ 29-30. At the meeting, Ms. Manning directed Castro to remove the crucifix. *Id.* ¶ 30. According to Ms. Castro, Ms. Manning explained that a religious item could not be hung on the walls of public-school buildings and that as a public-school employee, Ms. Castro was required to avoid the "perception of promoting a particular religion." *Id.* Ms. Castro says that Ms. Manning suggested that Ms. Castro put the crucifix in a desk drawer, to be pulled out only when she

wished to "ground" herself. *Id.* According to Ms. Castro, during the meeting, Mr. Soto stated his own religious views in an effort to pressure her to take down the crucifix. *Id.*[8]

At the meeting, which Ms. Castro attended with her union representative, Ms. Castro says she agreed to re-hang the crucifix on the desk where it would be less visible to students but where she could still see it. *Id.* ¶ 31. Mr. Mazzei says at the meeting the union representative suggested hanging the crucifix on the desk drawers, an idea that Ms. Castro entertained. Mazzei Decl. ¶ 16. Ms. Manning asserts that the union representative also proposed hanging the crucifix underneath the desktop, next to the drawers—a proposal that Ms. Manning seconded. Manning Decl. ¶ 16. Ms. Castro says that the group walked to the classroom after meeting and Ms. Castro was "surprised and offended" when Ms. Manning told her to "attach the crucifix to the side of the kneehole of [her] desk, by [her] legs." Castro Decl. ¶ 32. Ms. Castro says that as she put her hand on the crucifix to move it, she "felt sick to [her] stomach" and "broke down and began sobbing." *Id.* ¶ 33. She nevertheless moved the crucifix in the kneehole of the desk and left it in that location overnight while she prayed about what to do. *Id.* ¶ 35. When Ms. Castro returned to the classroom the next morning, she returned the crucifix to the wall next to the desk. She says she did so out of "sincere religious conviction" and informed Defendants of her decision. *Id.* ¶ 35. That same day, on December 11, 2024, Ms. Manning issued a Letter of Reprimand to Castro stating that her actions were "insubordinate" and that Mr. Soto would come to "assist" her with removing the crucifix from the classroom at the end of that day. *Id.* ¶¶ 36-37. The letter summarized the meeting held the day before:

---

[8] Ms. Manning asserts that any comments at the meeting "referencing [Ms. Castro's] pedagogy or personal beliefs simply reiterated the nature of complaints from students and staff" that had prompted the school to investigate. Manning Decl. ¶ 20.

At this pre-disciplinary meeting we discussed the Establishment Clause of the First Amendment that says that the government cannot establish a religion.

Prior to yesterday's pre-disciplinary meeting your building administration met with you and informed you the following:

- Per legal statutes, schools should remain neutral when speaking of religion, so as to not have a perception of endorsing a particular religion.
- The placement of religious artifacts is not permitted in the workplace unless the artifact is being used within a BOE approved curriculum.
- This same principle holds true when speaking to students about a particular religion.
- You need to take the cross down.
- Further insubordination may lead to disciplinary consequences.

Because public schools are run by the government, this means that public schools are not allowed, legally, to take any actions that would be seen as establishing or promoting a religion.

The following was discussed with you at yesterday's pre-disciplinary meeting pertaining to you as a CSDNB employee and the Establishment Clause of the First Amendment:

- The Establishment Clause includes employees of the public schools, including administrators *and teachers*.
- When a public school employee hangs a religious artifact in their classroom, it sends the message that the school district (which is an arm of the government) is promoting that religion, so putting that religious artifact on the wall of the school building is not legally permissible.
- You have told the administration that you are hanging this cross permanently.
- You have also told the administration that this cross is not tied to a specific curricular unit.
- This means that there is no pedagogical justification for hanging this cross.
- The Board of Education owns and controls the classroom walls.
  - So, by hanging this on the classroom wall, you are, in effect, saying that "the New Britain Board of Education endorses this religion."
  - That violates the Establishment Clause.

10

> At yesterday's meeting we discussed your personal religious beliefs and strategies to support you in the classroom. . . .

ECF No. 38-6, at 2-3.

When Mr. Soto came to the classroom, Ms. Castro said she would not remove the crucifix. Castro Decl. ¶ 39. Mr. Soto instructed Ms. Castro to report to his office the next morning if she did not remove the crucifix and informed her that she may face suspension and eventual termination for being insubordinate. *Id.* ¶ 40.[9] When Ms. Castro left school that evening, she left the crucifix affixed to the classroom wall. *Id.*

The next day, December 12, 2024, Ms. Castro saw that the crucifix had been removed from the classroom wall. *Id.* ¶ 41. Ms. Castro then attended a meeting in the principal's office with Ms. Manning, Mr. Soto, and Ms. Mazzei. *Id.* According to Ms. Castro, she was informed at the meeting she would be suspended without pay for two days and could "reflect" on whether it was in her "best interest" to keep hanging the crucifix on the wall." *Id.* ¶ 42. Ms. Castro was sent home with her crucifix in a box. *Id.* Ms. Manning issued Ms. Castro a Notice of Suspension, which stated in part:

> When a public-school employee hangs a religious artifact in their classroom, it sends the message that the school district (which is an arm of the government) is promoting that religion, so putting that religious artifact on the wall of the school building is not legally permissible.

*Id.* ¶ 43. The Notice stated that Ms. Castro could return to work on December 16, 2024 if she agreed to remove the crucifix from its location on the wall next to the desk. *Id.* ¶ 44.

On December 16, 2024, Ms. Castro emailed Defendants stating that she could not in good conscience conceal the crucifix. She said:

---

[9] Ms. Castro says that Mr. Soto again pressured her to remove the crucifix by referencing his religious views and told her to "give Caesar what is Caesar's." Castro Decl. ¶ 40.

> For me to take my crucifix down and put it under my desk made me feel like, instead of letting my light shine as Jesus told me to do, I was putting it under a bushel (Matthew 5:15). I had to put it back up.

*Id.* ¶ 46. She also cited to *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022), and 2023 Guidance from the Department of Education. *Id.* ¶ 47.[10] Ms. Castro was placed on paid administrative leave the same day. *Id.* ¶ 48.

On December 20, 2024, Ms. Castro sent a text message via the student communication portal that said: "I have been placed on Administrative Leave for refusing to remove a Crucifix from my desk area. The lesson to learn here is that doing what is right is not always easy." ECF No. 50-2, at 22. A student shared the message with a teacher, who notified administrators of the posting. Mazzei Decl. ¶ 21. A parent later told Mr. Mazzei that the parent thought the text message was an inappropriate thing to send to families. *Id.*

On January 24, 2025, Ms. Castro attended a videoconference with Dr. Gasper and Ms. Manning. Ms. Castro was represented by counsel at the meeting. Castro Decl. ¶ 50. During this meeting, Dr. Gasper proposed that Ms. Castro could place the crucifix in a desk drawer, under the desk (attached with a magnet), in her pocket, or behind a screen (that would obscure the crucifix from nearby students' views). Manning Decl. ¶ 18. At the meeting, Ms. Castro confirmed through counsel that she would not agree to remove or relocate her crucifix in the classroom so long as other teachers were permitted to keep personal expressive items in similar locations. Castro Decl. ¶ 50. On March 6, 2025, Defendants informed Ms. Castro that she was reassigned to a non-teaching role focused on curriculum. *Id.* ¶ 54. Ms. Castro has been allowed

---

[10] Ms. Castro has supplied a copy of the Guidance. *See* U.S. Department of Education, *Guidance on Constitutionally Protected Prayer and Religious Expression in Public Elementary and Secondary Schools* (2023). ECF No. 38-11.

to display the crucifix in her new work location. Manning Decl. ¶ 21. During a status conference on September 18, 2025, Ms. Castro's counsel confirmed that Ms. Castro remains in the non-teaching role working out of District headquarters.

### B.   Procedural History

This action was initiated with a complaint filed on January 30, 2025. Compl., ECF No. 1. On March 14, 2025, Castro moved for a preliminary injunction, ECF No. 38, and filed a supporting memorandum, ECF No. 38-1 ("Pl.'s Mem."). I held a status conference on March 25, 2025, ECF No. 47, and entered a briefing schedule based on dates proposed by the parties at that conference. ECF No. 48. On April 14, 2025, Defendants filed a memorandum in opposition to the preliminary injunction motion. ECF No. 50 ("Defs.' Mem."). On April 18, 2025, the parties filed a joint notice informing me that they did not request an evidentiary hearing or seek discovery on the pending motion for a preliminary injunction. ECF No. 52. On May 2, 2025, Castro filed a reply in further support of her motion. ECF No. 60 ("Pl.'s Reply").

I held oral argument on May 13, 2025, the earliest date proposed by the parties. During a status conference on May 28, 2025, the parties requested referral to a Magistrate Judge for purposes of conducting settlement discussions. ECF No. 66. Judge Richardson conducted a pre-settlement conference on June 10, 2025 and a settlement conference on July 30, 2025. ECF Nos. 71, 77. At a status conference on September 18, 2025, following additional settlement discussions, counsel for the parties informed me that they were at an impasse and requested a decision on the motion for preliminary injunction. ECF No. 85. At that time, counsel for the parties confirmed that they did not seek to provide any further evidence at an evidentiary hearing or otherwise relating to the pending motion. The parties have filed and responded to

various notices of supplemental authority following oral argument. *See* ECF Nos. 75, 76, 80, 81, 82, 83, 86, 87.

## II.    LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 24 (2008). A preliminary injunction is an "extraordinary and drastic" remedy, which "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007) (internal quotation marks omitted). To obtain a preliminary injunction, a movant must make a clear showing that (1) she is likely to succeed on the merits, (2) she is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of the equities tips in her favor, and (4) an injunction is in the public interest. *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (citing *Winter*, 555 U.S. at 20, 22).[11]

## III.    DISCUSSION

### A.    Federal Claims: Likelihood of Success on the Merits

Ms. Castro asserts that Defendants violated and continue to violate her rights under both the Free Speech and the Free Exercise Clauses of the First Amendment. "These Clauses work in tandem. Where the Free Exercise Clause protects religious exercises, whether communicative or not, the Free Speech Clause provides overlapping protection for expressive religious activities." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523 (2022). Under Supreme Court precedent, "a plaintiff bears certain burdens to demonstrate an infringement of his rights under the Free Exercise and Free Speech Clauses." *Id.* "If the plaintiff carries these

---

[11] At oral argument, counsel for Defendants stated that the relief sought by Ms. Castro, as narrowed at oral argument, *see supra* n.2, would not be a mandatory injunction. Tr. 42.

burdens, the focus then shifts to the defendant to show that its actions were nonetheless justified and tailored consistent with the demands of [Supreme Court] case law." *Id.*

### 1.    Free Speech Claim

The Free Speech Clause, applicable to state actors by the Fourteenth Amendment, states that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. Ms. Castro argues that the display of the crucifix on the classroom wall was "speech" under the First Amendment as (1) she "intended to convey a particularized message because displaying a crucifix expressed, among other things, her identify as a devout Catholic" and (2) her "intended message was very likely to be understood because the crucifix is one of the most ubiquitous symbols in Western society, identifying the owner of a display as likely to be expressing Christian faith." Pl.'s Mem. 29. Defendants do not dispute that the crucifix display constitutes "speech" within the meaning of the First Amendment's Free Speech Clause. Defendants argue, however, that the display was not protected speech. Defs.' Mem. 20.

It is well established that teachers and students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). However, the speech rights of public school employees are not "so boundless that they may deliver any message to anyone anytime they wish." *Kennedy*, 597 U.S. at 524. "In addition to being private citizens, teachers and coaches are also government employees paid in part to speak on the government's behalf and convey its intended messages." *Id.*; *Garcetti v. Ceballos*, 547 U.S. 410, 418-19 (2006) ("Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services. Public employees, moreover, often occupy trusted positions in society. When they

speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions.") (citation omitted); *Shurtleff v. City of Bos., Massachusetts*, 596 U.S. 243, 251 (2022) ("The First Amendment's Free Speech Clause does not prevent the government from declining to express a view. When the government wishes to state an opinion, to speak for the community, to formulate policies, or to implement programs, it naturally chooses what to say and what not to say. That must be true for government to work.") (citations omitted).

In considering free speech claims brought by government employees, courts proceed in two steps pursuant to the *Pickering-Garcetti* framework. *See Pickering v. Board of Ed. of Township High Sch. Dist. 205, Will Cnty.*, 391 U.S. 563 (1968); *Garcetti*, 547 U.S. at 418. The parties agree this framework applies to Ms. Castro's free speech claim. Pl.'s Mem. 28-29; Defs.' Mem. 19-21.[12]

At the first step, courts consider whether an employee is speaking pursuant to his or her official duties or as a citizen on a matter of public concern. Where "a public employee speaks 'pursuant to [his or her] official duties,' . . . the Free Speech Clause generally will not shield the individual from an employer's control and discipline because that kind of speech is—for constitutional purposes at least—the government's own speech." *Kennedy*, 597 U.S. at 527 (quoting *Garcetti*, 547 U.S. at 421). "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Garcetti*, 547 U.S. at 421-22. Instead "[i]t simply reflects

---

[12] Ms. Castro does not argue that the classroom walls were a "public forum" or "limited public forum" under the First Amendment. Tr. 12 ("We're not saying that this is a limited public forum."); Defs.' Mem. 19 n.9 (noting that Ms. Castro is not arguing that the classroom walls were a public forum).

the exercise of employer control over what the employer itself has commissioned or created." *Id.* However, "[w]hen an employee 'speaks as a citizen addressing a matter of public concern,'" then "the First Amendment may be implicated and courts should proceed to a second step." *Kennedy*, 597 U.S. at 528 (quoting *Garcetti*, 547 U.S. at 423). Courts must ask, therefore, whether a government employee spoke in his or her capacity as a private citizen or whether the expression amounted to speech attributable to the government. *See Kennedy*, 597 U.S. at 528 (stating that the question at step one of the *Pickering-Garcetti* framework is: "Did Mr. Kennedy offer his prayers in his capacity as a private citizen, or did they amount to government speech attributable to the District?").

At the second step of the *Pickering-Garcetti* framework, "courts should attempt to engage in a delicate balancing of the competing interests surrounding the speech and its consequences," including considering "whether an employee's speech interests are outweighed by the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* (internal quotation marks omitted).

Although *Garcetti* noted that "expression related to academic scholarship or classroom instruction" could implicate "additional constitutional interests" not implicated with respect to the speech of public employees in other settings, *Garcetti*, 547 U.S. at 425, Ms. Castro does not argue that the crucifix display has additional protection as academic scholarship or classroom instruction.[13]

---

[13] Pl.'s Mem. 30 (stating that "the crucifix was not used as part of Ms. Castro's curricular instruction"). *See Lee-Walker v. New York City Dep't of Educ.*, 712 F. App'x 43, 45 (2d Cir. 2017) (stating that it "is an open question in this Circuit whether *Garcetti* applies to classroom instruction" or if such instruction is instead governed by *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988)) (internal quotation marks omitted)

With respect to the first step of the *Pickering-Garcetti* framework, the parties do not dispute that the display of the crucifix related to a matter of public concern. Pl.'s Mem. 28; Defs.' Mem. 25 n.8. Accordingly, for purposes of step one of the *Pickering–Garcetti* framework, the only disputed issue is whether Ms. Castro displayed the crucifix on the classroom wall pursuant to her official duties as a teacher or as a private citizen.

The Second Circuit has "identified two relevant inquiries to determine whether a public employee speaks as a citizen: (1) whether the speech fall[s] outside of the employee's official responsibilities, and (2) whether a civilian analogue exist[s]." *Montero v. City of Yonkers, New York*, 890 F.3d 386, 397 (2d Cir. 2018) (internal quotation marks omitted). However, a lack of a civilian analogue is "not critical to a decision as to whether [an employee] spoke as a private citizen." *Id.* at 398. The relevant question is whether the speech was *pursuant* to the employee's official job duties not whether it *related* to the duties. *Id.*; *see also Lane v. Franks*, 573 U.S. 228, 240 (2014) (stating that the "critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties").

Ms. Castro argues that in displaying her crucifix, "she was speaking for herself, not the government." Pl.'s Mem. 30. She says the crucifix display was not part of curricular instruction, did not "owe its existence" to her role as a public school teacher, and was not furthering a "core" job duty. *Id.*; Pl.'s Reply 5. Instead, Ms. Castro says the display is like the personal family photos or inspirational quotes that other teachers placed near their desks and is similar to a person wearing a cross necklace. Pl.'s Mem. 30; Pl.'s Reply 5. Defendants, in contrast, argue that decorating the seventh grade classroom was "part and parcel of [Ms. Castro's] teaching duties." Defs.' Mem. 21. Defendants assert that the classroom was not Ms.

Castro's classroom only; rather, it belonged to the students, the teacher, the District, and the taxpayers. Defendants maintain that they controlled what was placed on classroom walls, and what is posted on the walls impacts student performance. According to Defendants, "[s]upervisors had the discretion to instruct a teacher to relocate a visible crucifix, to have the classroom in their view better achieve the District's educational mission—just as supervisors could order a teacher to relocate a New England Patriots pennant or a Baby Yoda figurine, for example, out of an aversion to branded merchandise." Defs.' Mem. 22-23.

In *Kennedy*, the Supreme Court concluded that when a football coach prayed on the field following a game he "was not engaged in speech 'ordinarily within the scope' of his duties as a coach." *Kennedy*, 597 U.S. at 509 (quoting *Lane*, 573 U.S. at 240). The Court observed that while offering the prayers, the coach "was not instructing players, discussing strategy, encouraging better on-field performance, or engaged in any other speech the District paid him to produce as a coach." *Id.* The Court reasoned:

> The timing and circumstances of Mr. Kennedy's prayers confirm the point. During the postgame period when these prayers occurred, coaches were free to attend briefly to personal matters—everything from checking sports scores on their phones to greeting friends and family in the stands. We find it unlikely that Mr. Kennedy was fulfilling a responsibility imposed by his employment by praying during a period in which the District has acknowledged that its coaching staff was free to engage in all manner of private speech. That Mr. Kennedy offered his prayers when students were engaged in other activities like singing the school fight song further suggests that those prayers were not delivered as an address to the team, but instead in his capacity as a private citizen. Nor is it dispositive that Mr. Kennedy's prayers took place "within the office" environment—here, on the field of play. Instead, what matters is whether Mr. Kennedy offered his prayers while acting within the scope of his duties as a coach. And taken together, both the substance of Mr. Kennedy's speech and the circumstances surrounding it point to the conclusion that he did not.

*Kennedy*, 597 U.S. at 530 (citations omitted).

In contrast, the Second Circuit concluded a teacher spoke pursuant to his official job duties in *Weintraub v. Board of Education*, 593 F.3d 196 (2d Cir. 2010). There, the Second Circuit reasoned that a teacher's speech in the form of a union grievance challenging the school administration's decision not to discipline a student for throwing a book at him in class was pursuant to official duties as "it was 'part-and-parcel of his concerns' about his ability to 'properly execute his duties,' as a public school teacher—namely, to maintain classroom discipline, which is an indispensable prerequisite to effective teaching and classroom learning." *Id.* at 203 (citations omitted). The Second Circuit concluded that the teacher's "speech challenging the school administration's decision to not discipline a student in his class was a means to fulfill, and undertaken in the course of performing, his primary employment responsibility of teaching." *Id.* (citations and internal quotation marks omitted); *see also id.* at 198 (concluding that "filing of the grievance was in furtherance of one of [plaintiff's] core duties as a public school teacher, maintaining class discipline").[14]

Here, based on the present factual record, I conclude Ms. Castro displayed items on the walls of the classroom in the course of performing one of her core duties as a teacher—creating a physical classroom conducive to learning. Decorating the walls of the classroom is part of the "actual, functional job responsibilities" of a teacher at DiLoreto. *See Matthews v. City of New York*, 779 F.3d 167, 184 (2d Cir. 2015). Indeed, District policy specifically instructs

---

[14] In contrast, in *Matthews v. City of New York*, 779 F.3d 167 (2d Cir. 2015), the Second Circuit concluded that a police officer engaged in protected speech when he spoke to his commanding officers about an arrest quota policy at his precinct of the New York City Police Department. The court observed that "[s]uch policy-oriented speech was neither part of [the plaintiff's] job description nor part of the practical reality of his everyday work." *Id.* at 174. Accordingly, the court concluded the plaintiff's speech was as a citizen and not as an employee because his "actual, functional job responsibilities did not include reporting his opinions on precinct-wide quota systems to the Precinct commanders." *Id.*

teachers to consider the "physical aspects of [the] classroom" with "both individual students' needs and instructional goals in mind"—given the impact that the physical classroom environment has on learning. ECF No. 50-4, at 9. The District policy provides a "checklist" of considerations for teachers as a "tool to ensure that the physical arrangement of the classroom is student-centered and task-focused." *Id*. Pursuant to her duty to create a physical classroom conducive to learning, Ms. Castro hung various items on the classroom wall including inspirational quotes, student artwork, a social studies poster, a daily schedule, and reminders about computer commands. Ms. Castro says she also hung "personal expressive items" in the classroom, including the crucifix, and explains that she believes displaying such "personal expressive items" makes "the classroom environment more conducive to learning" because these personal items humanize teachers to their students. Castro Decl. ¶¶ 16, 18.

Thus, as a general matter, Ms. Castro acted pursuant to her job duties as a teacher when she decorated the walls of her classroom with items the students would see during instructional time. The question is whether Ms. Castro was doing otherwise when she hung items she calls "personal expressive items" on the wall, including the crucifix. Ms. Castro specifically states that posting such items makes the classroom environment more conducive to learning because the items humanize the teacher to their students. In that way, therefore, Ms. Castro was acting pursuant to her official duties as a teacher by displaying the items. Ms. Castro says she wanted to convey an aspect of her personal identity by displaying the crucifix—her "identity as a devout Catholic." Pl.'s Mem. 29. But regardless of the connection of the expression to Ms. Castro's personal identity, the expression occurred in Ms. Castro's role as a teacher—as Ms. Castro communicated the message to students on a classroom wall during instructional time.

The circumstances in the present case differ from the "timing and circumstances" of the prayer at issue in *Kennedy*. 597 U.S. at 530. In *Kennedy*, the coach's religious expression occurred during the "postgame period" when "coaches were free to attend briefly to personal matters—everything from checking sports scores on their phones to greeting friends and family in the stands." *Id.* In addition, the Court concluded that the fact that the coach "offered his prayers when students were engaged in other activities like singing the school fight song further suggests that those prayers were not delivered as an address to the team, but instead in his capacity as a private citizen." *Id.* Here, in contrast, Ms. Castro's expression occurred when students were in the classroom for instructional time. While she was with students in the classroom for class, Ms. Castro fulfilled her core duties and acted in her capacity as a teacher. Unlike the students in *Kennedy*, who were engaged in other activities while the coach prayed, Ms. Castro's students received the religious message when they were required to be present in the classroom receiving instruction from Ms. Castro.[15]

Ms. Castro cites to several cases concluding that teachers engaged in protected speech when they wore cross necklaces. *See Nichol v. ARIN Intermediate Unit 28*, 268 F. Supp. 2d 536, 541 (W.D. Pa. 2003); *Draper v. Logan Cnty. Pub. Libr.*, 403 F. Supp. 2d 608, 611 (W.D. Ky. 2005). However, *Nichol* and *Draper* focus on whether the cross necklaces constituted speech on a matter of public concern and apply *Pickering* balancing. The cases, decided before

---

[15] At oral argument in *Kennedy*, counsel for Mr. Kennedy acknowledged that a teacher offering a prayer in the classroom "during instructional time" would be speaking pursuant to his or her official duties. Transcript of Oral Argument at *8-9, *Kennedy v. Bremerton Sch. Dist.*, 2022 WL 1214751 (2022) (No. 21-418).

*Garcetti*, do not discuss whether the expression was made pursuant to the official duties of the teachers.[16]

The circumstances of the present case are similar to *Johnson v. Poway United School District*, 658 F.3d 954 (9th Cir. 2011), where the Ninth Circuit concluded that a high school math teacher spoke as an "employee, not as a citizen" when he posted large banners in the classroom stating, among other things, "GOD SHED HIS GRACE ON THEE" and "All men are created equal, they are endowed by their CREATOR." *Id.* at 958, 966. In determining that the teacher's speech was in his role as a teacher rather than a citizen, the Ninth Circuit observed:

> Johnson did not make his speech while performing a function not squarely within the scope of his position. He was not running errands for the school in a car adorned with sectarian bumper stickers or praying with people sheltering in the school after an earthquake. "Rather, Johnson hung his banners pursuant to a long-standing Poway Unified School District policy, practice, and custom," of permitting teachers to decorate their classrooms subject to specific limitations and the satisfaction of the principal or a District administrator.

*Id.* at 967 (footnote and citation omitted). The Ninth Circuit concluded "*as a practical matter*, we think it beyond possibility for fairminded dispute that the 'scope and content of [Johnson's] job responsibilities' did not include speaking to his class in his classroom during class hours."

---

[16] In any event, a teacher wearing a necklace on her body differs from a teacher posting an image on a classroom wall, where the teacher's job duties specifically require her to ensure the physical aspects of the classroom further student learning. As Defendants observe, "the necklace would come and go with the teacher" whereas "the classroom walls represented an immutable feature of the educational environment—a uniquely governmental medium of expression." Defs.' Mem. 23-24. Ms. Castro also relies on *James v. Bd. of Ed. of Cent. Dist. No. 1 of Towns of Addison et al.*, 461 F.2d 566, 574-75 (2d Cir. 1972), where the Second Circuit held that a school board violated the First Amendment rights of a teacher for discharging him for wearing a black armband in class in symbolic protest against the Vietnam War. *James*, decided before *Garcetti*, did not consider whether the teacher wore the arm band pursuant to his official duties or as a private citizen. Rather, the case focused on whether the school had demonstrated that disruption resulted from the teacher's actions.

*Id.* (emphasis in original). Moreover, in considering whether the teacher's speech "owes its existence to his position, or whether he spoke just as any non-employee citizen could have," *id.*, the court concluded the teacher acted as an employee, reasoning: "[A]n ordinary citizen could not have walked into Johnson's classroom and decorated the walls as he or she saw fit, anymore than an ordinary citizen could demand that students remain in their seats and listen" to whatever perspective he wanted to share, *id.* at 968. The court concluded that it "need not reach a different conclusion simply because [the school district] allows its teachers some freedom in decorating their classrooms." *Id.* Instead, the school district could "take legitimate and appropriate steps to ensure that its message [wa]s neither garbled nor distorted by its individual messengers." *Id.* at 969 (internal quotation marks omitted). The Ninth Circuit thus held that "[b]ecause the speech at issue owes its existence to Johnson's position as a teacher, [the school district] acted well within constitutional limits in ordering Johnson not to speak in a manner it did not desire." *Id.* at 970.[17]

Ms. Castro attempts to distinguish *Johnson* on the ground that the banners at issue in that classroom were much larger—seven feet long and two feet high—than the foot-high crucifix at issue in this case. Pl.'s Reply 6. However, regardless of this difference, *Johnson*'s

---

[17] *Johnson* cites *Lee v. York Cnty. Sch. Div.*, 484 F.3d 687 (4th Cir. 2007), where the Fourth Circuit affirmed the district court's grant of summary judgment to a school district that removed items posted by a teacher on a classroom bulletin board that included news articles describing missionary work, discussing prayer at the White House, and outlining political candidates' religious views. *Id.* at 690. The Fourth Circuit observed that "[c]ourts have generally recognized that the public schools possess the right to regulate speech that occurs within a compulsory classroom setting, and that a school board's ability in this regard exceeds the permissible regulation of speech in other governmental workplaces or forums." *Id.* at 695. Although concluding that the teacher's speech was unprotected, the Fourth Circuit applied a different analysis than *Johnson*, concluding that the posted items were "curricular in nature, and thus not a matter of public concern" under the *Pickering* framework. *Id.* at 697.

analysis is instructive. In *Johnson*, as here, the school district had a policy governing the decoration of classroom walls and also allowed teachers some freedom with respect to postings on the walls. In *Johnson*, as here, the teacher sought to communicate his message on the walls of the classroom during instructional time.[18]

At oral argument, Ms. Castro argued that DiLoreto has created a "zone of personal expression by and around the teachers' desks." Tr. 10; *see also* Tr. 33 (stating "it is very clear to any observer looking at the desks which speech, which area[s] belong for lack of a better word, belong to the teacher and their personal items"). However, a clear demarcation of such a "zone" is not apparent from the spaces shown in the photos provided by Ms. Castro. *See* ECF Nos. 38-3; 38-4. Ms. Castro asserts that teachers keep "personal expressive items" on or near their desks but does not define the term "personal expressive item." Castro Decl. ¶¶ 16, 18, 25, 50. Although some items Ms. Castro labels "personal expressive items" are near teacher desks, some do not appear to be near teacher desks. In addition, some items are difficult to categorize as "personal" or "non-personal," particularly without a definition of the term.

---

[18] Citing *Shurtleff v. City of Boston, Massachusetts*, 596 U.S. 243 (2022), Castro argues that the government must actively control and shape a message for speech to be "government speech" rather that private speech. Pl.'s Reply 6. But *Shurtleff* was analyzing whether Boston's program allowing private groups to use one of its flag poles at a plaza to hang flags during events sponsored by the groups created a public forum or whether the flags hung by the private groups instead constituted government speech. *See* 596 U.S. at 252 ("The boundary between government speech and private expression can blur when, as here, a government invites the people to participate in a program. In those situations, when does government-public engagement transmit the government's own message? And when does it instead create a forum for the expression of private speakers' views?"). Here, in contrast, Castro has not raised a public forum argument. Tr. 12 ("We're not saying that this is a limited public forum."). Instead, the case law governing public employee speech governs here. The relevant inquiry is whether Castro spoke pursuant to her official duties— which the District has defined to include decorating classroom walls.

The wall next to the teacher's desk in the classroom where Ms. Castro taught contains items she calls "personal" such as the crucifix and her church calendar. However, on the same wall as the crucifix—and also close to the desk—is a "Student Daily Schedule," a list of computer "shortcuts," and instructions for "hard start[ing]" a Chrome Book. ECF No. 38-4. Immediately above the crucifix are children's drawings. It is unclear what personal significance these drawings may have. A painting on the same wall contains a Puerto Rican flag, which may or may not be a "personal expressive item." *Id.* Although the crucifix is placed on the wall near the desk, it is similarly close to a small table that is pushed against the wall and has papers on top of it. ECF No. 38-3; ECF No. 50-2; Mazzei Decl. ¶ 22. The crucifix is also quite close to the door of the classroom. ECF No. 38-3. It is not apparent, therefore, what physical area of this classroom would fall within a "zone of personal expression."

Ms. Castro points to "personal expressive items" in other classrooms—but in some instances the items do not appear to be by teacher desks. Castro Decl. ¶ 25. For example, in one classroom, hanging on the wall right by the door is an American flag, a New England Patriots pennant, and a Central Connecticut State University pennant. ECF No. 38-4, at 5. Posted on the door itself is a decal from the District containing a motivational quote. *Id.* Inspirational quotes appear on many of the classroom walls in the photos—both near and further away from teacher desks. *See* ECF Nos. 38-3, 38-4 at 6, 9. Although Ms. Castro calls inspirational quotes appearing on classroom walls "personal expressive items," it is not clear why these quotes are necessarily "personal" as opposed to messages teachers are utilizing to motivate students in their learning.

In sum, in examining the photos, it is difficult to discern where the "zone of personal expression" is located or how to divide certain items on the walls into "personal" or "non-personal" categories.

Accepting Ms. Castro's argument that teachers have a First Amendment free speech right to post "personal expressive items" related to matters of public concern on classroom walls—where they are visible to students during instructional time—would mean the District could not control the messages conveyed to students while the students are required to be present in the classroom for learning. Instead, with respect to each such item a teacher posted on the classroom wall, the District would need to engage in a *Pickering* balancing analysis and could prohibit only those items that are sufficiently disruptive.

Under these circumstances, based on the existing factual record, I conclude that Ms. Castro is unlikely to prevail on her claim that her display of the crucifix on the wall of the classroom constitutes speech as a private citizen rather than pursuant to her job duties as a teacher. Therefore, I conclude she is not likely to prevail on her free speech claim.

### 2.    Free Exercise Claim

In addition to her free speech claim, Ms. Castro argues that Defendants violated her rights under the Free Exercise Clause by requiring her to remove the crucifix from the classroom wall and by punishing her for refusing to do so. Pl.'s Mem. 21. The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Const. amend. I. "The Clause protects not only the right to harbor religious beliefs inwardly and secretly. It does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of (or abstention from) physical acts." *Kennedy*, 597 U.S. at 524 (internal

quotation marks omitted). The Free Exercise Clause is applicable to the States under the Fourteenth Amendment. *Id.*

Ms. Castro says that she "sincerely believes that her religion compels her to display her crucifix, not hide it under her desktop" and "[s]tifling her religious expression through concealment of the crucifix 'would be an affront to [her] faith.'" Pl.'s Mem. 22. Ms. Castro asserts that she "engages in religious exercise with her display, including non-communicative exercise such as praying with it during lunch breaks and viewing it periodically when the task of teaching proves particularly stressful." Pl.'s Reply 12; *see also* Castro Decl. ¶ 21 ("I hang the crucifix on the wall in the personal space next to my desk for multiple reasons. It reminds me of my grandmother, helps me pray silently in my personal time, and express[es] my identity as a Christian.").

### a.    Plaintiff's Burden

"[A] plaintiff may carry the burden of proving a free exercise violation in various ways, including by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy*, 597 U.S. at 525. At least outside the public employment context, if a plaintiff shows a policy is not "neutral" or "generally applicable," a court "will find a First Amendment violation unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Id.* (citations omitted).

"A government policy will not qualify as neutral if it is 'specifically directed at . . . religious practice.'" *Id.* at 526 (quoting *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 878 (1990)). "A policy can fail this test if it 'discriminate[s] on its face,' or if a religious exercise is otherwise its 'object.'" *Id.* (quoting *Church of Lukumi Babalu*

*Aye, Inc. v. Hialeah*, 508 U.S. 520, 533 (1993)). "A government policy will fail the general applicability requirement if it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way,' or if it provides 'a mechanism for individualized exemptions.'" *Id.* (quoting *Fulton v. City of Phila.*, *Pa.*, 593 U.S. 522, 534 (2021)). "Failing either the neutrality or general applicability test is sufficient to trigger strict scrutiny." *Id.*

As the Supreme Court explained in *Kennedy*, "[a] plaintiff may also prove a free exercise violation by showing that 'official expressions of hostility' to religion accompany laws or policies burdening religious exercise; in cases like that [the Court has] 'set aside' such policies without further inquiry." *Id.* at 525 n.1 (quoting *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 584 U.S. 617, 639 (2018)).

In her opening memorandum in support of the motion for preliminary injunction, Ms. Castro asserts that Defendants did not act neutrally because they "singled out Ms. Castro's expressive display of a personal item (i.e., the crucifix) expressly *because of* the religious nature of the crucifix." Pl.'s Mem. 23. In addition, Ms. Castro argues that Defendants did not act pursuant to a generally applicable policy because they exercised "unbound discretion with regard to teachers' personal expressive displays in their workspaces." *Id.* at 24. Ms. Castro argues that Defendants' actions therefore triggered strict scrutiny. *Id.*

In response to Plaintiff's memorandum, Defendants do not argue that they acted pursuant to a neutral or generally applicable policy or that they did not burden Ms. Castro's free exercise of religion within the meaning of the First Amendment. Instead, Defendants argue that the *Pickering-Garcetti* framework applies rather than strict scrutiny, Defs.' Mem. 20, but that they survive strict scrutiny if the standard does apply, *id.* at 28. In her reply brief, Ms.

Castro responds to Defendants' *Pickering-Garcetti* argument, asserting again that strict scrutiny applies. Pl.'s Reply 12.

On October 9, 2025, Ms. Castro filed a notice of supplemental authority that cites *Mid Vermont Christian School v. Saunders*, 151 F.4th 86 (2d Cir. 2025), and argues that I should simply "set aside" Defendants' actions under the Free Exercise Clause "without further inquiry" because Defendants have displayed "hostility" to Ms. Castro's religious beliefs. ECF No. 86 at 1. *Mid Vermont* applies the rule that a plaintiff may "prove a free exercise violation by showing that 'official expressions of hostility' to religion accompany laws or policies burdening religious exercise." *Kennedy*, 597 U.S. at 525 n.1 (2022) (quoting *Masterpiece Cakeshop,* 584 U.S. at 639); *see Mid Vt. Christian Sch.*, 151 F.4th at 93. Under such circumstances, *Masterpiece Cakeshop* says that a defendant's actions may be "set aside" without further inquiry regarding the defendant's justification. However, in her memorandum and reply in support of the motion for preliminary injunction, Ms. Castro nowhere discusses this doctrine from *Masterpiece Cakeshop* or argues that Defendants engaged in "official expressions of hostility" to her religious beliefs. *See* Pl.'s Mem. 21-27; Pl.'s Reply 12. Ms. Castro also did not assert such an argument at oral argument. Indeed, at oral argument, Defendants underscored that Ms. Castro had not made this argument. Tr. 76 ("There is no claim of viewpoint hostility."). Under these circumstances, Ms. Castro may not use a notice of supplemental authority to raise an argument not raised in her briefing on her preliminary injunction motion. *Mid Vermont* simply applies the doctrine set forth in *Masterpiece Cakeshop*, which was repeated in *Kennedy* and available to Ms. Castro when she filed her motion. Ms. Castro did not present this argument to the court in her briefing or give Defendants an opportunity to respond to it in their opposition brief. Accordingly, this argument is forfeited

for purposes of the preliminary injunction motion. *See, e.g.*, *Parlato v. Town of E. Haven*, No. 3:22-CV-1094 (SVN), 2023 WL 5206873, at *19 n.9 (D. Conn. 2023) (declining to consider theory not included in motion briefing); *Worth v. Picard*, No. 3:21-cv-432 (CSH), 2021 WL 5447121, at *2 n.3 (D. Conn. 2021) (declining to consider argument not raised in opening brief). Ms. Castro may raise this argument in support of a request for a permanent injunction.

### b.     Application of *Pickering-Garcetti* to Free Exercise Claims

The parties dispute whether the *Pickering-Garcetti* framework applies to Ms. Castro's free exercise claim.

Ms. Castro's free exercise claim is based on her assertion that Defendants burdened her sincere religious practices by preventing her from displaying the crucifix on the classroom wall. Defendants argue that because Ms. Castro's motion characterizes the crucifix display as "symbolic religious expression" and "devotional religious speech," Ms. Castro's free speech and free exercise claims are both governed by the *Pickering-Garcetti* framework. Defs.' Mem. 21. According to Defendants, because Ms. Castro decorated the walls in furtherance of her teaching duties, she cannot maintain either a free speech *or* a free exercise claim based on the District's requirement that she remove the crucifix from the walls. *Id.* In other words, given this case involves religious expression, Defendants assert that step one of the *Pickering-Garcetti* framework applies not only to Ms. Castro's free speech claim but also her free exercise claim. *Id.* Ms. Castro disagrees. Pl.'s Reply 12.

In making their *Pickering-Garcetti* argument, Defendants cite to the Second Circuit's decision in *Knight v. Connecticut Department of Public Health*, 275 F.3d 156, 160 (2d Cir. 2001). Defs.' Mem. 21. But *Knight* rested on the *second* step of *Pickering-Garcetti*—applying the second-step's balancing test to both the free exercise and free speech claims in the case.

*Knight*, 275 F.3d at 164. *Knight*, decided before *Garcetti*, did not address whether courts should analyze whether expression was pursuant to job duties under the first step of the *Pickering-Garcetti* framework when a plaintiff asserts a state actor has burdened religious expression under the Free Exercise Clause.[19]

*Kennedy* does not address the issue directly but implies step one of the *Pickering-Garcetti* framework applies at least in some form to free exercise claims, stating: "Because our analysis and the parties' concessions lead to the conclusion that Mr. Kennedy's prayer constituted private speech on a matter of public concern, we do not decide whether the Free Exercise Clause may sometimes demand a different analysis at the first step of the *Pickering-Garcetti* framework." *Kennedy*, 597 U.S. at 531 n.2. Justice Thomas's concurrence in *Kennedy* observes that the "Court refrains from deciding whether or how public employees' rights under the Free Exercise Clause may or may not be different from those enjoyed by the general public." *Kennedy*, 597 U.S. at 544 (Thomas, J., concurring). Justice Thomas stated: "In the free-speech context, for example, that inquiry has prompted us to distinguish between different kinds of speech; we have held that 'the First Amendment protects public employee speech only when it falls within the core of First Amendment protection—speech on matters of public concern.' It remains an open question, however, if a similar analysis can or should apply to free-exercise claims in light of the 'history' and 'tradition' of the Free Exercise Clause." *Id.*[20]

---

[19] In *Knight*, the Second Circuit assumed arguendo that the employees' comments touched on a matter of public concern. *Knight*, 275 F.3d at 164.

[20] The parties' briefs in *Kennedy* did not address the application of step one of the *Pickering-Garcetti* framework to Mr. Kennedy's free exercise claim as distinct from his free speech claim. Brief for Petitioner, *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022) (No. 21-418); Brief for Respondent, *Kennedy*, 597 U.S. 507 (No. 21-418); Reply Brief, *Kennedy*, 597 U.S. 507 (No. 21-

At issue in the present case is not whether Ms. Castro needs to establish her religious expression relates to a matter of public concern, as Defendants concede that it does. Rather, the issue is whether categorizing the display as expression pursuant to official duties at step one of the *Pickering-Garcetti* framework precludes Ms. Castro's free exercise claim.

Ms. Castro's free exercise and free speech claims fully overlap in the sense that the religious exercise that Ms. Castro says is infringed is necessarily communicative. Ms. Castro acknowledges that the crucifix display intended to convey a "particularized message." Pl.'s Mem. 29. She also states that she "sincerely believes that her religion compels her to display her crucifix, not hide it under her desktop" and "[s]tifling her religious expression through concealment of the crucifix 'would be an affront to [her] faith.'" *Id.* at 22.

In asserting that her free speech and free exercise claims are not "hybrid," Ms. Castro says she engages in religious exercise with her display that includes "non-communicative exercise such as praying with it during lunch breaks and viewing it periodically when the task of teaching proves particularly stressful." Pl.'s Reply 12; *see also id.* (stating that "the Free Speech and Free Exercise clauses dually and separately protect her right to display the crucifix in her personal space because some of her conduct is symbolic speech, some is non-communicative prayer, and some is both"). But Defendants have not prohibited Ms. Castro from displaying the crucifix during noninstructional time such as lunch breaks. Instead,

---

418). At oral argument, counsel for Mr. Kennedy stated: "[I]f the statement really is the government's own speech, then I don't think you'd have the basis for either a free speech or a free exercise claim. It may be, though, that in deciding whether or not the coach's speech is his own speech or the government's speech, you might apply a slightly different test in the free exercise context than you would in the free speech case.'" Transcript of Oral Argument at *6-7, *Kennedy v. Bremerton Sch. Dist.*, 2022 WL 1214751 (2022) (No. 21-418). Counsel argued, however, that regardless "we are comfortably on the private side of the *Garcetti* inquiry." *Id.* at *7.

Defendants' restriction specifically seeks to prevent the display's communication of a message to students in the classroom. Although Ms. Castro's act of *viewing* the crucifix is itself noncommunicative, Ms. Castro asserts the right to put the crucifix on the wall during instructional time when the students can view it too. Ms. Castro's practice of hanging the crucifix on the classroom wall necessarily communicates a message to the students in the classroom who are also viewing the crucifix. Ms. Castro has not pointed to any religious practices that Defendants suppressed that do not involve displaying the crucifix on the classroom wall while she is teaching students in the classroom. And Ms. Castro's free exercise and free speech claims demand the same relief—preventing Defendants from disciplining her for displaying the crucifix during instructional time.

Given that Ms. Castro's free exercise claim rests on exercise that necessarily involves communication of a religious message, I conclude that the analysis utilized under *Pickering-Garcetti* step one for Ms. Castro's free speech claim applies to her free exercise claim. I have already concluded that the crucifix display on the classroom wall was pursuant to Ms. Castro's official duties and is therefore speech attributed to the District. The speech is thus, for constitutional purposes, the government's own speech. *See Kennedy*, 597 U.S. at 527 ("If a public employee speaks 'pursuant to [his or her] official duties,' this Court has said the Free Speech Clause generally will not shield the individual from an employer's control and discipline because that kind of speech is—for constitutional purposes at least—the government's own speech."). Under these circumstances, the Free Exercise Clause does not compel the District to communicate a religious message. Rather, the District can control the messages broadcast to students on the classroom walls during instructional time.

Accordingly, based on the existing record, I conclude that Ms. Castro is unlikely to prevail on her free exercise claim.

###     c.     Government Justification

Even if categorizing the crucifix display as expression pursuant to official duties at step one of the *Pickering-Garcetti* framework does not preclude Ms. Castro's free exercise claim, I conclude that Ms. Castro is unlikely to prevail on her free exercise claim.

Here, the parties do not dispute that the second step of the *Pickering-Garcetti* test would govern consideration of Defendants' burden with respect to Ms. Castro's free speech claim if that claim survived step one of the *Pickering-Garcetti* test. However, Ms. Castro argues *Pickering-Garcetti* step two balancing does not apply at all to her free exercise claim. Rather, Ms. Castro maintains that Defendants must show that the restrictions on her rights serve a compelling interest and are narrowly tailored to that end. The Supreme Court left unresolved in *Kennedy* what standard applies in assessing a state official's burden where a government employee establishes free exercise has been burdened. *See Kennedy*, 597 U.S. at 532 ("Under the Free Exercise Clause, a government entity normally must satisfy at least 'strict scrutiny,' showing that its restrictions on the plaintiff's protected rights serve a compelling interest and are narrowly tailored to that end. A similar standard generally obtains under the Free Speech Clause. The District, however, asks us to apply to Mr. Kennedy's claims the more lenient second-step *Pickering-Garcetti* test, or alternatively intermediate scrutiny. Ultimately, however, it does not matter which standard we apply. The District cannot sustain its burden under any of them.") (citations omitted).

The Second Circuit, however, has defined the government's burden when a government employee shows infringement of free exercise rights. In *Knight*, a nurse and interpreter

employed by state agencies brought free exercise and free speech claims against their employers after they were reprimanded for discussing their religious beliefs with clients while performing their duties. *See Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156, 160 (2d Cir. 2001). The employees argued that "theirs are hybrid claims, implicating both free speech and free exercise rights, and requiring a strict scrutiny analysis rather than analysis under *Pickering*." *Id.* at 166. The Second Circuit rejected that argument, reasoning:

> In this Circuit, we have not yet addressed generally whether hybrid claims require a greater governmental justification than each component of the hybrid claim taken separately and we need not do so here because appellants' comments are limited to the public employee context. As discussed above, it is well settled that appellants' right to free speech as public employees is entitled to some First Amendment protection. However, due to the state's significant interest in regulating the expressive conduct of its employees while they are acting on behalf of the state, appellants' free speech claims are subject to the *Pickering* balancing test. The allegation that a state action that regulates public conduct infringes more than one of a public employee's constitutional rights does not warrant more heightened scrutiny than each claim would warrant when viewed separately. In both situations, the employer's interest remains the same and is entitled to the same weight in the constitutional balance.

*Knight*, 275 F.3d at 167 (citation omitted); *see also Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 648-49 (9th Cir. 2006) (applying *Pickering* balancing and rejecting government employee's argument that court "should apply a stricter test instead of a balancing test because the Department's restrictions on his religious speech to clients violate his rights under both the Free Exercise and the Free Speech Clauses of the First Amendment"); *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006) (concluding that *Pickering* balancing should apply to freedom of association and free exercise claims as well as free speech claims of government employee); *Brown v. Polk Cnty., Iowa*, 61 F.3d 650, 658 (8th Cir. 1995) (applying *Pickering* balancing to free exercise claim by government employee, stating that *Pickering* "dealt with free speech rather than the free exercise of religion, but because the

analogy is such a close one, and because we see no essential relevant differences between those rights, we shall endeavor to apply the principles of *Pickering* to the case at hand"); *Baz v. Walters*, 782 F.2d 701, 708 (7th Cir. 1986) (applying *Pickering* balancing to free exercise claim involving government employee).

Although Ms. Castro argues she is not bringing "hybrid claims" like those in *Knight*, Pl.'s Reply 12, I have concluded that the religious exercise Ms. Castro says has been infringed is necessarily communicative as it requires the display of the crucifix. Thus, *Knight*'s holding that step two of *Pickering-Garcetti* applies to free exercise claims that overlap with free speech claims controls here.

Defendants argue that they prevail at step two of *Pickering-Garcetti* because they reasonably concluded that the crucifix display is likely to be disruptive to learning. Defs.' Mem. 25-28. In addition, Defendants state that their "desire to avoid an Establishment Clause violation independently tilts the *Pickering* balance for the District." *Id.* at 28. Defendants also maintain that even if strict scrutiny applies, strict scrutiny is satisfied because the District has a compelling interest in avoiding an Establishment Clause violation. *Id.* at 28-29. Finally, Defendants assert that "an objectively substantial risk" of an Establishment Clause violation precludes injunctive relief under Second Circuit case law, which requires that government entities be "accorded some leeway" in balancing the free exercise rights of government employees and potential Establishment Clause liability. *Id.* at 40-41.

### i. Leeway When Balancing the Free Exercise and Establishment Clauses

I agree with Defendants that Second Circuit case law requires courts to provide government entities with some leeway when balancing the free exercise rights of government

employees with the risk of Establishment Clause liability. As described below, I conclude that Ms. Castro is unlikely to prevail on her free exercise claim even if step one of *Pickering-Garcetti* does not preclude her claim.[21]

As noted, the Second Circuit in *Knight* rejected free exercise and free speech challenges by a nurse and interpreter, employed by the state, who wished to share their religious beliefs with clients. In applying step two of *Pickering-Garcetti*, and balancing the employees' rights with the employer's interest in "effective and efficient public services," the court concluded that "the state showed permitting religious speech when working with clients was and would continue to be disruptive." *Knight*, 275 F.3d at 164. In addition, the court concluded that "the state raised valid Establishment Clause concerns in limiting the use of religious speech with clients." *Id.* at 165. Quoting its previous decision in *Marchi v. Bd. of Coop. Educ. Servs. of Albany*, 173 F.3d 469 (2d Cir. 1999), the Second Circuit observed that "[w]hen government endeavors to police itself and its employees in an effort to avoid transgressing Establishment Clause limits, it must be accorded some leeway" and concluded: "Here, both Knight and Quental promoted religious messages while working with clients on state business, raising a legitimate Establishment Clause concern. This permits the state to place a slight burden on appellants' speech: Knight and Quental may not share their religious beliefs with clients while conducting state business." *Knight*, 275 F.3d at 165-66.

In *Marchi*, a public school teacher brought free speech and free exercise challenges to a school district's directive requiring him to cease using religious references in "the delivery

---

[21] Because I reach this conclusion, I need not resolve whether Defendants have satisfied step two *Pickering* balancing by showing that the crucifix was disruptive or potentially disruptive, and whether the government's interest in avoiding this disruption outweighs Ms. Castro's interest.

of his instructional program." *Marchi*, 173 F.3d at 472. The teacher asserted that the directive was unconstitutional as applied to a letter with religious references that he sent to a student's parent. *Id.* at 475. The Second Circuit rejected the challenge, reasoning that the school district's concern that the teacher's conduct could expose it to liability for an Establishment Clause violation justified the restriction—even if the conduct did not, in fact, constitute an Establishment Clause violation. The court said:

> [W]hen government endeavors to police itself and its employees in an effort to avoid transgressing Establishment Clause limits, it must be accorded some leeway, even though the conduct it forbids might not inevitably be determined to violate the Establishment Clause and the limitations it imposes might restrict an individual's conduct that might well be protected by the Free Exercise Clause if the individual were not acting as an agent of government.
>
> . . . .
>
> The decisions governmental agencies make in determining when they are at risk of Establishment Clause violations are difficult, and, in dealing with their employees, they cannot be expected to resolve so precisely the inevitable tensions between the Establishment Clause and the Free Exercise Clause that they may forbid only employee conduct that, if occurring, would violate the Establishment Clause and must tolerate all employee conduct that, if prohibited as to non-employees, would violate the Free Exercise Clause. When government is both the initiator of some religiously related actions, through the conduct of its employees, and the regulator of the extent of such actions, through the conduct of its supervising employees, it need not determine, at the peril of legal liability, precisely where the line would be drawn if its employees were not involved. Though school boards, like all instrumentalities of government, must observe the basic free exercise rights of its employees, the scope of the employees' rights must sometimes yield to the legitimate interest of the governmental employer in avoiding litigation by those contending that an employee's desire to exercise his freedom of religion has propelled his employer into an Establishment Clause violation. In discharging its public functions, the governmental employer must be accorded some breathing space to regulate in this difficult context. For his part, the employee must accept that he does not retain the full extent of free exercise rights that he would enjoy as a private citizen.

*Marchi*, 173 F.3d at 476.

Following *Marchi* and *Knight*, the Second Circuit again stressed the need to give government actors some "leeway" when balancing free exercise and Establishment Clause concerns in *Bronx Household of Faith v. Bd. of Educ. of City of New York*, 750 F.3d 184, 199 (2d Cir. 2014). At issue in *Bronx Household* was whether the New York City Board of Education could refuse to permit the holding of religious services in school facilities that were made available to other outside users after school hours. Citing *Marchi*, the Second Circuit rejected the district court's holding that "unless the excluded practice would in fact constitute a violation of the Establishment Clause, steering clear of conduct that might be reasonably suspect under the Establishment Clause does not furnish adequate reason for declining to offer the school facilities for the conduct of religious worship services." *Id.* at 197. The Second Circuit concluded: "In our view, the better rule allows the Board, if it makes a reasonable, good faith judgment that it runs a substantial risk of incurring a violation of the Establishment Clause by hosting and subsidizing the conduct of religious worship services, to decline to do so." *Id.* at 198; *see also Silver v. Cheektowaga Cent. Sch. Dist.*, 670 F. App'x 21, 22 (2d Cir. 2016) (affirming district court's dismissal of free speech claim brought by teacher directed to remove religiously-themed postings in classroom and stating that "when government endeavors to police itself and its employees in an effort to avoid transgressing Establishment Clause limits, it must be accorded some leeway" and school restrictions "fell within the scope of the 'leeway' referenced in *Marchi*"); *Skoros v. City of New York*, 437 F.3d 1, 34-35 (2d Cir. 2006) (stating that "we afford the government some leeway in policing itself to avoid Establishment Clause issues, even if it thereby imposes limits that go beyond those required by the Constitution").

District courts in this Circuit have applied this "leeway" concept in cases where school districts have tried to balance employee rights with concerns about Establishment Clause violations. *See, e.g.*, *Downing v. W. Haven Bd. of Ed.*, 162 F. Supp. 2d 19, 28 (D. Conn. 2001) (holding in case involving a teacher wearing a shirt containing a religious message that "even if Downing's shirt would not have violated the Establishment Clause, the defendants' proscriptive conduct may still pass constitutional muster" and "whatever First Amendment rights were implicated by Downing wearing her tee shirt must give way to the defendants' legitimate concerns about a potential Establishment Clause violation in a public school").

At oral argument, counsel for Ms. Castro was unable to point to any Second Circuit cases that overruled or narrowed the Second Circuit's holdings in *Marchi* and *Knight* that state officials must be given some "leeway" and "breathing space" when balancing free exercise rights of employees with a government entity's potential liability for an Establishment Clause violation. However, counsel asserted that the "leeway" aspect of these cases was "not good law" after *Kennedy*, because "*Kennedy* said the tie does not go to the runner when there's only a phantom constitutional violation." Tr. 36.

In *Kennedy*, the Supreme Court concluded that that there was only a "mere shadow" of an Establishment Clause violation as "Mr. Kennedy's private religious exercise did not come close to crossing any line one might imagine separating protected private expression from impermissible government coercion." 597 U.S. at 537. Under these circumstances, the Court held that "in no world may a government entity's concerns about phantom constitutional violations justify actual violations of an individual's First Amendment rights." *Id.* at 543. I do not read *Kennedy* as overruling the Second Circuit's decisions in *Marchi*, *Knight*, and *Bronx Household*. These Second Circuit cases remain binding on me. I thus agree with Defendants

that Second Circuit case law provides that the District has some "leeway" and "breathing space" as it undertakes the difficult task of balancing the Establishment and Free Exercise Clauses.

### ii.    Establishment Clause Concerns

Ms. Castro argues that Defendants improperly relied on the "endorsement" test of *Lemon v. Kurtzman*, 403 U. S. 602 (1971),[22] which *Kennedy* made clear had been abandoned. Ms. Castro says that like the District in *Kennedy*, the District here may not rely on a mistaken view of the Establishment Clause as justification for burdening Ms. Castro's religious practices. Pl.'s Mem. 36-38; Pl.'s Reply 7-8. Defendants argue that allowing the crucifix to remain on the classroom wall would constitute a violation of the Establishment Clause or, at the very least, expose the District to a risk of liability for such a violation. Defs.' Mem. 28-42. Based on the existing record, I conclude that Ms. Castro is unlikely to show that Defendants did anything other than make "a reasonable, good faith judgment" that permitting Ms. Castro to hang the crucifix on the classroom wall during instructional time "runs a substantial risk of incurring a violation of the Establishment Clause." *Bronx Household*, 750 F.3d at 198. I agree with Defendants, therefore, that a preliminary injunction should not issue.

---

[22] Under *Lemon*, courts assessed Establishment Clause claims by examining a law's purposes, effects, and potential for entanglement with religion. *Lemon*, 403 U.S. at 612-13. "In time, the approach also came to involve estimations about whether a 'reasonable observer' would consider the government's challenged action an 'endorsement' of religion." *Kennedy*, 597 U.S. at 534 (quoting *Cnty. of Allegheny v. Am. C.L. Union Greater Pittsburgh Chapter*, 492 U.S. 573, 594 (1989)).

The Supreme Court has addressed issues relating to religious expression in public schools multiple times over the past six decades. In *Engel v. Vitale*, 370 U.S. 421 (1962), the Supreme Court held that a New York law requiring students in public schools to pray aloud with their teachers each morning violated the Establishment Clause—even though the children could choose to remain silent or leave the room. The Court observed that "[w]hen the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain." *Id.* at 431; *see also Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 205-06, 224-25 (1963) (holding unconstitutional the recitation of Bible verses by high school students each morning, which was broadcast over the school's intercom system).

In *Stone v. Graham*, 449 U.S. 39 (1980), the Court struck down a Kentucky statute that mandated that public school classrooms display posters of the Ten Commandments. The Court observed that "[p]osting of religious texts on the wall serves no such educational function" and this was "not a case in which the Ten Commandments are integrated into the school curriculum, where the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like." *Id.* at 42. Instead, the Court reasoned, "[i]f the posted copies of the Ten Commandments are to have any effect at all, it will be to induce the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments." *Id.* The Court concluded it was insignificant "that the Bible verses involved in this case are merely posted on the wall, rather than read aloud . . . for 'it is no defense to urge that the religious practices here may be relatively minor encroachments on the First Amendment.'" *Id.*

In a series of cases that followed, the Court held unconstitutional various religious practices in public schools. *See Wallace v. Jaffree*, 472 U.S. 38, 48-49 (1985) (holding that an Alabama statute authorizing a daily period of silence in public schools for prayer violated the Establishment Clause); *Lee v. Weisman*, 505 U.S. 577, 599 (1992) (holding unconstitutional a school district's practice of including clergy-led prayers during an official public school graduation ceremony); *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 309-10 (2000) (holding unconstitutional a public school's practice of allowing students to lead pre-football-game prayers broadcast over the school's intercom system, stating: "School sponsorship of a religious message is impermissible because it sends the ancillary message to members of the audience who are nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community") (internal quotation marks omitted).

Supreme Court cases have noted several particular concerns about religious practices in public elementary and secondary schools. First, children are compelled by law to be at school and thus "captive audiences." *See Schempp*, 374 U.S. at 223 (noting that students were "required by law to attend school" and were "held in the school buildings under the supervision and with the participation of teachers employed in those schools"); *Lee*, 505 U.S. at 598 (stating that "the State . . . in every practical sense compelled attendance and participation in an explicit religious exercise at an event of singular importance to every student" and left no real possibility for objecting students to opt out); *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987) (noting that the "State exerts great authority and coercive power through mandatory attendance requirements"); *Santa Fe*, 530 U.S. at 311 (noting attendance at football games

where students led prayers over school broadcast system was required for "cheerleaders, members of the band, and, of course, the team members themselves").

Second, school-age children are particularly susceptible to subtle pressure to conform their beliefs to those of their teachers or peers. *See Lee*, 505 U.S. at 592 ("[T]here are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools . . . . What to most believers may seem nothing more than a reasonable request that the nonbeliever respect their religious practices, in a school context may appear to the nonbeliever or dissenter to be an attempt to employ the machinery of the State to enforce a religious orthodoxy."); *see also id.* at 593 (observing that "pressure, though subtle and indirect, can be as real as any overt compulsion"); *Edwards*, 482 U.S. at 584 ("Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family. . . . The State exerts great authority and coercive power through mandatory attendance requirements, and because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure."); *Santa Fe*, 530 U.S. at 312 (noting that "adolescents are often susceptible to pressure from their peers towards conformity, and that the influence is strongest in matters of social convention") (internal quotation marks omitted); *cf. Mahmoud v. Taylor*, 145 S. Ct. 2332, 2355 (2025) (stating that young children are "often impressionable and implicitly trus[t] their teachers") (internal quotation marks omitted).[23]

---

[23] *Mahmoud* relies on *Lee* and *Edwards*. *See Mahmoud*, 145 S. Ct. at 2355 ("'The State exerts great authority and coercive power through' public schools 'because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure.'") (quoting *Edwards*,

In *Kennedy*, the Supreme Court stated that it had "long ago abandoned *Lemon* and its endorsement test offshoot" and "[i]n place of *Lemon* and the endorsement test, this Court has instructed that the Establishment Clause must be interpreted by reference to historical practices and understandings." *Kennedy*, 597 U.S. at 534-35 (internal quotation marks omitted). The Court observed that it had "long held that government may not, consistent with a historically sensitive understanding of the Establishment Clause, make a religious observance compulsory," "coerce anyone to attend church," nor "force citizens to engage in a formal religious exercise." *Id.* at 537 (citations and internal quotation marks omitted). "No doubt, too, coercion along these lines was among the foremost hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." *Id.* However, the Court concluded that "Mr. Kennedy's private religious exercise did not come close to crossing any line one might imagine separating protected private expression from impermissible government coercion." *Id.* The Court observed that the coach did not "direct any prayers to students or require anyone else to participate" and his "plan was to wait to pray until athletes were occupied." *Id.* at 538. The Court reasoned that accepting the school district's view would mean "[n]ot only could schools fire teachers for praying quietly over their lunch, for wearing a yarmulke to school, or for offering a midday prayer during a break before practice" but a "school would be *required* to do so." *Id.* at 540. Such a rule, in the Court's view, "would defy this Court's traditional understanding that permitting private speech is not the same thing as

---

482 U.S. at 584); *see also id.* ("'[T]here are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools.'") (quoting *Lee*, 505 U.S. at 592).

coercing others to participate in it." *Id.* 540-41. The Court in *Kennedy* distinguished prior

cases, reasoning:

> [T]his case looks very different from those in which this Court has found prayer involving public school students to be problematically coercive. In *Lee*, this Court held that school officials violated the Establishment Clause by "including [a] clerical membe[r]" who publicly recited prayers "as part of [an] official school graduation ceremony" because the school had "in every practical sense compelled attendance and participation in" a "religious exercise." In *Santa Fe Independent School Dist. v. Doe*, the Court held that a school district violated the Establishment Clause by broadcasting a prayer "over the public address system" before each football game. The Court observed that, while students generally were not required to attend games, attendance *was* required for "cheerleaders, members of the band, and, of course, the team members themselves." None of that is true here. The prayers for which Mr. Kennedy was disciplined were not publicly broadcast or recited to a captive audience. Students were not required or expected to participate. And, in fact, none of Mr. Kennedy's students did participate in any of the three October 2015 prayers that resulted in Mr. Kennedy's discipline.

*Id.* at 541-42 (citations omitted).

Following *Kennedy*, several lower courts have concluded that *Stone v. Graham*, 449

U.S. 39 (1980), remains binding law and have held that statutes mandating the display of the

Ten Commandments in public school classrooms likely violate the Establishment Clause.

After a panel of the Fifth Circuit affirmed the district court decision preliminarily enjoining

the enforcement of a Texas statute, the Fifth Circuit vacated the decision and is considering

the issue *en banc*. *Roake v. Brumley,* 141 F.4th 614 (5th Cir.)*, reh'g en banc granted, opinion

vacated*, 154 F.4th 329 (5th Cir. 2025).[24]

---

[24] The Fifth Circuit is also considering *en banc* an appeal from *Nathan v. Alamo Heights Indep.*, No. SA-25-CV-00756-FB, 2025 WL 2417589, at *24 (W.D. Tex. Aug. 20, 2025), which held the Texas statute unconstitutional. *See Nathan v. Alamo Heights Indep. Sch. Dist.*, No. 25-50695, 2025 WL 3018244 (5th Cir. Oct. 28, 2025), *hearing en banc ordered sub nom.*

In *Stinson v. Fayetteville Sch. Dist. No. 1*, No. 5:25-CV-5127, 2025 WL 2231053, at *11 (W.D. Ark. Aug. 4, 2025), *appeal filed*, Case No. 25-2713 (8th Cir. Aug. 22, 2025), the district court held that an Arkansas statute requiring the display of the Ten Commandments in public school classrooms likely violated the Establishment Clause.

*Stinson* reasoned that although *Kennedy* declared the *Lemon* test abandoned, "there is no cause to believe that all Supreme Court precedent that relied on the *Lemon* test has been—or will be—overruled." *Stinson*, 2025 WL 2231053, at *7. *Stinson* observed that "*Kennedy* cited two public-school Establishment Clause cases, *Lee v. Weisman* and *Santa Fe Independent School District v. Doe*—both of which applied the *Lemon* test—and treated them as still-binding precedent." *Id. Stinson* continued: "In fact, Justice Gorsuch made a point of distinguishing *Lee* and *Santa Fe* from the 'very different' facts in *Kennedy*, *Lee* and *Santa Fe* involved 'problematically coercive' religious practices that had been imposed upon students and 'compelled [their] attendance and participation.'" *Id.* (citations omitted).

*Stinson* also concluded that regardless of whether *Stone* controlled, the display of the Ten Commandments would still violate the Establishment Clause under *Kennedy*'s historical practices and understanding test given the display is impermissibly coercive. In reaching this conclusion, *Stinson* observed that students were required to be present in the classroom where the religious message was displayed. *See id.*, at *11, *14 ("[T]he Ten Commandments are not passive because students in public schools are forced to engage with them and cannot look away . . . . Once students are at school, staff control their movements and often their expression. Students may not move around freely to avoid official religious indoctrination or to contest it beyond certain limits. This is especially true in the classroom context.").

In concluding that the display of the Ten Commandments is impermissibly coercive, *Stinson* also referenced the impressionability of youth and their susceptibility to influence in the school setting. *See Stinson*, 2025 WL 2231053, at *14 ("Coercion is rife in such an environment 'because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure.'") (quoting *Edwards*, 482 U.S. at 584).

Ms. Castro argues that Defendants—like the school officials in *Kennedy*—explicitly relied on the now-abandoned endorsement test from *Lemon* when they insisted that she remove the crucifix from the classroom wall. Ms. Castro is correct Defendants stated in their communications with her that school could not be seen as "endorsing" particular religious beliefs. *See, e.g.*, ECF No. 38-6, at 3 ("So, by hanging this on the classroom wall, you are, in effect, saying that 'the New Britain Board of Education endorses this religion.'"). However, in the same letter from Ms. Manning, the District also articulated the more general principle that "[b]ecause public schools are run by the government, this means that public schools are not allowed, legally, to take any actions that would be seen as establishing or promoting a religion." *Id.* at 2.[25]

The letter from Ms. Manning also more specifically justified the District's actions with reasons that it continues to rely upon including that "[t]he Board of Education owns and

---

[25] The 2023 U.S. Department of Education's *Guidance on Constitutionally Protected Prayer and Religious Expression in Public Elementary and Secondary Schools*, issued post-*Kennedy* and relied upon by Castro in this case, *see* ECF No. 38-11, states: "Although a government may not promote or favor religion or coerce the consciences of students, schools also may not discriminate against private religious expression by students, teachers, or other employees. Schools must also maintain neutrality among faiths rather than preferring one or more religions over others." *Id.* at 4-5; *see also id.* at 7 ("When teachers, coaches, and other public school officials speak in their official capacities, they may not engage in prayer or promote religious views.").

controls the classroom walls." *Id.* at 3. The letter noted that Ms. Castro "told the administration that this cross is not tied to a specific curricular unit" and thus there was "no pedagogical justification for hanging this cross." *Id.* After observing that Ms. Castro told "the administration that [she was] hanging this cross permanently," the letter stated (in language that echoes *Stone*): "When a public school employee hangs a religious artifact in their classroom, it sends the message that the school district (which is an arm of the government) is promoting that religion, so putting that religious artifact on the wall of the school building is not legally permissible." *Id.*

I have already concluded that Ms. Castro is unlikely to prevail on her argument that the crucifix display was speech as a private citizen rather than pursuant to her official duties as an employee. To the extent that a holding at step one of the *Pickering-Garcetti* framework that the crucifix display is expression pursuant to official duties does not preclude Ms. Castro from reaching step two of the framework on her free exercise claim, I conclude that Ms. Castro is unlikely to prevail at step two. As noted, under binding Second Circuit cases, the District must be afforded some leeway in balancing the free exercise rights of its employees and the risk of an Establishment Clause violation. *See Marchi*, 173 F.3d at 476; *Knight*, 275 F.3d at 165-66; *Bronx Household of Faith*, 750 F.3d at 199. Unlike the coach's prayer in *Kennedy*, the crucifix display is a religious message on the classroom wall broadcast to a "captive audience" of students required to be in the classroom. *See Kennedy*, 597 U.S. at 534 ("The prayers for which Mr. Kennedy was disciplined were not publicly broadcast or recited to a captive audience."). In light of the Supreme Court's cases relating to religious displays and exercises in public schools, *see, e.g.*, *Lee*, 505 U.S. at 592; *Stone*, 449 U.S. at 42; *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 309-10, I conclude based on the factual record currently before me that Ms. Castro is

unlikely to prevail in showing it was unreasonable for the District to conclude that it risked liability for an Establishment Clause violation had it permitted Ms. Castro to hang the crucifix on the classroom wall during instructional time.[26]

Therefore, for purposes of the motion for a preliminary injunction, I conclude that Ms. Castro is not likely to prevail on her Free Exercise Clause claim.

## B.    State Law Claims

Ms. Castro also brings a state law claim under Connecticut's Act Concerning Religious Freedom ("Act"), Conn. Gen. Stat. § 52-571b. Ms. Castro asserts that she has shown her rights were burdened within the meaning of the Act and Defendants cannot satisfy strict scrutiny as required by the Act. Pl.'s Mem. 27-28. Defendants argue that the Act requires a plaintiff to show a "substantial burden" on religious practices. According to Defendants, Ms. Castro fails to meet this burden and they, in any event, satisfy the strict scrutiny standard. Defs.' Mem. 42-44.

---

[26] The reasonableness of the judgment is reinforced by the holdings of lower courts in multiple cases relating to religious images and messages on public school classroom walls. *See, e.g.*, *Washegesic v. Bloomingdale Pub. Sch.*, 33 F.3d 679, 683-84 (6th Cir. 1994) (affirming district court's order requiring school to remove a portrait of Jesus from the public school hallway stating "[a]s in *Stone*, the portrait of Jesus is not integrated into any course of study," "like *Lee*, the school controls the picture," and the portrait could be viewed as a "as a governmental statement favoring one religious group and downplaying others"); *Joki v. Bd. of Educ. of the Schuylerville Cent. Sch. Dist.*, 745 F. Supp. 823, 825 (N.D.N.Y. 1990) (concluding that a painting in a public high school auditorium depicting the Crucifixion of Jesus Christ violated the Establishment Clause and needed to be removed); *Ahlquist v. City of Cranston ex rel. Strom*, 840 F. Supp. 2d 507, 511, 525-26 (D.R.I. 2012) (concluding that *Stone* controlled and the prayer mural that referenced "our heavenly father" on the wall of a public high school auditorium violated the Establishment Clause); *Helland v. S. Bend Cmty. Sch. Corp.*, 93 F.3d 327, 331 (7th Cir. 1996) ("A school can direct a teacher to 'refrain from expressions of religious viewpoints in the classroom and like settings.'") (quoting *Bishop v. Aronov*, 926 F.2d 1066, 1077 (11th Cir. 1991)). Although these cases rely on *Lemon*'s endorsement test, the cases also rest on the general principle that public schools must not promote a particular religion.

The Act provides that the "state or any political subdivision of the state shall not burden a person's exercise of religion under section 3 of article first of the Constitution of the state even if the burden results from a rule of general applicability." Conn. Gen. Stat. § 52-571b(a). To justify the burden, the state must demonstrate "that application of the burden to the person (1) is in furtherance of a compelling governmental interest, and (2) is the least restrictive means of furthering that compelling governmental interest." *Id.* § 52-571b(b); *see also Gawlik v. Semple*, 197 Conn. App. 83, 123-24 (2020) (discussing statute).

Connecticut courts do not appear to have addressed cases where government employers assert that Establishment Clause concerns justify burdening employee free exercise rights under the Act. Thus, it is unclear whether Connecticut courts would provide the leeway that the Second Circuit requires in balancing Establishment Clause concerns with free speech rights under the Free Exercise Clause. It is also not clear if Connecticut courts would conclude that employees' free exercise rights are burdened within the meaning of the Act when their expression amounts to government speech under step one of the *Pickering-Garcetti* framework. In addition, as noted, the parties dispute whether a plaintiff must show her free exercise rights were not just "burdened" but "substantially burdened." *See* Defs.' Mem. 42-43; Pl.'s Mem. 27; Pl.'s Reply 12.

A district court may decline to exercise supplemental jurisdiction over a state law claim if, *inter alia*, "the claim raises a novel or complex issue of State law" or "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367. Because Castro is not likely to succeed on the merits of any federal claim, and her state law claim raises novel issues of Connecticut law, I am likely to decline supplemental jurisdiction of the claim under the Act. Given these circumstances, Ms. Castro's state law claim will not serve as the basis for

a preliminary injunction at this time. *See, e.g.*, *RHC Operating LLC v. City of New York*, No. 21-CV-9322 (JPO), 2022 WL 951168, at *15 (S.D.N.Y. Mar. 30, 2022) ("Because Plaintiff is not likely to succeed on the merits of any federal claim, it is not likely that the Court will retain supplemental jurisdiction over the remaining state law claims. In the 'early stages of litigation,' 'judicial economy, convenience, fairness, and comity' are likely to counsel in favor of dismissing those claims without prejudice to refiling in state court. Accordingly, Plaintiff's state-law claims cannot serve as a basis to issue a preliminary injunction at this time.") (citations omitted); *Bimber's Delwood, Inc. v. James*, 496 F. Supp. 3d 760, 788 (W.D.N.Y. 2020) ("Plaintiffs' state-law claims require interpretation of state law alone, and are thus more appropriately determined in state court in the interests of comity and efficiency, particularly because they involve important state constitutional questions. Accordingly, this Court would decline to exercise supplemental jurisdiction over Plaintiffs' state law claims, and, in the absence of a likelihood of success on any federal claims, declines to entertain the state-law claims in the context of Plaintiffs' request for [preliminary] injunctive relief."); *Quental v. Conn. Comm'n on Deaf & Hearing Impaired*, 122 F. Supp. 2d 133, 143 (D. Conn. 2000) (declining to exercise supplemental jurisdiction over claim under Conn. Gen. Stat. § 52-571b where judgment entered against plaintiff on federal constitutional claims), *aff'd sub nom. Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156 (2d Cir. 2001).

## IV.    <u>CONCLUSION</u>

For the reasons stated above, Ms. Castro's motion for a preliminary injunction, ECF

No. 38, is **DENIED**.

**SO ORDERED.**

New Haven, Connecticut
November 3, 2025

/s/*Sarah F. Russell*
SARAH F. RUSSELL
United States District Judge

# Appendix 1



# Appendix 2

